[ORAL ARGUMENT NOT YET SCHEDULED]

**No. 23-5083**

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

STATE OF GEORGIA and BRAD RAFFENSPERGER, Georgia Secretary of State, in his official capacity,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Defendant-Appellant.

_____

On Appeal from the United States District Court
for the District of Columbia

_____

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## UNITED STATES DEPARTMENT OF JUSTICE

_____

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel certifies as follows:

## A.    Parties and Amici

Plaintiffs-appellees are the State of Georgia and Brad Raffensperger, Georgia Secretary of State, in his official capacity.

Defendant-appellant is the United States Department of Justice.

No intervenors or amici participated in the case in district court.

## B.    Rulings Under Review

Defendant seeks review of the district court's order and memorandum opinion granting plaintiffs' motion for summary judgment and directing the disclosure of certain materials withheld under FOIA Exemption 5. *See Georgia v. U.S. Dep't of Justice*, No. 1:21-cv-3138 (D.D.C. Feb. 20, 2023) (McFadden, J.) (Dkt Nos. 22, 23), reproduced at J.A. 160-192.

## C.    Related Cases

This case has not previously been before this Court or any other court. The parties are currently engaged in related litigation in the Northern District of Georgia, which plaintiffs' FOIA request directly concerns. *See United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga.) (complaint filed June 25, 2021), *as consolidated*, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga.).

/s/ *Jeffrey E. Sandberg*
Jeffrey E. Sandberg

# TABLE OF CONTENTS

**Page**

GLOSSARY

INTRODUCTION ......................................................................... 1

STATEMENT OF JURISDICTION .............................................. 4

STATEMENT OF THE ISSUES ................................................... 4

PERTINENT STATUTES AND REGULATIONS ....................... 4

STATEMENT OF THE CASE ...................................................... 5

    A.    Statutory Background ....................................................... 5

    B.    Proceedings In Georgia (SB 202 Litigation) .................... 7

    C.    Proceedings In District of Columbia (FOIA Suit) .......... 11

SUMMARY OF ARGUMENT ..................................................... 17

STANDARD OF REVIEW .......................................................... 19

ARGUMENT ............................................................................... 20

I.    THE DEPARTMENT OF JUSTICE DID NOT WAIVE WORK-
PRODUCT PRIVILEGE WITH RESPECT TO THE
WITHHELD CO-COUNSEL COMMUNICATIONS. .................... 20

    A.    The Attorney Work-Product Privilege Is Waived Only By
Disclosure To An Adversary, Not To Allied Litigants. .............. 20

    B.    Work Product Privilege Attaches To All Of The Withheld
Co-Counsel Communications. ..................................................... 25

    C.    The District Court Applied The Wrong Standard For
Waiver Of Work-Product Privilege, Then Erred In The
Standard It Did Apply. ................................................................. 27

II.    THE CONFIDENTIAL CO-COUNSEL COMMUNICATIONS
ARE "INTRA-AGENCY MEMORANDUMS" UNDER FOIA. ....... 32

    A.    Communications Pursuant To A Common-Interest
Agreement Are "Intra-Agency Memorandums" Not Subject
To Compelled Disclosure Under FOIA ...................................... 32

1.    Intra-agency records subject to withholding under
      Exemption 5 are not limited to communications
      among agency employees. ................................................ 32

2.    Exemption 5 protects privileged work product shared
      in a common-interest arrangement. ................................... 38

B.    The District Court's Contrary Interpretation Is Not
      Textually Compelled, Misunderstands This Court's
      Precedent, And Disregards Congress's Manifest Intentions. ....... 49

CONCLUSION .......................................................................................... 59

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES[*]

**Cases:**                                                              **Page(s)**

*Akin, Gump, Strauss, Hauer & Feld, LLP v. U.S. Dep't of Justice,*
    503 F. Supp. 2d 373 (D.D.C. 2007)  ........................................................  41

*American Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce,*
    907 F.2d 203 (D.C. Cir. 1990)  ..................................................  37

*American Mgmt. Servs., LLC v. Department of the Army,*
    703 F.3d 724 (4th Cir. 2013)  .............................................  29, 30, 40, 45, 52

*American Small Bus. League v. Department of Def.,*
    372 F. Supp. 3d 1018 (N.D. Cal. 2019)  ........................................  40, 45-46

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991)  .........................................................  45

*Aviation Consumer Action Project v. Washburn,*
    535 F.2d 101 (D.C. Cir. 1976)  .................................................  36

*Byers Theaters v. Murphy,*
    1 F.R.D. 286 (W.D. Va. 1940)  ...............................................  24

*Campaign Legal Ctr. v. U.S. Dep't of Justice,*
    34 F.4th 14 (D.C. Cir. 2022)  ...............................................  37

*Chicago Tribune Co. v. U.S. Dep't of Health & Human Servs.,* No. 95-cv-3917,
    1997 WL 1137641 (N.D. Ill. Mar. 28, 1997)  ...............................  41

*Citizens Progressive All. v. U.S. Bureau of Indian Affairs,*
    241 F. Supp. 2d 1342 (D.N.M. 2002)  .......................................  41

*Coastal States Gas Corp. v. Department of Energy,*
    617 F.2d 854 (D.C. Cir. 1980) .................................................  21

*Connecticut Mut. Life Ins. Co. v. Shields,*
    16 F.R.D. 5 (S.D.N.Y. 1954) ...............................................  24, 44

\**Department of Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001)  .......................................  6, 34, 39, 40, 52, 53

---

[*] Authorities chiefly relied upon are marked with asterisks.

*Doe, In re*,
    662 F.2d 1073 (4th Cir. 1981) .................................................................. 25

*Durham v. U.S. Dep't of Justice*,
    829 F. Supp. 428 (D.D.C. 1993) ............................................................. 41

*Food Mktg. Inst. v. Argus Leader Media*,
    139 S. Ct. 2356 (2019) ...................................................................... 33, 42

*Forest Grove Sch. Dist. v. T.A.*,
    557 U.S. 230 (2009) ............................................................................. 48

*Formaldehyde Inst. v. Department of Health & Human Servs.*,
    889 F.2d 1118 (D.C. Cir. 1989) ........................................................ 35, 36

*Fox News Network, LLC v. U.S. Dep't of the Treasury*,
    739 F. Supp. 2d 515 (S.D.N.Y. 2010) .................................................... 41

*FTC v. Grolier Inc.*,
    462 U.S. 19 (1983) ............................................................................ 20, 43

*Hanson v. U.S. Agency for Int'l Dev.*,
    372 F.3d 286 (4th Cir. 2004) ............................................................ 46, 56

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ................................................................ 21, 26, 44

*Hunton & Williams v. U.S. Dep't of Justice*,
    590 F.3d 272 (4th Cir. 2010) ............. 3, 15, 38, 39, 40, 45, 46, 52, 55, 56, 58

*Jobe v. National Transp. Safety Bd.*,
    1 F.4th 396 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 757 (2022) .................. 36

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) ............................................................................. 42

*Jordan v. U.S. Dep't of Justice*,
    591 F.2d 753 (D.C. Cir. 1978) ............................................................... 20

*Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*,
    3 F.4th 390 (D.C. Cir. 2021) ................................................................. 33

*Judicial Watch, Inc. v. Department of Energy*,
    412 F.3d 125 (D.C. Cir. 2005) ....................................................... 6, 35, 36

*Judicial Watch, Inc. v. Department of Justice*,
    432 F.3d 366 (D.C. Cir. 2005) ............................................................. 4, 19

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018) ...................................................................... 49

*Leader v. U.S. Dep't of Justice,* No. 11-cv-540,
    2012 WL 13027964 (D. Ariz. Aug. 9, 2012) ...................................... 40, 45

*Leonia Amusement Corp. v. Loew's, Inc.*,
    13 F.R.D. 438 (S.D.N.Y. 1952) ............................................................. 24

*Lindsey, In re*,
    158 F.3d 1263 (D.C. Cir. 1998) .............................................................. 23

*Lorillard v. Pons*,
    434 U. S. 575 (1978) ........................................................................... 48

*Lucaj v. Federal Bureau of Investigation*,
    852 F.3d 541 (6th Cir. 2017) ............................................................ 41, 48

*Madley v. U.S. Parole Comm'n*,
    278 F.3d 1306 (D.C. Cir. 2002) .............................................................. 49

*McKinley v. Board of Governors of Fed. Reserve Sys.*,
    647 F.3d 331 (D.C. Cir. 2011) ...........................................................35-36

*McMillan v. Escambia County*,
    748 F.2d 1037 (Former 5th Cir. 1984) .................................................... 32

*National Ass'n of Criminal Def. Lawyers* (*NACDL*) *v. U.S. Dep't of Justice Exec. Office for U.S. Attys.*,
    844 F.3d 246 (D.C. Cir. 2016) ................................................. 3, 20, 21, 43

**National Inst. of Military Justice* (*NIMJ*) *v. U.S. Dep't of Def.*,
    512 F.3d 677 (D.C. Cir. 2008) ............................................ 6, 35, 36, 38, 51

*National Sec. Archive v. Central Intelligence Agency*,
    752 F.3d 460 (D.C. Cir. 2014) ............................................................... 37

*Nishnic v. U.S. Dep't of Justice*,
    671 F. Supp. 771 (D.D.C.), *aff'd*, 828 F.2d 844 (D.C. Cir. 1987) .............. 41

**NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ......................................................... 5, 20, 42, 43, 53

- v -

*Old Orchard Citizens Grp., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
 636 F. Supp. 542 (N.D. Ohio 1986) ............................................................ 41

*Owens v. Republic of Sudan*,
 864 F.3d 751 (D.C. Cir. 2017), *vacated and remanded on other grounds
 sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ......................... 49

*Pacific Pictures Corp., In re*,
 679 F.3d 1121 (9th Cir. 2012) .................................................................... 29

*Patino-Restrepo v. Department of Justice*,
 246 F. Supp. 3d 233 (D.D.C. 2017), *aff'd*,
 2019 WL 1250497 (D.C. Cir. Mar. 14, 2019) .......................................... 37

*Property of the People, Inc. v. Office of Mgmt. & Budget*,
 394 F. Supp. 3d 39 (D.D.C. 2019) ............................................................ 37

*Public Citizen, Inc. v. Department of Justice*,
 111 F.3d 168 (D.C. Cir. 1997) .................................................................. 35

*Quarles v. Department of Navy*,
 893 F.2d 390 (D.C. Cir. 1990) .................................................................. 37

*Reporters Comm. for Freedom of the Press v. FBI*,
 3 F.4th 350 (D.C. Cir. 2021) .............................................................. 47, 54

*Rojas v. FAA*,
 989 F.3d 666 (9th Cir. 2021), *cert. denied*,
 142 S. Ct. 753 (2022) ............................................................. 36, 42, 46, 55

*Ryan v. Department of Justice*,
 617 F.2d 781 (D.C. Cir. 1980) .................................................................. 36

*Schaeffler v. United States*,
 806 F.3d 34 (2d Cir. 2015) ....................................................................... 29

*Sealed Case, In re*,
 146 F.3d 881 (D.C. Cir. 1998) .................................................................. 43

*Sealed Case, In re*,
 856 F.2d 268 (D.C. Cir. 1988) .................................................................. 43

*Smith v. Bentley*,
 9 F.R.D. 489 (S.D.N.Y. 1949) .................................................................. 24

*Southwest Airlines Co. v. Saxon*,
   142 S. Ct. 1783 (2022) .............................................................. 33

*Texas v. Interstate Commerce Comm'n*,
   889 F.2d 59 (5th Cir. 1989) (per curiam)................................. 36

*Torres v. Lynch*,
   578 U.S. 452 (2016) ................................................................. 34

*Transmirra Prods. Corp. v. Monsanto Chem. Co.*,
   26 F.R.D. 572 (S.D.N.Y. 1960) ....................................... 24, 44

*U.S. Dep't of Justice v. Julian*,
   486 U.S. 1 (1988).......................................................... 6, 34, 36

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   141 S. Ct. 777 (2021) ............................................................ 5, 37

*United States v. AT&T Co.*,
   642 F.2d 1285 (D.C. Cir. 1980) .............. 2, 22, 23, 25, 27, 29, 43, 51, 54-55

*United States v. Deloitte LLP*,
   610 F.3d 129 (D.C. Cir. 2010) ...................... 2, 6, 18, 21, 22, 23, 26, 27, 29

*United States v. Marengo Cty. Comm'n*,
   731 F.2d 1546 (11th Cir. 1984) .............................................. 32

*United States v. Sanmina Corp.*,
   968 F.3d 1107 (9th Cir. 2020) ................................................ 23

*United States v. Texas*,
   507 U.S. 529 (1993) ................................................................ 45

*United States v. Weber Aircraft Corp.*,
   465 U.S. 792 (1984) ...................................................... 52, 42, 54

*United Steelworkers of Am. v. Marshall*,
   647 F.2d 1189 (D.C. Cir. 1980) ............................................. 34

*United Techs. Corp. v. NLRB*,
   632 F. Supp. 776 (D. Conn.), *aff'd*, 777 F.2d 90 (2d Cir. 1985) ............ 40-41

*Vilastor-Kent Theatre Corp. v. Brandt*,
   19 F.R.D. 522 (S.D.N.Y. 1956) ....................................... 24, 44

*Waterman v. IRS*,
  61 F.4th 152 (D.C. Cir. 2023) ................................................. 37

*Waymo LLC v. Uber Techs., Inc.*,
  870 F.3d 1350 (Fed. Cir. 2017) ............................................... 29

*Welby v. U.S. Dep't of Health & Human Servs.*, No. 15-cv-195,
  2016 WL 1718263 (S.D.N.Y. Apr. 27, 2016) ........................... 40

*Williams & Connolly v. SEC*,
  662 F.3d 1240 (D.C. Cir. 2011) ............................................... 37

**Statutes:**

Freedom of Information Act (FOIA):
  5 U.S.C. § 552(a)(3) ...................................................... 5
  5 U.S.C. § 552(a)(4)(B) ............................................. 4, 11
  5 U.S.C. § 552(b)(1)-(9) ................................................ 5
  *5 U.S.C. § 552(b)(5) ................................... 2, 3, 4, 5, 37
  5 U.S.C. § 552(f)(1) ..................................................... 33

*FOIA Improvement Act of 2016,
  Pub. L. No. 114-185, 130 Stat. 538 ...................................... 46
    § 2, 130 Stat. at 539 ................................................. 47
    § 2(2), 130 Stat. at 540 ............................................. 47

5 U.S.C. § 2101 *et seq.* ................................................ 33

28 U.S.C. § 516 .......................................................... 55

28 U.S.C. § 517 .......................................................... 55

28 U.S.C. § 1291 ......................................................... 4

28 U.S.C. § 1292(a) ...................................................... 4

28 U.S.C. § 1331 ......................................................... 4

52 U.S.C. § 10301 ........................................................ 7

52 U.S.C. § 10308(d) .................................................. 7, 31

Election Integrity Act of 2021, 2021 Ga. Laws Act 9 (SB 202) ............ 7

**Rules:**

Fed. R. App. P. 4(a)(1)(B) .......................................................... 4

Fed. R. Civ. P. 26(b)(3)(B) ........................................... 21, 22, 26

**Legislative Materials:**

H.R. 653, 114th Cong. (2015) ...................................................... 47

S. 337, 114th Cong. (2015) ......................................................... 47

S. Rep. No. 89-813 (1965)............................................... 20, 42, 43

S. Rep. No. 114-4 (2015) ................................................ 47, 48, 54

**Other Authorities:**

*Developments in the Law—Discovery*,
  74 Harv. L. Rev. 940 (1961) ................................................... 24

Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*
  (5th ed. 2007)......................................................................... 23

Fed. Judicial Ctr., *Manual for Complex Litigation, Fourth* (2004)...................9, 57

*Intra*:
  American College Dictionary (1966) ...................................... 33
  Ballentine's Law Dictionary (3d ed. 1969) ............................. 33
  Black's Law Dictionary (4th ed. 1951) ................................... 33
  Webster's Third New International Dictionary (1966) .............. 33

*Moore's Federal Practice–Civil* (2023):
  § 26.47[5] ............................................................................... 28
  § 26.70[6] ............................................................................... 23

*Restatement* (*Third*) *of The Law Governing Lawyers* (2000):
  § 76 .................................................................................. 25, 28
  § 79 ....................................................................................... 25
  § 91 ........................................................................ 24, 25, 27, 29

Rice et al., *Attorney-Client Privilege in the United States* § 4:36 (2022) ................ 28

*Waiver of Attorney-Client Privilege on Inter-Attorney Exchange of Information*,
    63 Yale L.J. 1030 (1954) ........................................................................ 24

Wright & Miller, *Federal Practice and Procedure* § 2024 (3d ed. 2023) ............... 23

# GLOSSARY

| | |
|---|---|
| 2016 Act | FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 |
| DOJ | Department of Justice |
| FOIA | Freedom of Information Act |
| J.A. | Joint Appendix |
| NACDL | National Association of Criminal Defense Lawyers |
| NIMJ | National Institute for Military Justice |
| Restatement | Restatement (Third) of The Law Governing Lawyers |
| VRA | Voting Rights Act |

## INTRODUCTION

In 2021, Georgia enacted omnibus legislation amending its voting laws. Seven plaintiff groups sued in the Northern District of Georgia challenging the legislation on various grounds, including under the Voting Rights Act. The United States Attorney General, after determining that certain provisions of the legislation violated Section 2 of the Voting Rights Act, likewise instituted suit to enjoin enforcement of those provisions. *See United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga.). All eight suits were assigned to the same district judge. After determining it was in the United States' litigating interest to consult and coordinate discovery with other plaintiffs, the Department of Justice entered into a common-interest arrangement for sharing privileged attorney work product with co-counsel.

The district court consolidated the United States' suit with five of the private suits and affirmatively directed government and private counsel to conduct discovery jointly. In a stipulation approved by that court, all parties—including the State of Georgia—agreed that documents and communications created and exchanged solely among allied plaintiffs' counsel or defendants' counsel after March 2021 would not be subject to discovery. The consolidated suits remain pending in that court.

Despite that stipulation, Georgia then filed this Freedom of Information Act (FOIA) suit in the District Court for the District of Columbia, demanding disclosure of all communications between Department of Justice attorneys and specified persons and entities, including the private plaintiffs in the pending voting-rights litigation and their counsel.  The Department produced relevant documents but withheld confidential communications among allied counsel under Exemption 5, explaining that those records were privileged under, *inter alia*, the attorney work-product doctrine.  *See* 5 U.S.C. § 552(b)(5).

The district court recognized that the co-counsel communications were undisputedly attorney work product and that releasing them would harm the United States' ability to litigate.  It nonetheless ordered them disclosed, believing both that the government had waived its privilege by communicating with allied counsel and that the communications were not "inter-agency or intra-agency memorandums or letters" within the scope of Exemption 5.

Both rulings are wrong.  The district court plainly erred in concluding that government and private counsel waived their respective work-product privileges.  Work-product protection is waived by voluntary disclosure only when made to an adversary, not to aligned litigants.  *United States v. Deloitte LLP*, 610 F.3d 129, 139-40 (D.C. Cir. 2010); *United States v. AT&T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

The district court likewise erred in concluding that FOIA effectively vitiates the work-product privilege for communications among allied parties via common-interest arrangement. Exemption 5 provides that FOIA's disclosure requirements "do[] not apply" to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This Court has long recognized that "intra-agency memorandums or letters" are not narrowly limited to correspondence among agency employees but embrace a variety of materials generated or shared at an agency's initiative in furtherance of its functions. The type of confidential communications at issue here, which are a crucial and commonplace feature of multiparty litigation, fall well within the protections afforded by FOIA's calibrated scheme; indeed, "'Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5' to the FOIA." *National Ass'n of Criminal Def. Lawyers* (*NACDL*) *v. U.S. Dep't of Justice Exec. Office for U.S. Attys.*, 844 F.3d 246, 251 (D.C. Cir. 2016); *see Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 278 (4th Cir. 2010) (FOIA does not require that "one side in litigation … play by one set of rules and another side play by a more privileged set of rules"). The district court's order should be reversed.

3

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.  J.A. 7.  The district court entered its opinion and order on February 20, 2023.  J.A. 160-192.  The government timely appealed on April 20, 2023.  J.A. 193-194; Fed. R. App. P. 4(a)(1)(B).  The order "requiring release of documents by the Government" is a "final decision," *Judicial Watch, Inc. v. Department of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quotation marks omitted), as to which this Court has appellate jurisdiction under 28 U.S.C. §§ 1291 and 1292(a).

## STATEMENT OF THE ISSUES

**1**.  Whether confidential litigation communications among the Department of Justice and allied private counsel "would not be available by law … in litigation" against the Department because they are attorney work product for which privilege has not been waived.  5 U.S.C. § 552(b)(5).

**2**.  Whether the same confidential communications, undertaken pursuant to a common-interest arrangement authorized by the Department of Justice, qualify as "intra-agency memorandums or letters" within the meaning of FOIA Exemption 5.  5 U.S.C. § 552(b)(5).

## PERTINENT STATUTES AND REGULATIONS

Pertinent authorities appear in an addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Freedom of Information Act requires federal agencies to make certain documents available to the public upon request.  5 U.S.C. § 552(a)(3). A requester dissatisfied with the agency's response may sue to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld."  *Id.* § 552(a)(4)(B).

FOIA "does not apply to matters" within nine listed exemptions. 5 U.S.C. § 552(b)(1)-(9).  Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  *Id.* § 552(b)(5).  That statutory text, originally enacted in 1966 and re-enacted without relevant change in 2016, "incorporates the privileges available to Government agencies in civil litigation," including the "attorney work-product privilege."  *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021); *see United States v. Weber Aircraft Corp.*, 465 U.S. 792, 798 (1984); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975).

Withholding is generally improper if the privilege has been waived. Whether waiver has occurred is determined by the substantive law of each privilege.  For attorney-client privilege, "voluntary disclosure" to a third party

generally effects a waiver, subject to certain exceptions, including the common-interest doctrine. *United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010). By contrast, for attorney work-product privilege, voluntary disclosure does not effect a waiver unless the disclosure is made "to an adversary or a conduit to an adversary." *Id.* at 140.

Exemption 5 includes a "threshold condition" that the "communication be 'intra-agency or inter-agency.'" *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 & n.3 (2001). In interpreting this condition, this Court and other courts of appeals have long taken a "'functional' approach," *id.* at 7, that accounts for the character and use of the document. "[A] document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency.'" *National Inst. of Military Justice* (*NIMJ*) *v. U.S. Dep't of Def.*, 512 F.3d 677, 684 (D.C. Cir. 2008) (quoting *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125, 130 (D.C. Cir. 2005)). Rather, an "intra-agency" document includes, *inter alia*, "one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity." *Klamath*, 532 U.S. at 9-10 (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J. dissenting)).

**B.    Proceedings In Georgia (SB 202 Litigation)**

This case concerns confidential litigation communications between Department of Justice attorneys and aligned counsel for private parties, all of whom are currently litigating parallel voting-rights cases against the same defendants in the same court concerning the same state enactment.

**1.**  In March 2021, Georgia enacted Senate Bill 202.  *See* Election Integrity Act of 2021, 2021 Ga. Laws Act 9 (SB 202).  After careful review, in June 2021, the Attorney General determined that certain provisions of SB 202 violated Section 2 of the Voting Rights Act (VRA), 52 U.S.C. § 10301, because they were adopted with the purpose of denying or abridging the right to vote on account of race, and brought suit to enjoin enforcement of those provisions. *United States v. Georgia*, No. 1:21-cv-2575 (N.D. Ga.); *see* 52 U.S.C. § 10308(d) (authorizing civil action to enforce Section 2 of VRA).

By then, seven other groups of plaintiffs had already filed suit in the same court challenging the same (and other) provisions of SB 202.  *See New Ga. Project v. Raffensperger*, No. 1:21-cv-1229; *Georgia State Conference of NAACP v. Raffensperger*, No. 1:21-cv-1259; *Sixth District of African Methodist Episcopal Church v. Kemp*, No. 1:21-cv-1284; *Asian Americans Advancing Justice-Atlanta v. Raffensperger*, No. 1:21-cv-1333; *Concerned Black Clergy of Metro. Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-1728; *VoteAmerica v. Raffensperger*, No. 1:21-cv-1390;

*Coalition for Good Governance v. Raffensperger*, No. 1:21-cv-2070.  Five of these suits (*New Georgia Project*, *Georgia State Conference of NAACP*, *Sixth District of African Methodist Episcopal Church*, *Asian Americans Advancing Justice-Atlanta*, and *Concerned Black Clergy of Metropolitan Atlanta*) include claims of race discrimination in violation of Section 2 of the VRA or the U.S. Constitution. The remaining two suits (*VoteAmerica* and *Coalition for Good Governance*) present non-race-based statutory and constitutional claims.

All eight cases were assigned to the same district judge (Boulee, J.). The Republican National Committee, the Georgia Republican Party, and several other entities intervened as defendants in the eight cases.

After denying motions to dismiss, in December 2021, the district court administratively consolidated the six cases presenting race-discrimination claims—including the United States' suit—in an action captioned *In re Georgia Senate Bill 202*, No. 21-mi-55555 (N.D. Ga.).  J.A. 47-55.  In ordering consolidation for discovery, the court noted that the six cases involve "mostly the same facts and legal issues" and that "allegations of race discrimination arguably predominate."  J.A. 53.  The court did not include the final two cases (*VoteAmerica* and *Coalition for Good Governance*) in the consolidation inasmuch as they assertedly required less extensive discovery.  But it nonetheless "strongly encouraged" counsel in those two cases to coordinate with the

consolidated cases.  J.A. 55.  The court indicated that it would "decide at a later date whether consolidation for additional purposes [*i.e.*, trial] is warranted."  J.A. 54 n.2.

**2.**  In complex civil litigation, parties with aligned interests frequently decide—and, sometimes, are directed by courts—to consult and coordinate with one another in the litigation.  *Cf.* Fed. Judicial Ctr., *Manual for Complex Litigation, Fourth* § 10.22 *et seq.* (2004).  Consistent with that practice, one month after the United States filed suit, the Department of Justice entered into a common-interest arrangement with the other plaintiffs challenging SB 202.  Pursuant to that arrangement, the Department and certain private counsel (specifically, those also litigating race-discrimination claims) exchanged substantive communications discussing legal strategy, potential witnesses, discovery objectives, and legal research.  The Department's decision to participate in consultation among the six race-discrimination cases effectively anticipated orders later entered by the district court, which formally consolidated those cases and affirmatively required counsel to coordinate and/or proceed jointly with discovery reports, depositions, and written requests.  J.A. 23-24.[1]

---

[1] The Department and a subset of private plaintiffs have since collaborated to file a joint motion for preliminary injunction.  *See* Plaintiffs'

*Continued on next page.*

The Department and private plaintiffs memorialized that common-interest arrangement.  In a July 28, 2021 email among plaintiffs' counsel in seven cases (all except *Coalition for Good Governance*), counsel agreed that the parties "share a common interest in the successful prosecution of this litigation" and "may share (but are not required to share) privileged communications and other litigation material between and among them without waiving the attorney-client privilege, the work product protection or any other privilege or protection."  J.A. 22, 37-38.  In February 2022, plaintiffs' counsel in all eight cases signed a further common-interest agreement.  J.A. 22-23, 39-45.

The protected nature of the plaintiffs' co-counsel communications was also confirmed in stipulations approved by the Georgia district court. All relevant parties to the SB 202 litigation—including the State of Georgia— "agree[d]," as to documents and communications "created or exchanged" after March 2021, that "they do not need to collect, review, or produce such materials created by and, if shared with any other(s), exchanged *solely among*: (1) attorneys for any of the Plaintiffs in this case (and their staff); or (2) attorneys for any of the Defendants in this case (and their staff)."  J.A. 77; *see*

---

Joint Motion for Preliminary Injunction, *In re Georgia Senate Bill 202*, No. 1:21-mi-55555 (N.D. Ga. May 30, 2023) (Dkt. No. 566).

J.A. 24-25, 62-99.  By confirming that discovery would not extend to co-counsel communications within the SB 202 litigation—whether on the plaintiffs' side or the defendants' side—the stipulation effectively recognized that attorney work-product privilege applied to those materials.  Georgia has never argued in that litigation that that privilege has been waived.

## C.    Proceedings In District of Columbia (FOIA Suit)

**1.**  Plaintiffs in this FOIA action are the State of Georgia and its Secretary of State.  In August 2021, they submitted a FOIA request to the Department of Justice seeking, *inter alia*, all communications between the Department and private counsel concerning SB 202 and the pending litigation in the Northern District of Georgia.  *See* J.A. 15-19.[2]  To enforce that request, plaintiffs commenced this suit in December 2021, electing to file in the District of Columbia instead of Georgia.  *Cf.* 5 U.S.C. § 552(a)(4)(B) (FOIA venue).

In response, Department components searched the files of numerous custodians in the Civil Rights Division, the Offices of the Attorney General, Deputy Attorney General, and Associate Attorney General, and the Office of Legislative Affairs.  J.A. 105-106; Dkt. No. 14-6, ¶ 15 (Brinkmann Decl.).

---

[2] Plaintiffs also requested all communications between the Department and various other named persons or entities, but those communications have not been the subject of any challenged withholdings and are not at issue in this appeal.  *Cf.* J.A. 25-26 (describing the 62 entities named in plaintiffs' request).

The Department ultimately produced several hundred pages but, as relevant here, withheld six documents and redacted 52 others pursuant to Exemption 5 and other exemptions.  J.A. 111-113.  All of these documents pertain to communications between July and September 2021 that occurred between Department counsel and private co-counsel in the SB 202 litigation after the United States had already brought suit.  J.A. 123-138 (*Vaughn* index).

Georgia argued that the Exemption 5 withholdings were unlawful.[3] It asserted that "DOJ waived any privilege over [its] communications" with private counsel because "DOJ has failed to carry its burden of establishing that it exchanged [them] … in pursuit of a common legal interest."  Dkt. No. 15, at 17; *see id.* at 12-17.  Georgia also argued that "for these same communications, DOJ has failed to satisfy its independent burden" of explaining why the records qualified as intra-agency memorandums or letters.  *Id.* at 22; *see id.* at 18-22.

---

[3] Georgia initially challenged the adequacy of the Department's search and withholdings pursuant to Exemptions 6 and 7(C), but later abandoned those claims.  J.A. 163.  Georgia also unilaterally decided not to "challenge the withholding of [any] communications exchanged" among Department and private counsel after the "consolidation order where DOJ was directed to coordinate with the other plaintiffs."  Dkt No. 15, at 8 n.2; *see* J.A. 164 n.3. Georgia conceded, however, that its interpretation of FOIA would require disclosure of such later communications if requested.  *See* J.A. 225-26.

**2.** The district court ruled in Georgia's favor on both grounds, concluding that "the records Georgia seeks are not exempt from disclosure under FOIA Exemption 5." J.A. 191; *see* J.A. 160-191.

**a.** The district court first concluded that the communications among Department attorneys and private co-counsel did not qualify as "intra-agency memorandums or letters" under Exemption 5. J.A. 164-182. The court began by assuming that the "ordinary meaning of Exemption 5" categorically "excludes communications to or from non-agency parties," such as "DOJ's communications with private litigants." J.A. 166. The court recognized that under this Court's precedents, documents "generated by non-governmental parties" in a consultative capacity may well qualify as "intra-agency" memorandums or letters. J.A. 167; *cf. supra* p. 6. It concluded, however, that this Court's reasoning was inapplicable here in light of "three principles" it perceived in this Court's decisions, all of which relate to deliberative advice provided by agency consultants rather than attorney work product exchanged among allied litigants. J.A. 169.

First, the district court deemed it problematic that the Department of Justice had not "shown that the private plaintiffs and their lawyers are not self-interested." J.A. 170. The court based this conclusion on the fact that the private plaintiffs "also challenge SB 202" and thus "work to advance their own

13

causes." J.A. 171. The court acknowledged that the Department had submitted a declaration from a member of the litigation team explaining the role of the Department's communications with private counsel in advancing the government's litigation interests. But the court faulted the Department for not also providing "evidence from any of the interest groups contextualizing their purpose in collaborating with the federal government." J.A. 172.

Second, positing that "a party is more likely to be considered a consultant if the agency solicited the communications," J.A. 169, the district court found "nothing in the record suggest[ing] that DOJ solicited the private entities for assistance in litigating its case against Georgia." J.A. 174. That the Department had decided it was in the United States' interest to enter into a common-interest agreement with the private parties' counsel did not "mean … that it was DOJ that solicited input from [its co-litigants] rather than the other way around." J.A. 174-175.

Third, suggesting that a "private party is more likely to be a consultant when the agency seeks its expertise," the district court found that the Department of Justice had not shown it needed help from any "'discrete group of ex[per]ts.'" J.A. 169, 175. It dismissed the notion that it would be useful or prudent for Department litigators to coordinate efforts with other plaintiffs' counsel bringing overlapping claims at the same time in the same court,

asserting that it "cannot imagine a group of lawyers less in need of assistance to enforce federal voting laws than the specialists in DOJ's Civil Rights Division." J.A. 176.

The district court acknowledged, but rejected as unpersuasive, on-point Fourth Circuit precedent holding that documents exchanged with co-counsel under a common-interest agreement qualify as "intra-agency." J.A. 178 (discussing *Hunton & Williams*, 590 F.3d 272). In particular, the district court dismissed the concern that an unduly constrained construction of "intra-agency memorandums" would transform FOIA into a ready tool for circumventing basic litigation privileges. J.A. 179. In the court's view, "federal agencies are not ordinary litigants" and "if FOIA's disclosure obligations temper an agency's ability" to conduct litigation on the same terms as other litigants, "this is a feature, not a bug." J.A. 179-180. The court thus construed FOIA as compelling disclosure notwithstanding its agreement that "revealing the withheld communications would hurt the Government's [and private plaintiffs'] litigation" by "'provid[ing] insight to the SB 202 defendants on the Department's litigation strategy'" and causing a "'chilling effect on the coordination efforts of the Common Interest Group in the ongoing litigation.'" J.A. 190 n.8 (alteration in original) (quoting J.A. 30-31).

15

**b.**  Separately, the district court credited Georgia's argument that "even if the communications are considered 'intra-agency,'" any privilege was waived and so "Exemption 5 nonetheless does not apply."  J.A. 182.  The court noted that the government had invoked the "attorney work-product privilege[]," *id.*, and acknowledged that "Georgia does not dispute that the withholdings satisfy the ordinary [substantive] requirements" for that privilege, J.A. 183.  It then announced that "sharing otherwise privileged communications with third parties generally waives any existing privilege" unless the "common interest doctrine" applies.  *Id.*

Having assumed that the common-interest doctrine controls the waiver analysis, the district court then found it was not satisfied.  The court reasoned that "all the challenged withholdings" failed to satisfy the doctrine because, in the court's view, the Department and private plaintiffs "brought substantively different lawsuits asserting separate claims under separate legal theories."  J.A. 186-187.  The court observed that the seven private lawsuits "variously allege that SB 202 violates the First, Fourteenth, and Fifteenth Amendments, the Americans with Disabilities Act, the Rehabilitation Act, … the Civil Rights Act of 1964" and causes "discriminatory effects" in violation of the VRA, while "DOJ's allegations [under the VRA] were limited to discriminatory purpose."  J.A. 187.  Although the Department explained that these suits had

16

"'substantial overlap'" with the United States' action, the district court stated that "two of the suits (*VoteAmerica* and *Coalition for Good Governance*) do not allege that SB 202 violates the [VRA] at all." J.A. 187-188. It reasoned that, at a minimum, the common-interest doctrine should "not protect the communications between DOJ and these two groups" and "by disclosing communications to them, DOJ waived any privilege that could have attached vis-à-vis the other plaintiff groups." J.A. 188. The district court failed to note, however, that virtually all records at issue were communications only among counsel in the six suits presenting race-discrimination claims, and did not include counsel in *VoteAmerica* or *Coalition for Good Governance*.

## SUMMARY OF ARGUMENT

The United States and various other plaintiffs are currently litigating a consolidated voting-rights action in the District Court for the Northern District of Georgia. As is often the case in multi-party litigation, the United States entered into a common-interest arrangement with the aligned plaintiffs, and all parties—including the State of Georgia—stipulated in that litigation that confidential co-counsel communications dating back to March 2021 would not be subject to discovery. Yet Georgia then filed this suit in the District Court for the District of Columbia seeking those very same materials. The district court erred in concluding that FOIA compels their disclosure.

**I.** The confidential litigation communications at issue are indisputably of the kind protected by attorney work-product privilege, and the United States and private plaintiffs did not waive that protection. Work-product privilege is waived only by voluntary disclosure "to an adversary or a conduit to an adversary," not to other third parties. *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010). Indeed, a core purpose of work-product doctrine is to promote effective trial preparation, which in complex litigation often warrants coordination with allied litigants. The district court erroneously failed to apply those principles because it mistakenly believed that an assertion of attorney work-product privilege is subject to the same requirements as attorney-client privilege. In any event, the court's analysis fails on its own terms: the arrangements in this case would clearly satisfy the common-interest doctrine of attorney-client privilege.

**II.** The district court also erred in ruling that Congress, by enacting FOIA, compelled the disclosure of privileged litigation communications under common-interest arrangement. This Court has never understood Exemption 5's protection for "inter-agency or intra-agency memorandums or letters" to be limited to correspondence solely among government employees (or, indeed, to be limited only to "memorandums and letters" strictly construed). The district court gave short shrift to this Court's decisions, assuming their functional

18

mode of interpretation to be applicable only to deliberative advice solicited from expert consultants.  No basis exists for that assumption.  The Supreme Court has determined that Exemption 5 affords the government the same litigation protections as private parties, including the attorney work-product privilege.  It does not preclude the government and allied counsel from relying on that privilege, and Congress did not purport to carve out common-interest agreements from its protection or otherwise deny the United States the ability to participate in multi-party litigation on the same terms as other litigants. That has long been the prevailing interpretation of Exemption 5, and when it reenacted Exemption 5's operative text in 2016 without change, Congress ratified that interpretation.  This Court should reaffirm the same conclusion.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment, including its application of FOIA and the work-product doctrine. *Judicial Watch, Inc. v. Department of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005).

## ARGUMENT

## I.   THE DEPARTMENT OF JUSTICE DID NOT WAIVE WORK-PRODUCT PRIVILEGE WITH RESPECT TO THE WITHHELD CO-COUNSEL COMMUNICATIONS.

### A.   The Attorney Work-Product Privilege Is Waived Only By Disclosure To An Adversary, Not To Allied Litigants.

**1.**  " 'Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5' to the FOIA." *NACDL v. U.S. Dep't of Justice Exec. Office for U.S. Attys.*, 844 F.3d 246, 251 (D.C. Cir. 2016) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975)); *see also FTC v. Grolier Inc.*, 462 U.S. 19, 20 (1983).  Because the federal government's ability to conduct its affirmative and defensive litigation alike would be severely compromised if litigating counsel were "forced to 'operate in a fishbowl,' " Congress specifically sought to protect the "working papers of the agency attorney and documents which would come within the attorney-client privilege if applied to private parties."  S. Rep. No. 89-813, at 2, 9 (1965).

The common-law work-product doctrine, which recognizes that "materials prepared by one's attorney in anticipation of litigation are generally privileged from discovery by one's adversary," is designed to "protect 'the integrity of the adversary trial process itself.' "  *NACDL*, 844 F.3d at 250-51 (quoting *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978) (en banc)).  The work-product privilege was recognized by the Supreme Court in

20

*Hickman v. Taylor*, 329 U.S. 495 (1947), which held that an attorney's records of interviews of third-party witnesses were presumptively protected from civil discovery. To prepare for litigation, "an attorney must 'assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference.'" *United States v. Deloitte LLP*, 610 F.3d 129, 134-35 (D.C. Cir. 2010) (quoting *Hickman*, 329 U.S. at 511). The Supreme Court recognized that an attorney's preparation for trial is reflected not only in private notes but also in his or her exchanges with others as reflected in "interviews, statements, memoranda, [and] correspondence." *Id.* (quoting *Hickman*, 329 U.S. at 511). The privilege protects these interactions by "provid[ing] a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *NACDL*, 844 F.3d at 251 (alteration in original) (quoting *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 864 (D.C. Cir. 1980)). That protection, in turn, facilitates the orderly and efficient resolution of litigation.

In 1970, "[t]he work-product doctrine announced in *Hickman*" was "partially codified in Federal Rule of Civil Procedure 26(b)(3)." *Deloitte*, 610 F.3d at 135. Under that Rule, a party "[o]rdinarily … may not discover documents and tangible things that are prepared in anticipation of litigation or

for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3).  The Rule allows a court to order disclosure of such materials only in cases of "'substantial need'" and "'undue hardship.'"  *Deloitte*, 610 F.3d at 135.  Even then, the court must "still 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'"  *Id.* (quoting Fed. R. Civ. P. 26(b)(3)(B)).  Such "opinion work product," whether reflected in personal notes or correspondence with other counsel, is "virtually undiscoverable."  *Id.* (quotation marks omitted).

**2.**  The work-product privilege is subject to a different waiver standard than other litigation privileges.  In particular, the "strict standard of waiver in the attorney-client privilege context" is not "appropriate for work product cases."  *United States v. AT&T Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).  "The purpose of the work product doctrine is to protect information against *opposing parties*, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation."  *Id.* (emphasis added).  Thus, "[w]hile voluntary disclosure waives the attorney-client

privilege," it does not waive work-product protection unless the disclosure "undercut[s] the adversary process."  *Deloitte*, 610 F.3d at 139-40.[4]

Accordingly, this Court has held that sharing work product with a third party waives protection only if "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy *from the disclosing party's adversary*."  *Deloitte*, 610 F.3d at 140 (emphasis added) (quotation marks omitted).  Similarly, "the overwhelming majority" of courts of appeals "have espoused or acknowledged the general principle that the voluntary disclosure of work product waives the protection only when such disclosure is made to an adversary or is otherwise inconsistent with the purpose of work-product doctrine—to protect the adversarial process."  *United States v. Sanmina Corp.*, 968 F.3d 1107, 1120 (9th Cir. 2020) (citing *Deloitte* and other cases); *see also* 6 *Moore's Federal Practice–Civil* § 26.70[6][a] (2023); 8 Wright & Miller, *Federal Practice and Procedure* § 2024 nn.61-67 and accompanying text (3d ed. 2023); 2 Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 1040-42 (5th ed. 2007).

---

[4] This Court once remarked in passing that "disclosure of attorney-client *or work product confidences to third parties* waives the protection of the relevant privileges" unless the common-interest doctrine is satisfied.  *In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998) (emphasis added).  But that case did not involve any asserted work-product materials, *see id.* at 1282 n.15, and it cited *AT&T* as good law.  It thus casts no doubt on the principles set forth in *AT&T* and *Deloitte*.

It follows that the sharing of attorney work product with allied litigants does not waive the privilege. "Effective trial preparation often entails disclosing work product to coparties and nonparties." *Restatement* (*Third*) *of The Law Governing Lawyers* § 91 cmt. b (2000) (*Restatement*). Attorney work product thus "may generally be disclosed to … associated lawyers and other professionals working for the client, or persons similarly aligned on a matter of common interest" without waiving work-product protection. *Id.* Indeed, from the earliest days of its recognition, courts have rejected the notion that an "inter-attorney exchange" among allied litigants would somehow defeat the "qualified privilege enjoyed by an attorney's work product." *Transmirra Prods. Corp. v. Monsanto Chem. Co.*, 26 F.R.D. 572, 579-80 (S.D.N.Y. 1960); *see Vilastor-Kent Theatre Corp. v. Brandt*, 19 F.R.D. 522, 524-26 (S.D.N.Y. 1956); *Connecticut Mut. Life Ins. Co. v. Shields*, 16 F.R.D. 5, 7 (S.D.N.Y. 1954).[5] That is because such coordination among counsel obviously furthers—not undermines—the adversarial process and the efficient resolution of the dispute.

---

[5] *See also, e.g.*, *Leonia Amusement Corp. v. Loew's, Inc.*, 13 F.R.D. 438, 441 (S.D.N.Y. 1952); *Smith v. Bentley*, 9 F.R.D. 489, 490-91 (S.D.N.Y. 1949); *Byers Theaters v. Murphy*, 1 F.R.D. 286, 289 (W.D. Va. 1940); Note, *Waiver of Attorney-Client Privilege on Inter-Attorney Exchange of Information*, 63 Yale L.J. 1030, 1031-32 (1954) ("[I]t appears safe to conclude that the exchange of 'work product' among counsel for parties with a common interest will not subject that data to pre-trial discovery."); *Developments in the Law—Discovery*, 74 Harv. L. Rev. 940, 1045 (1961) (endorsing same conclusion).

24

This Court reached just that conclusion in *AT&T*, where it considered whether attorneys for MCI had waived work-product privilege by sharing documents with counsel for the United States, which was also pursuing antitrust claims against AT&T. Concluding that the protection remained intact, the Court noted that the United States and MCI "anticipate[d] litigation against a common adversary on the same issue or issues"; "shared common interests in developing legal theories"; and wished to "shar[e] the fruit of the[ir] trial preparation efforts" to assist one another. 642 F.2d at 1299-1300. The parties' "overlapping" interests, and choice to consult on "issues common to their two cases," demonstrated that the sharing of their work product was in furtherance of—not detrimental to—the functioning of the adversary system. *Id.* at 1300; *see also, e.g.*, *Restatement* § 91 cmt. b & reporter's note; *In re Doe*, 662 F.2d 1073, 1081 (4th Cir. 1981).

### B. Work-Product Privilege Attaches To All Of The Withheld Co-Counsel Communications.

The records at issue here plainly qualify for work-product protection.

First, all of the materials at issue were email communications or attached work product directly related to the SB 202 litigation and prepared either by Department of Justice attorneys or by counsel for the private parties aligned with the United States in that litigation. These materials "include documents discussing legal strategy, potential witnesses, types of discovery

needed, division of labor in … case[s] that would likely be consolidated, and the efficient presentation of the case," as well as "legal research and attorney notes in furtherance of the ongoing litigation concerning SB 202." J.A. 29-30. The documents reflect "mental impressions, conclusions, opinions, and legal theories" of the type expressly protected by both the common-law work-product privilege and Federal Rule of Civil Procedure 26(b)(3). *Id.*; *cf. Hickman*, 329 U.S. at 508. Indeed, as the district court observed, Georgia "does not dispute that the withholdings satisfy the ordinary requirements of the … work-product privilege[]." J.A. 183.

Second, that privilege has never been waived. As discussed, although "the voluntary disclosure of attorney work product *to an adversary or a conduit to an adversary* waives work-product protection for that material," other disclosures do not. *Deloitte*, 610 F.3d at 140 (emphasis added). Here, it is undisputed that the relevant communications were shared only among plaintiffs' counsel in the SB 202 litigation and, in nearly every instance (*cf. infra* p. 29 n.7), only among counsel in the six race-discrimination cases. And in all instances, the disclosing parties "had a reasonable basis for believing that the recipient[s] would keep the disclosed material confidential" from opposing counsel, particularly inasmuch as they expressly memorialized an intention to share privileged information. *Deloitte*, 610 F.3d at 141. There is no basis to

conclude here that any disclosures were made to any "conduit to [the United States' or private plaintiffs'] adversaries." *Id.*

### C. The District Court Applied The Wrong Standard For Waiver Of Work-Product Privilege, Then Erred In The Standard It Did Apply.

The district court's contrary analysis reflects both a fundamental error of law and a clearly erroneous understanding of relevant facts.

The district court did not discuss this Court's analysis and holdings in *AT&T* and *Deloitte* and instead sought to apply waiver standards applicable to attorney-client communications. The attorney-client privilege is generally waived through voluntary disclosure to third parties, *see Restatement* § 79, except where the common-interest doctrine is satisfied, *see id.* § 76(1). As discussed, however, work-product protection is waived by voluntary disclosure only if made "to an adversary or a conduit to an adversary." *Deloitte*, 610 F.3d at 140; *see also AT&T*, 642 F.2d at 1299. The question the district court should have asked was whether the sharing of work product occurred under "circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it." *Restatement* § 91(4). Such circumstances clearly did not exist here. "A disclosure made in the pursuit of … trial preparation" against a "common adversary" does not effect a waiver. *AT&T*, 642 F.2d at 1299-1300. In fact, where (as here) such a

27

disclosure "is conducted under a guarantee of confidentiality, the case against waiver is *even stronger.*"  *Id.* (emphasis added).

Even accepting the district court's mistaken legal premise, the common-interest doctrine would be satisfied here so that no waiver of privilege occurred.  Under that doctrine, "[i]f two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged … is privileged as against third persons." *Restatement* § 76(1).  This rule "permits persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers." *Id.* cmt. b.  The common interest "may be either legal, factual, or strategic in character," and "[t]he interests of the separately represented clients need not be entirely congruent." *Id.* cmt. e; *see, e.g.*, 6 *Moore's Federal Practice–Civil* § 26.47[5] (stating that "[p]rivileges are not waived" when "parties with similar litigation interests in different lawsuits share privileged information"); 1 Rice et al., *Attorney-Client Privilege in the United States* § 4:36 (2022) (explaining that common-interest doctrine does not require "identical legal interests").[6]

---

[6] Cases applying this doctrine also commonly require parties to "make the communication in pursuit of a joint strategy in accordance with some form
*Continued on next page.*

28

The Department of Justice at all times shared common interests with private plaintiffs in the SB 202 litigation in vindicating federal civil rights laws to protect the rights of Georgia voters.  J.A. 28.  Those interests are not only "legal" (establishing liability under Section 2 of the VRA), but "factual" (proving a racial motivation in enacting SB 202) and "strategic" (prevailing in enjoining the challenged statutory provisions).  *Restatement* § 91 cmt. e.  Indeed, these interests are sufficiently shared such that all eight suits were assigned to the same judge and the six cases raising race-discrimination claims were formally consolidated to require joint conduct of litigation.

To facilitate that coordination, the Department of Justice and other SB 202 plaintiffs entered into a common-interest arrangement pursuant to which the records at issue were exchanged.[7]  A July 28, 2021 email memorialized that

---

of agreement—whether written or unwritten."  *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1129 (9th Cir. 2012); *see, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, 870 F.3d 1350, 1359-60 (Fed. Cir. 2017); *Schaeffler v. United States*, 806 F.3d 34, 40, 42 (2d Cir. 2015); *American Mgmt. Servs., LLC v. Department of the Army*, 703 F.3d 724, 732-33 (4th Cir. 2013).  As explained below, any such requirement was amply satisfied here.

[7] Only two discrete items—emails dated July 27 and July 28, 2021— predated the July 28, 2021 common-interest agreement.  *See* J.A. 157-158 (reproducing these emails in redacted form); J.A. 202.  But no waiver of privilege occurred even as to these items.  As explained, under precedent, no formal agreement is required to maintain the work-product protection; a "guarantee of confidentiality" simply renders "the case against waiver … even stronger."  *AT&T*, 642 F.2d at 1299-1300; *see Deloitte*, 610 F.3d at 141.

the Department and private plaintiffs "share[d] a common interest in the successful prosecution of this litigation" and provided that they "may share (but are not required to share) privileged communications and other litigation material between and among them without waiving the attorney-client privilege, the work product protection or any other privilege or protection." J.A. 22, 37-38.  They later reaffirmed their arrangement in another formal agreement.  J.A. 22-23, 39-45.  And that arrangement was effectively endorsed by a stipulation under which Georgia agreed it would not obtain materials "created by and … exchanged *solely among* … attorneys for any of the Plaintiffs in this case."  J.A. 77; *see* J.A. 24-25.

The district court's belief that this arrangement was insufficient rested on both legal and factual error.  The court suggested that the common-interest doctrine of attorney-client privilege requires a "strong identity" of interests. J.A. 186 (quotation marks omitted).  As just discussed, the *Restatement* and a majority of authority is to the contrary; effectively recognizing as much, the court later stated that it "need not decide whether the common interest doctrine requires a total identity of interests to apply, or whether partially overlapping claims and legal theories is sufficient to invoke the doctrine." J.A. 187.  That is because the court mistakenly presumed that all records at issue had also been shared with counsel in *VoteAmerica* and *Coalition for Good*

*Governance*, the two suits not presenting race-discrimination claims and thus involving the least overlap with the United States' suit. J.A. 188. The court reasoned that "by disclosing communications to [those two groups], DOJ waived any privilege that could have attached vis-à-vis the other plaintiff groups." *Id.*

That conclusion reflects a fundamental misunderstanding of the facts. None of the withheld or redacted records were shared with counsel in *Coalition for Good Governance*. *Cf.* J.A. 123-138 (*Vaughn* index). And the vast majority of records (all except the two noted in n.9 above) were not shared with counsel for *VoteAmerica* either, but instead only among counsel in the six ultimately consolidated VRA cases. *Id.* Even on its own terms, then, the district court's theory of waiver is plainly in error.

The district court also mistakenly placed significance on its observation that the Department of Justice, unlike the private plaintiffs, did not plead "constitutional claims." J.A. 172, 187, 189-190. That difference reflects not some divergent strategic interest but, rather, an invocation of the Department's express authority to sue for violations of the Voting Rights Act. *Cf.* 52 U.S.C. § 10308(d). In any event, the legal standard for proving discriminatory purpose under VRA Section 2 and race discrimination under the Fourteenth and Fifteenth Amendments is the same under governing precedent. *See, e.g.*,

31

*United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1553 (11th Cir. 1984);

*McMillan v. Escambia County*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984).

Indeed, it is because of that overlap that the district court consolidated the six

suits for discovery and, in turn, the United States and private plaintiffs have

since prepared and filed a joint motion for preliminary injunction. Such

coordinated presentation on common issues improves the adversarial process

by reducing litigation burdens on plaintiffs, defendants, and courts alike.

## II.    THE CONFIDENTIAL CO-COUNSEL COMMUNICATIONS ARE "INTRA-AGENCY MEMORANDUMS" UNDER FOIA.

### A.    Communications Pursuant To A Common-Interest Agreement Are "Intra-Agency Memorandums" Not Subject To Compelled Disclosure Under FOIA.

The district court separately erred in ruling that Exemption 5's

protection for "inter-agency or intra-agency memorandums or letters"

implicitly but necessarily compels public disclosure under FOIA of attorney

work product shared confidentially among the Department of Justice and

allied counsel pursuant to a common-interest arrangement.

### 1.    Intra-agency records subject to withholding under Exemption 5 are not limited to communications among agency employees.

Exemption 5 authorizes the withholding of all "inter-agency or intra-

agency memorandums or letters" that would presumptively be privileged in

civil discovery. The terms "inter-agency" and "intra-agency" are not defined,

nor is "memorandums or letters."  Those terms therefore must be given a "'fair reading'" with a view to their role in the operation of the statute.  *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019); *see id.* (rejecting assumption that FOIA's exemptions must be "narrowly construed"); *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) (text is given "ordinary meaning" as "interpreted 'in [its] context,' not in isolation").

At all relevant times, "intra-" has meant "within."[8]  The term "agency," in turn, is statutorily defined as "includ[ing] any executive department … or other establishment in the executive branch," 5 U.S.C. § 552(f)(1).  As a "creature[] of statute" established to fulfill congressional delegated functions, an agency necessarily must act through the persons it engages or invites to participate in its activities.  *Judge Rotenberg Educ. Ctr., Inc. v. U.S. Food & Drug Admin.*, 3 F.4th 390, 399 (D.C. Cir. 2021).  Many such persons will hold status as an "employee" or "official" under federal law, *cf.* 5 U.S.C. § 2101 *et seq.*, and for that reason, Justice Scalia observed that "[a]part from its present context, the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employees of a single

---

[8] *See, e.g.*, Ballentine's Law Dictionary 660 (3d ed. 1969) ("Within; in the space of; within the bounds of."); Black's Law Dictionary 957 (4th ed. 1951) ("In; near; within."); American College Dictionary 639 (1966) ("a prefix meaning 'within'"); Webster's Third New International Dictionary 1185 (1966) ("1 a: within"; "b: during").

33

agency." *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting).

But courts do not "'interpret the relevant words … in a vacuum,'" *Torres v. Lynch*, 578 U.S. 452, 459 (2016), and agencies regularly perform important functions by utilizing the services of individuals and entities (including private contractors) that are not federal employees.  When an "agency" performs its functions, whether through federal employees or by utilizing the services of others, all such persons operate under the agency umbrella, and their communications are logically understood to be "intra-agency."  Thus, as Justice Scalia concluded, "[i]t is textually possible and much more in accord with the purpose of the provision [*i.e.*, Exemption 5], to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting); *see Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9-10 (2001) (discussing Justice Scalia's interpretation and assuming without deciding that it is correct).

This Court's decisions have consistently reflected such a "functional" interpretation of Exemption 5.  *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1220 (D.C. Cir. 1980); *cf. Klamath*, 532 U.S. at 7.  It is "well established

in this circuit" that "a document need not be created by" or "remain in the possession" of agency employees "in order to qualify as 'intra-agency'" within the meaning of Exemption 5's text. *NIMJ v. U.S. Dep't of Def.*, 512 F.3d 677, 684 (D.C. Cir. 2008) (quoting *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125, 130 (D.C. Cir. 2005)). Reaffirming that principle in *NIMJ*, this Court concluded that Exemption 5 encompasses "comments solicited from non-governmental … lawyers whose counsel DoD sought." 512 F.3d at 680. The Court explained that its holding was firmly grounded in its precedents, noting, among other cases, *Formaldehyde Institute v. Department of Health & Human Servs.*, 889 F.2d 1118 (D.C. Cir. 1989) (applying to Exemption 5 to documents received from private, nongovernmental parties as part of scientific peer review), and *Public Citizen, Inc. v. Department of Justice*, 111 F.3d 168 (D.C. Cir. 1997) (applying Exemption 5 to communications from former Presidents concerning electronic records from their administrations). And this Court has since reaffirmed that "[w]hen an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency," those documents qualify as an "'intra-agency' memorandum for purposes of determining the applicability of Exemption 5." *McKinley v. Board*

*of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011) (quoting

*NIMJ*, 512 F.3d at 680).[9]

Under this "established line" of cases, "the pertinent element" in

applying Exemption 5 "is the role, if any, that the document plays in the

process of agency deliberations," not the position of the document's author or

recipient. *NIMJ*, 512 F.3d at 681, 684 (quoting *Formaldehyde Inst.*, 889 F.2d at

1122). Other courts of appeals have adopted the same view. *See, e.g.*, *Rojas v.*

*FAA*, 989 F.3d 666, 675 (9th Cir. 2021) (en banc) (concluding that "the scope

of Exemption 5 turns on the character of the document at issue" and adopting

interpretation discussed in *Klamath* and *Julian*), *cert. denied*, 142 S. Ct. 753

(2022); *Jobe v. National Transp. Safety Bd.*, 1 F.4th 396, 404 (5th Cir. 2021)

("Every circuit to address this issue, including ours, has concluded that intra-

agency communications are not limited to those between or among an

agency's employees."), *cert. denied*, 142 S. Ct. 757 (2022); *Texas v. Interstate*

*Commerce Comm'n*, 889 F.2d 59, 61 (5th Cir. 1989) (per curiam) (proper

---

[9] *See also, e.g.*, *Judicial Watch*, 412 F.3d at 130-31 (documents prepared by an informal policy development group established by the President and composed of various federal officials); *Ryan v. Department of Justice*, 617 F.2d 781, 784 (D.C. Cir. 1980) (questionnaire responses from Senators addressing how they make judgeship recommendations); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 104, 107 (D.C. Cir. 1976) (memorandum prepared by agency employees and shown to advisory committee that included "representatives from private and public organizations").

interpretation of "intra-agency" involves "a functional test" or "functional definition").

This functional interpretation both is sensible in itself and accords with the practical reading long given to the nouns that "intra-agency" modifies. Although Exemption 5 refers to "inter-agency or intra-agency *memorandums or letters*," 5 U.S.C. § 552(b)(5) (emphasis added), courts have readily understood that the provision naturally encompasses not only documents denominated as memorandums and letters, but also draft agency opinions, *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021); computer "printout[s]," *Waterman v. IRS*, 61 F.4th 152, 161 (D.C. Cir. 2023); email attachments, *Campaign Legal Ctr. v. U.S. Dep't of Justice*, 34 F.4th 14 (D.C. Cir. 2022); and cost estimates, *Quarles v. Department of Navy*, 893 F.2d 390 (D.C. Cir. 1990).[10] *Cf. U.S. Fish & Wildlife Serv.*, 141 S. Ct. at 788 (explaining that whether a document qualifies for deliberative process privilege "is a functional rather than formal inquiry").

---

[10] *See also, e.g.*, *National Sec. Archive v. CIA*, 752 F.3d 460 (D.C. Cir. 2014) (draft historical manuscripts and reports); *Williams & Connolly v. SEC*, 662 F.3d 1240 (D.C. Cir. 2011) (handwritten notes); *American Fed. of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203 (D.C. Cir. 1990) (notebooks and indices); *Property of the People, Inc. v. Office of Mgmt. & Budget*, 394 F. Supp. 3d 39, 44 (D.D.C. 2019) (Outlook calendar entries); *Patino-Restrepo v. Department of Justice*, 246 F. Supp. 3d 233 (D.D.C. 2017), *aff'd*, 2019 WL 1250497 (D.C. Cir. Mar. 14, 2019) (draft extradition requests).

2.    **Exemption 5 protects privileged work product shared in a common-interest arrangement.**

The text, context, history, and purpose of Exemption 5 demonstrate that communications pursuant to a common-interest arrangement like that at issue here likewise fall within the scope of "intra-agency memorandums or letters."

**a.**  In applying Exemption 5 to such communications, the Fourth Circuit in *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272 (4th Cir. 2010), relied upon its analysis of other courts of appeals' decisions addressing the scope of "intra-agency memorandums or letters" in the context of advice provided by agency consultants. *Id.* at 279-80.  The court expressed agreement with this Court's Exemption 5 precedents "[b]oth before and after *Klamath*," noting that the communications at issue in those cases "can be considered 'intra-agency'" because the "consultant [was] collaborating with an agency in the agency's pursuit of the public interest." *Id.* (citing *NIMJ*, 512 F.3d at 684).

The Fourth Circuit reasoned that "[t]his same rationale readily reaches cases in which the government partners with another party in litigation." *Hunton & Williams*, 590 F.3d at 280.  "By cooperating with the agency in pursuit of the agency's own litigation aims, the litigation partner in a limited sense becomes a part of the enterprise that the agency is carrying out"—*i.e.*, a participant in the Department of Justice's litigation efforts. *Id.*  And "communications between the agency and its partner" in pursuit of that

38

litigation enterprise can "be understood as 'intra-agency' for purposes of Exemption 5" because the cooperation takes place only once an agency has "determine[d] that the public interest and the litigation partner's interest have converged" and accordingly has invited the partner to play a coordinating role. *Id.* Although the government's litigating partner may well "stand[] to gain" from this common-interest arrangement—just as "paid consultants" and "agency employees" also benefit from a relationship with the agency—the partner "stands to gain personally only if the public's interest is vindicated." *Id.*; *see also American Mgmt. Servs., LLC v. Department of the Army*, 703 F.3d 724, 734-35 (4th Cir. 2013) (reaffirming this reasoning).

The Fourth Circuit explained that the relationship between the government's litigating attorneys and co-counsel for aligned parties is plainly distinct from the supplicatory relationship at issue in *Klamath*. *Klamath* concerned an agency's assertion of the deliberative process privilege over documents submitted by an Indian Tribe advocating for the agency's support of the Tribe's water-rights claims over those of other parties. In holding that those documents were not "intra-agency memorandums" and therefore not protected by Exemption 5, the Supreme Court did not articulate any general test, instead concluding only that the "intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government

39

benefit at the expense of other applicants."  532 U.S. at 12 n.4.  As the Fourth

Circuit has explained, such concerns about "self-interested parties attempting

to persuade the government to adopt a particular policy" are "no longer in play

once the government is actually persuaded that [a particular] policy is in the

public interest" and, moreover, has affirmatively decided it is appropriate to

coordinate the government's litigation with others sharing the same interest.

*American Mgmt. Servs.*, 703 F.3d at 735 (quoting *Hunton & Williams*, 590 F.3d at

279).

The Fourth Circuit's decision is consistent not only with *Klamath*, but

also with decades of decisions by every other court called upon to consider

whether Exemption 5 protects work-product communications between

agencies and litigants allied with them.  *See, e.g.*, *American Small Business League

v. Department of Def.*, 372 F. Supp. 3d 1018, 1030-32 (N.D. Cal. 2019)

(sustaining withholding of communications "made pursuant to a joint defense

agreement" with government contractor); *Welby v. U.S. Dep't of Health &

Human Servs.*, No. 15-CV-195, 2016 WL 1718263, at *7-8 & nn.11-12

(S.D.N.Y. Apr. 27, 2016) (same as to emails among federal, state, and local

authorities under "common interest doctrine"); *Leader v. U.S. Dep't of Justice*,

No. 11-cv-540, 2012 WL 13027964, at *2-6 (D. Ariz. Aug. 9, 2012) (same as to

correspondence with qui tam relator's attorney); *United Techs. Corp. v. NLRB*,

632 F. Supp. 776, 784 (D. Conn.), *aff'd*, 777 F.2d 90 (2d Cir. 1985) (same as to

work product disclosed to union, which was the charging party in proceeding

brought by NLRB, because of the "common interest shared" by union and

NLRB in case against employer).[11]  *But cf. Lucaj v. FBI*, 852 F.3d 541, 544, 547-

49 (6th Cir. 2017) (rejecting application of Exemption 5 to written "requests for

assistance" sent by the Department of Justice to two foreign governments,

which were not partners with the United States in pending or imminent

litigation, and expressing disagreement with the reasoning of *Hunton &*

---

[11] *See also Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 559, 562-63 (S.D.N.Y. 2010) (sustaining withholding under Exemption 5 as to communications between Treasury and Federal Reserve Bank "covered by the common interest doctrine"); *Citizens Progressive All. v. U.S. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1354-56, 1363-64 (D.N.M. 2002) (documents agency shared confidentially with Indian Tribe pursuant to "common-interest privilege"); *Chicago Tribune Co. v. U.S. Dep't of Health & Human Servs.*, No. 95-cv-3917, 1997 WL 1137641, at *2-5 (N.D. Ill. Mar. 28, 1997) (communications between agency and contractor discussing how to respond to FOIA request); *Nishnic v. U.S. Dep't of Justice*, 671 F. Supp. 771, 775 (D.D.C.), *aff'd*, 828 F.2d 844 (D.C. Cir. 1987) (reports potentially shared with Israeli government because "[DOJ] and the Israeli government have been involved in litigation against a common adversary on the same (or very similar) issues"); *Old Orchard Citizens Grp., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 636 F. Supp. 542, 544 (N.D. Ohio 1986) (agency "evaluations [and] opinions" partially disclosed to private party, "since the disclosure was not to adversary parties").  *Cf. Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. U.S. Dep't of Justice*, 503 F. Supp. 2d 373, 380 (D.D.C. 2007) (generally recognizing that Exemption 5 protects "communications [that] are conducted in furtherance of joint prosecution and on the basis of common interests"); *Durham v. U.S. Dep't of Justice*, 829 F. Supp. 428, 433 (D.D.C. 1993) (same).

*Williams* in that context in light of a perceived "responsibility to 'narrowly construe' FOIA's exemptions").[12]

**b.** The context, history, and purpose of Exemption 5 confirm this understanding of the text.  As the Supreme Court has repeatedly observed, Congress's central concern in enacting Exemption 5 was to safeguard "the 'frank discussion of legal or policy matters' in writing" and ensure that documents "normally privileged in the civil discovery context" could not be obtained through FOIA.  *Sears, Roebuck & Co.*, 421 U.S. at 149-50 (quoting S. Rep. No. 89-813, at 9 (1965)).  Faithful to that intent, the Supreme Court has "consistently rejected" interpretations of Exemption 5 that would "circumvent[]" basic litigation privileges and "create an anomaly in that the FOIA could be used to supplement civil discovery."  *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801-02 (1984) (collecting cases); *see John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989) (similar); *see, e.g.*, *Rojas*, 989 F.3d at 672-73 (relying upon "context" and "consideration of the purposes served by Exemption 5" to give the term "intra-agency" its "fair reading").

---

[12] The Supreme Court has since rejected this assumption that "FOIA exemptions should be narrowly construed," explaining that the exemptions serve "'important interests'" and must, like the rest of the statute, be given "'a fair reading.'"  *Food Mktg. Inst.*, 139 S. Ct. at 2366; *see supra* p. 33.

Of particular importance here, it is "clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5." *Sears, Roebuck & Co.*, 421 U.S. at 154; *see Grolier*, 462 U.S. at 20; *NACDL*, 844 F.3d at 250. From the beginning, that common-law privilege has applied not only to private counsel but also to "Government attorneys in litigation." *Sears, Roebuck & Co.*, 421 U.S. at 154 (citing cases). Congress designed Exemption 5 to protect the "working papers of the agency attorney and documents which would come within the attorney-client privilege if applied to private parties." S. Rep. No. 89-813, at 2.

As this Court has frequently observed, the work-product doctrine rests on a "strong public policy against invading the privacy of an attorney's course of preparation" regardless of the form that preparation takes. *In re Sealed Case*, 856 F.2d 268, 273 (D.C. Cir. 1988); *see also In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) ("Without a strong work-product privilege, lawyers would keep their thoughts to themselves, *avoid communicating with other lawyers*, and hesitate to take notes.") (emphasis added). This protected zone of privacy for "adversary preparation" is valuable because it "ultimately furthers the truth-finding process." *AT&T*, 642 F.2d at 1300.

Moreover, as already discussed (*supra* pp. 24-25 & n.5), the common-law privilege has long been understood to encompass litigation preparation among

allied parties.  Well before Congress enacted FOIA, the Supreme Court reasoned that work-product protection properly extends not only to private notes but also to "correspondence," "memoranda," and other documents reflecting cooperation with other lawyers. *Hickman*, 329 U.S. at 511.  And in the twenty years between *Hickman* and FOIA's enactment, federal courts repeatedly rejected arguments that an "inter-attorney exchange" of documents among allied litigants would somehow defeat the "qualified privilege enjoyed by an attorney's work product." *Transmirra Prods. Corp.*, 26 F.R.D. at 579-80; *see Vilastor-Kent Theatre Corp.*, 19 F.R.D. at 524-26 (rejecting assertion that memorandum "lost the protection which attaches to the work-product of an attorney" insofar as "a copy … was transmitted to" counsel for allied party); *Connecticut Mut. Life Ins. Co.*, 16 F.R.D. at 7 (rejecting argument that work-product protection was waived by "the fact that [the attorney's reports] have been displayed to third persons"); *supra* p. 24 n.5 (additional cases).  In reaching those conclusions, courts have understood that coordination among allied parties furthers the effective presentation and efficient resolution of litigation, thereby serving central purposes of the work-product doctrine.

Congress was no doubt aware of the nature of the litigating privileges it intended to protect in enacting Exemption 5, and there is no indication that it understood or intended the phrase "inter-agency or intra-agency" to constrain

the Department of Justice's ability to litigate cases on the same terms as private litigants. Because Exemption 5's text does not require such a reading (much less unambiguously), it should be interpreted so as not to abrogate or otherwise foreclose application of the work-product doctrine's common-law scope. *See, e.g.*, *United States v. Texas*, 507 U.S. 529, 534-35 (1993) (presuming that Congress intends to retain common law and explaining that "[i]n order to abrogate a common-law principle, the statute must 'speak directly'"); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[C]ourts may take it as given that Congress has legislated with an expectation that the [common-law] principle will apply except when a statutory purpose to the contrary is evident.") (quotation marks omitted).

In reliance on this established understanding of the scope of work-product doctrine, the Department of Justice has long utilized common-interest agreements in numerous litigation contexts, both affirmative and defensive. These include not only enforcing voting rights laws, but also pursuing damages under the False Claims Act, *e.g.*, *Leader*, 2012 WL 13027964, at *2-6; overseeing litigation involving federal contracts, *e.g.*, *American Mgmt. Servs.*, 703 F.3d at 732-35; defending intellectual-property claims, *e.g.*, *Hunton & Williams*, 590 F.3d at 277-80; defending litigation involving confidential commercial information of private businesses, *e.g., American Small Bus. League*,

45

372 F. Supp. 3d at 1030-32; and defending numerous other constitutional, statutory, and regulatory challenges in which state, local, tribal, or private persons or entities are also defendants in the same or related litigation.

Given the myriad factual circumstances in which allied-party litigation communications may occur, this Court need not (and should not) definitively resolve in this case how Exemption 5 would or would not apply in other such instances. But the breadth of circumstances in which common-interest arrangements are used underscores that "[a] Congress whose aim was to further" the enforcement and defense of federal law "would not have limited Exemption 5's coverage" to work product shared only among agency employees. *Rojas*, 989 F.3d at 673. Nothing in FOIA purports to "'prevent[] the government from drawing confidential counsel from the private sector'" or "force the United States into a uniquely disadvantaged litigation posture." *Hunton & Williams*, 590 F.3d at 277-78 (quoting *Hanson v. U.S. Agency for Int'l Dev.*, 372 F.3d 286, 294 (4th Cir. 2004)).

**c.** In any event, Congress ratified that judicial determination when it reenacted Exemption 5's relevant text without change in the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538 (2016 Act). The 2016 Act made several significant changes to FOIA, including, for example, by providing "that agencies may only withhold information under a

FOIA exemption if the agency 'reasonably foresees that disclosure would harm an interest protected by an exemption' or if 'disclosure is prohibited by law.'" *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 357-58 (D.C. Cir. 2021) (quoting 2016 Act § 2, 130 Stat. at 539).  Congress also added a sunset provision to Exemption 5 under which "the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested." *Id.* at 357.[13]

Yet Congress reenacted without change the relevant statutory language at issue here, again providing that Exemption 5 extends to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  2016 Act § 2(2), 130 Stat. at 540.  Congress reenacted that language based on an understanding that Exemption 5 "permits agencies to withhold from disclosure inter- and intra-agency documents that would be exempt from discovery in civil or criminal litigation" and that that category of exempt documents "includes but is not limited to [documents protected by] the attorney-client privilege, the *attorney*

---

[13] This sunset provision originally would have applied to all withholdings under Exemption 5.  *See* S. 337 & H.R. 653, 114th Cong. (both introduced Feb. 2, 2015).  In response to concerns about feared effects on government litigation and attorney-client communications, however, the sunset was ultimately limited to the deliberative-process privilege.  *Cf.* S. Rep. No. 114-4, at 15-18 (additional views of Senator Sessions).

*work product doctrine*, and deliberative process documents." S. Rep. No. 114-4, at 10 (2015) (emphasis added).

That 2016 reenactment ratified the prevailing judicial understanding that Exemption 5's text protects attorney work product shared under a common-interest agreement. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239-240 (2009) (quoting *Lorillard v. Pons*, 434 U. S. 575, 580 (1978)). When Congress acted in 2016, decades of precedent from this Court and other courts had interpreted "intra-agency" in a functional manner, *see supra* pp. 34-37, and the Fourth Circuit and numerous other federal courts had repeatedly applied that term specifically to common-interest arrangements, *supra* pp. 38-41 & n.11.[14] And both before and after FOIA's enactment in 1966, courts have consistently recognized that a core application of work-product privilege is to shield litigation preparation among cooperating co-counsel from disclosure to a shared adversary. *See supra* pp. 23-25. Congress's re-enactment of Exemption 5 in the wake of these decades of precedent is properly taken as

---

[14] The only arguably contrary authority is the Sixth Circuit's 2017 decision in *Lucaj*. But *Lucaj* post-dates Congress's ratification and, in any event, it addresses the inapposite context of a federal agency's requests for law-enforcement assistance from foreign governments, not attorney work product shared with co-litigants. 852 F.3d at 544-45; see *supra* pp. 40-42 & n.12.

confirmation that the phrase "intra-agency memorandums or letters" textually encompasses privileged co-counsel communications. *See, e.g.*, *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) (concluding that re-enacted text "retain[s] its established meaning" where "Courts of Appeals [had] consistently construed the [relevant statutory] phrase"); *Owens v. Republic of Sudan*, 864 F.3d 751, 777-78 (D.C. Cir. 2017) (applying principle where lower courts adopted interpretation "for over a decade"), *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020); *Madley v. U.S. Parole Comm'n*, 278 F.3d 1306, 1309 (D.C. Cir. 2002) (invoking principle where amendment "left th[e] interpreted language unchanged and made no effort to disapprove" one of this Court's prior opinions).

### B. The District Court's Contrary Interpretation Is Not Textually Compelled, Misunderstands This Court's Precedent, And Disregards Congress's Manifest Intentions.

**1.** The district court's analysis rests on a premise that this Court has already rejected: that the term "intra-agency memorandums" is textually limited to communications among agency employees. The court mistakenly found this Court's decisions rejecting that premise to be inapplicable here on the ground that, as a factual matter, those cases concerned deliberative advice by outside experts rather than attorney work product exchanged among cooperating litigants. But the key—and more basic—point is that this Court's

decisions have consistently given Exemption 5 a functional interpretation that
looks to the role of the document in the agency's operation and that applies the
exemption even where one of the parties to a communication is not a federal
employee.  And in formulating those decisions, this Court did not purport to
universally define the limits of "intra-agency memorandums," but instead
made case-specific determinations about whether materials received from or
shared with outside parties were sufficiently related to agency functions to be
deemed "intra-agency" in character.

　　The "three principles" the district court derived from past cases involving
consultants (J.A. 169) reflect a serious misunderstanding of this Court's
decisions, which have never adopted such principles as requirements for
Exemption 5.  This Court, for instance, has never held that agency consultants
are bound to act solely in the agency's interest (and not also in their own
interest) in order for their communications to fall within Exemption 5.
The district court faulted the Department for not providing corroborating
declarations from private counsel attesting to a supportive purpose in sharing
their work product with the government.  But this Court has never required
attestations of this kind, and doing so would be particularly anomalous in the
context of a common-interest agreement among co-litigants that, by its very
existence, reflects a recognition of shared interests.  In any event, "[t]he

Government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives." *AT&T*, 642 F.2d at 1300.

The district court was equally mistaken in concluding that the Department of Justice had not sufficiently "solicited" communications with private counsel. The Department's decision to enter into a common-interest arrangement constitutes just such a solicitation of coordination, akin to forming an ad hoc committee that allied counsel were invited to join.

Finally, the district court's discussion of "expertise" mistakenly treated this Court's identification of one common motive underlying an agency's decision to consult non-employees as if that particular motive were a universal requirement for communications with non-employees to fall within the scope of Exemption 5. *Cf. NIMJ*, 512 F.3d at 682-83 (observing that "agencies occasionally will encounter problems outside their ken" and desire the "help of outside experts") (quotation marks omitted). A judgment by the Department of Justice that that the United States' litigation aims would be furthered by consultation with allied litigants is an equally powerful motive to consult with persons other than government employees. Among other things, "in the absence of coordination, the government—or any party whose interests align

51

with the government's—might find its position strafed inadvertently by 'friendly fire.'" *Hunton & Williams*, 590 F.3d at 279.

**2.** The district court's other reasons for declining to apply Exemption 5 fare no better. The court repeatedly invoked the Supreme Court's decision in *Klamath*, but as already discussed, "*Klamath* did not address the common interest doctrine" and thus did not speak to confidential communications among parties who " 'share a unitary interest in achieving a litigative outcome and result.' " *American Mgmt. Servs.*, 703 F.3d at 734 (quoting *Hunton & Williams*, 590 F.3d at 279). Indeed, *Klamath* did not even purport to articulate a general test for deciding when a memorandum is "intra-agency." The Court "assum[ed]" without deciding that communications with non-agency personnel can "qualify as intra-agency under Exemption 5" and then simply concluded that the "intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants." *Klamath*, 532 U.S. at 12 & n.4. That is not the situation here—the communications occurred only among parties whom the Department itself chose to involve in its litigation preparation because, given that they were asserting overlapping claims against the same defendants, their interests in this instance coincided with "the public interest." *American Mgmt. Servs.*, 703 F.3d at 735 (quoting *Hunton & Williams*, 590 F.3d at 279).

The district court was also quite wrong to suggest that sustaining Exemption 5's application here would collapse its requirements into a single inquiry. *Cf.* J.A. 178. It is common ground that to be properly withheld, a record must be both "intra-agency" and "fall within the ambit of a privilege against discovery." *Klamath*, 532 U.S. at 8. Here, the withheld records "fall within the ambit of a privilege against discovery" (*id.*) because they are attorney work product for which privilege has not been waived, *see supra* pp. 20-32, and they are "intra-agency memorandums" because they were exchanged only among persons invited by the agency to participate in a common-interest arrangement to advance the agency's performance of its functions, *see supra* pp. 32-49. Depending on the particular privilege at issue, certain facts can be relevant in satisfying both legal inquiries—just as related doctrinal factors in other contexts are sometimes satisfied by the same evidence. And any such instances of factual overlap in the intra-agency and privilege analysis is unremarkable, given that they form part of the same provision whose overall purpose is to protect the "frank discussion of legal or policy matters" within documents "normally privileged in the civil discovery context." *Sears, Roebuck & Co.*, 421 U.S. at 149-50.

**3.** The district court's decision is also unsupported by any policy justification that could reasonably be attributed to Congress. As discussed,

Congress plainly anticipated—and sought to foreclose—the risk of FOIA being used as an end-run around the limits of civil discovery in pending litigation. *See Weber Aircraft Corp.*, 465 U.S. at 800-01. Nothing in the text or legislative history of FOIA indicates that the adjectives "inter-agency" and "intra-agency" were meant to narrow the traditional scope of work-product protection that all litigants may invoke. Indeed, even in the 2016 Act—an Act "designed to increase the availability of government records to the public" by, *inter alia*, requiring the government to withhold documents only where "foreseeable harm" would result, *Reporters Comm.*, 3 F.4th at 357, 369—Congress expressly re-enacted Exemption 5 without relevant change and confirmed that it covers "the attorney work product doctrine" without suggesting any restriction on that doctrine's longstanding scope. S. Rep. No. 114-4, at 10.

The district court here acknowledged that its reading "would cause foreseeable harm" to the United States within the meaning of the 2016 Act. J.A. 190 n.8. It sought to defend that result on the asserted justification that "federal agencies are not ordinary litigants" and that "if FOIA's disclosure obligations temper an agency's ability to litigate with private parties in secret, this is a feature, not a bug." J.A. 180. But as this Court long ago explained, "[t]he Government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives." *AT&T*,

54

642 F.2d at 1300.  In entrusting the Attorney General with the duty to enforce and defend federal law, Congress surely understood that the authority conferred upon him to supervise "the conduct of litigation" and "attend to the interests of the United States," 28 U.S.C. §§ 516-517, would encompass the ability to engage in confidential communications with allied parties and counsel if he determines that it is in the United States' litigating interests to do so (and, certainly, when encouraged or requested by courts to coordinate in that manner).

Other courts of appeals, unlike the district court, have readily understood these points.  The "government has the same right" to confidential counsel "as any private party," and FOIA does not purport to divest it of the "valuable right to partner with other parties in litigation." *Hunton & Williams*, 590 F.3d at 274.  Exemption 5's coverage of "inter-agency or intra-agency memorandums or letters" does not, by its terms, "demand[] that the government, alone among all litigants, be stripped of civil discovery privileges when it has done nothing more than communicate with other litigating parties with whom it shares a singular and unitary litigation interest." *Id.* at 278; *accord, e.g.*, *Rojas*, 989 F.3d at 673 (finding nothing in "FOIA's text or its legislative history" to "support th[e] assumption" that "Congress saddled agencies with a strong disincentive to employ the services of outside experts,

55

even when doing so would be in the agency's best interests"). Congress enacted and re-enacted FOIA "to foster political accountability, not to force the United States into a uniquely disadvantaged litigation posture," *Hunton & Williams*, 590 F.3d at 277, or to "thwart its ability to discharge its functions in the public interest," *Hanson*, 372 F.3d at 294. The district court seriously erred in assuming Congress enacted FOIA with the policy motive of disadvantaging the United States' conduct of litigation.

Moreover, as the district court failed to recognize, its decision impairs not simply the United States' ability to litigate but also that of others whose interests align with those of the federal government in any particular case. Here, the court ordered disclosure not only of emails drafted by Department attorneys, but also of materials authored by private counsel who shared them with the government under express assurances of confidentiality. *See supra* pp. 9, 26-27; J.A. 123-138 (*Vaughn* index). If the district court's decision were allowed to stand, private parties going forward will be severely chilled from coordinating with the government lest their confidential work product be rendered subject to release under FOIA and therefore readily available to their litigation adversaries. That, in turn, would prejudice the ability of those litigants to efficiently present their case to the court.

The district court's decision also impairs the Judicial Branch's ability to manage multiparty litigation involving federal parties. The federal courts' *Manual for Complex Litigation* urges judges both to "encourage[]" coordination among allied attorneys and to consider "institut[ing] procedures under which one or more attorneys are selected and authorized to act on behalf of other counsel and their clients." *Manual for Complex Litigation, Fourth* §§ 10.22-10.221 (2004). This coordination is desirable not because courts doubt the ability of individual counsel to represent their respective clients but, rather, because it promotes "efficiency" and simplifies matters for parties and the court alike. *Id.* § 10.221. The *Manual* recognizes that "[c]ommunication among the various allied counsel and their respective clients should not be treated as waiving work-product protection or the attorney-client privilege." *Id.* § 10.222. Nothing in Exemption 5, whether as originally enacted or as re-enacted in 2016, remotely suggests that Congress intended to undermine the ability of federal courts to use those same tools when superintending multiparty litigation that happens to involve a federal agency or officer.

In sum, the confidential co-counsel communications at issue here fall within the core of the protection provided by Exemption 5. The parties to this FOIA suit are simultaneously litigating against each other in another federal court. There is no serious dispute that the records at issue here could not be

obtained via discovery there.  Yet Georgia demands, via collateral lawsuit in a different forum, access to the very materials it effectively stipulated to be privileged.  Whatever limits the term "intra-agency" may impose in other cases implicating Exemption 5, it does not exclude attorney work product shared with allied co-counsel in a common-interest arrangement.  Instead, treating common-interest communications as "part of the enterprise that the agency is carrying out," *Hunton & Williams*, 590 F.3d at 280—and thus functionally "intra-agency"—is essential to maintaining a level playing field in litigation and to vindicating Exemption 5's manifest purpose of preventing FOIA from becoming a routine tool for backdoor discovery.

## CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
    *Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
*/s/ Jeffrey E. Sandberg*
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*
  *jeffrey.e.sandberg@usdoj.gov*

  *Counsel for Defendant-Appellant*
  *United States Department of Justice*

SEPTEMBER 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,909 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Calisto 14-point font, a proportionally spaced typeface.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2023, I electronically filed the foregoing opening brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey E. Sandberg*
Jeffrey E. Sandberg

**ADDENDUM**

### 5 U.S.C. § 552—Public information; agency rules, opinions, orders, records, and proceedings

**(a)** Each agency shall make available to the public information as follows:

… 

  **(3)**

    **(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

     …

  …

**(b)** This section does not apply to matters that are—

  …

  **(5)** inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

  …

….