ORAL ARGUMENT NOT YET SCHEDULED
No. 23-5083

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF GEORGIA; BRAD RAFFENSPERGER,
GEORGIA SECRETARY OF STATE, IN HIS OFFICIAL CAPACITY,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF JUSTICE,

*Defendant-Appellant.*

Appeal from the U.S. District Court for the District of Columbia
Civil Case No. 1:21-cv-03138-TNM; Hon. Trevor N. McFadden

## BRIEF OF APPELLEES

CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY
  *Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

GENE C. SCHAERR
  *Counsel of Record*
ERIK S. JAFFE
BRIAN J. FIELD
ANDREW STRAIN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

BRYAN P. TYSON
BRYAN F. JACOUTOT
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(678) 336-7197
btyson@taylorenglish.com

*Counsel for Appellees*

OCTOBER 20, 2023

## CERTIFICATE AS TO THE PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record for Appellees, State of Georgia and Brad Raffensperger, Georgia Secretary of State, in his official capacity, hereby provides the following information:

### I.    Parties, Intervenors, and *Amici* Appearing Below

The parties who appeared in the U.S. District Court for the District of Columbia are:

1.    State of Georgia, Plaintiff;

2.    Brad Raffensperger, Georgia Secretary of State, in his official capacity, Plaintiff; and

3.    United States Department of Justice, Defendant.

No intervenors or *amici curiae* appeared in the U.S. District Court for the District of Columbia.

### II.    Parties, Intervenors, and *Amici* Appearing in this Court in this Matter

The parties who have appeared before the U.S. Court of Appeals for the District of Columbia Circuit in this matter are:

1.    United States Department of Justice, Defendant-Appellant;

2.    State of Georgia, Plaintiff-Appellee; and

3.    Brad Raffensperger, Georgia Secretary of State, in his official capacity, Plaintiff-Appellee.

*Amici curiae* that have appeared in this Court are:

1.    Advancement Project Education Fund;

2.    Asian Americans Advancing Justice-AAJC;

3.    Lawyers' Committee for Civil Rights Under Law;

4.    NAACP Legal Defense & Educational Fund, Inc.; and

5.    Southern Poverty Law Center.

There are no intervenors in this Court.

Appellees are government entities, and as such, are not required to file a Rule 26 disclosure.

## III.  Rulings Under Review

The ruling under review in this case is the order entered on February 20, 2023, by the Honorable Trevor N. McFadden, U.S. District Court for the District of Columbia, granting Plaintiffs' motion for summary judgment and denying Defendant's motion for summary judgment.

The Order and Memorandum Opinion are reprinted in the Joint Appendix ("J.A.") filed with the Appellant's Opening Brief on September 8, 2023, at J.A. 160–92.  The decision is available at --F. Supp. 3d--, 2023 WL 2116375 (D.D.C. 2023).

## IV.  Related Cases

This case has not previously been filed with this court or any other court.  Counsel for Appellees is not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).


/s/ *Gene C. Schaerr*
Gene C. Schaerr
*Counsel for Appellees*

# TABLE OF CONTENTS

CERTIFICATE AS TO THE PARTIES, RULINGS, AND
    RELATED CASES ................................................................. i

TABLE OF AUTHORITIES ..................................................... v

GLOSSARY ............................................................................ ix

INTRODUCTION .................................................................... 1

COUNTER-STATEMENT OF ISSUES ................................... 3

STATUTES AND REGULATIONS ......................................... 3

STATEMENT ......................................................................... 4

    A.    Georgia SB 202 Litigation .......................................... 4

    B.    FOIA Request and Lawsuit ......................................... 8

    C.    The District Court's Ruling ....................................... 12

SUMMARY OF ARGUMENT ................................................ 13

ARGUMENT ......................................................................... 19

    I.    DOJ CANNOT SATISFY EXEMPTION 5'S THRESHOLD
    INTERNALITY REQUIREMENT. ....................................... 19

    II.    ALTERNATIVELY, DOJ WAIVED THE ATTORNEY WORK
    PRODUCT PRIVILEGE BY SENDING MATERIALS TO THIRD
    PARTIES. ..................................................................... 42

CONCLUSION ...................................................................... 58

CERTIFICATE OF COMPLIANCE ....................................... 60

ANTI-VIRUS CERTIFICATION ............................................ 60

ADDENDUM:

    52 U.S.C. § 552: Public information; agency rules,
    opinions, orders, records, and proceedings ...................... Addendum 1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bowles v. Nat'l Ass'n of Home Builders*,
  224 F.R.D. 246 (D.D.C. 2004) ...............................................................53

*Carter v. George Washington Univ.*,
  387 F.3d 872 (D.C. Cir. 2004) .......................................................31, 55

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ............................................................52

*Crooker v. Bureau of Alcohol, Tobacco & Firearms*,
  670 F.2d 1051 (D.C. Cir. 1981) ..........................................................26

*Cutter v. Wilkinson*, 544 U.S. 709 (2005) ................................................43

*Dep't of Air Force v. Rose*, 425 U.S. 352 (1976) ........................... 13, 25, 26

\* *Dep't of Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) 15, 16, 20, 21, 23, 24, 25, 26, 27, 28, 31, 37, 38, 39, 40

*Dist. of Columbia v. Air Fla., Inc.*,
  750 F.2d 1077 (D.C. Cir. 1984) .....................................................44, 47

*Feld v. Fireman's Fund Ins. Co.*,
  909 F.3d 1186 (D.C. Cir. 2018) .....................................................45, 47

*Flynn v. Comm'r of Internal Revenue Serv.*,
  269 F.3d 1064 (D.C. Cir. 2001) ...........................................40, 43, 44, 45

\* *Food Mktg. Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019) .....................................................14, 19, 20, 26

*Formaldehyde Inst. v. Dep't of Health & Hum. Servs.*,
  889 F.2d 1118 (D.C. Cir. 1989) ..........................................................36

*Frontier Refin., Inc. v. Gorman-Rupp Co., Inc.*,
  136 F.3d 695 (10th Cir. 1998) ............................................................53

*Hormel v. Helvering*, 312 U.S. 552 (1941) ...............................................43

\*Authorities upon which we chiefly rely are marked with asterisks.

*Hunton & Williams v. U.S. Dep't of Just.*,
  590 F.3d 272 (4th Cir. 2010) .......................16, 36, 37, 38, 40, 41, 51, 52

*Huron v. Cobert*, 809 F.3d 1274 (D.C. Cir. 2016) ...................................47

*In re Ga. Senate Bill 202*,
  No. 1:21-MI-55555-JPB, 2023 WL 6628601
  (N.D. Ga. Oct. 11, 2023) ......................................................................10

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) .............................................................47

*\*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998) ...........................18, 49, 51

*In re Subpoenas Duces Tecum*, 738 F.2d 1367 (D.C. Cir. 1984).............49

*Johnston v. Reily*, 160 F.2d 249 (D.C. Cir. 1947)...................................43

*Jud. Watch, Inc. v. Dep't of Energy*,
  412 F.3d 125 (D.C. Cir. 2005) ............................................................36

*LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) ...........................36

*Lucaj v. Fed. Bureau of Investigation*,
  852 F.3d 541 (6th Cir. 2017) .............................................................37

*Marymount Hosp., Inc. v. Shalala*,
  19 F.3d 658 (D.C. Cir. 1994) .......................................................43, 45

*Maydak v. U.S. Dep't of Just.*,
  218 F.3d 760 (D.C. Cir. 2000) ...........................................................45

*McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*,
  647 F.3d 331 (D.C. Cir. 2011) ....................................15, 28, 32, 33, 38

*Milner v. Dep't of Navy*, 562 U.S. 562 (2011)...................................25, 26

*\*Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*,
  512 F.3d 677 (D.C. Cir. 2008) ....................16, 27, 28, 32, 33, 34, 35, 38

*Nat'l Parks & Conservation Ass'n v. Morton*,
  498 F.2d 765 (D.C. Cir. 1974) ...........................................................26

*Pennsylvania Elec. Co. v. Fed. Energy Regul. Comm'n*,

vi

11 F.3d 207 (D.C. Cir. 1993) ............................................... 45

*Pub. Citizen, Inc. v. Dep't of Just.*,
111 F.3d 168 (D.C. Cir. 1997) ........................................ 27

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l*
*Boundary & Water Comm'n*, 740 F.3d 195
(D.C. Cir. 2014) ........................................ 15, 22, 28, 31, 38

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*,
421 U.S. 168 (1975) ........................................................ 24

*Roberts v. Carrier Corp.*, 107 F.R.D. 678 (N.D. Ind. 1985) .................... 53

* *Rojas v. Fed. Aviation Admin.*,
989 F.3d 666 (9th Cir. 2021) ................................... 24, 26, 37

*Roosevelt v. E.I. Du Pont de Nemours & Co.*,
958 F.2d 416 (D.C. Cir. 1992) ...................................... 44

*Rose v. Dep't of Air Force*, 495 F.2d 261 (2d Cir. 1974) ........................ 13

*Roth v. U.S. Dep't of Just.*, 642 F.3d 1161 (D.C. Cir. 2011) ............ 17, 45

*Ryan v. Dep't of Just.*, 617 F.2d 781 (D.C. Cir. 1980) ................ 27, 32, 34

*Sackett v. Env't Prot. Agency*, 598 U.S. 651 (2023) ................................ 40

*Senate of P.R. v. U.S. Dep't of Just.*,
823 F.2d 574 (D.C. Cir.  1987) ...................................... 52, 56

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps*
*of Eng'rs*, 531 U.S. 159 (2001) ........................................ 40

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ................................. 34

*Teva Pharms., USA, Inc. v. Leavitt*,
548 F.3d 103 (D.C. Cir. 2008) ...................................... 47

*U.S. Dep't of Just. v. Julian*, 486 U.S. 1 (1988) ......................... 24, 25, 26

*United States v. Am. Tel. & Tel. Co.*,
642 F.2d 1285 (D.C. Cir. 1980) ........................ 48, 49, 50, 53

*United States v. AT&T*, 86 F.R.D. 603 (D.D.C. 1979) ........................... 53

*United States v. Deloitte LLP*, 610 F.3d 129 (D.C. Cir. 2010) .......... 50, 51

*United States v. Raines*, 362 U.S. 17 (1960) ........................................... 29

*United States v. Weber Aircraft Corp.*, 465 U.S. 792 (1984) .................. 20

*Woodhull Freedom Found. v. United States*,
72 F.4th 1286 (D.C. Cir. 2023) ............................................................. 19

## Statutes

5 U.S.C. § 551 .......................................................................................... 22

*\* 5 U.S.C. § 552 ............................................. 3, 13, 14, 19, 20, 21, 22, 24, 37

42 U.S.C. § 12188 ..................................................................................... 29

52 U.S.C. § 10101 ..................................................................................... 29

52 U.S.C. § 10302 ..................................................................................... 29

FOIA Improvement Act of 2016,
Pub. L. No. 114-185, 130 Stat. 538 (2016) .......................................... 40

## Rules

Fed. R. App. P. 10 ............................................................................... 31, 55

Fed. R. Civ. P. 26 ..................................................................................... 48

## Other Authorities

Press Release, Off. of Pub. Affs., U.S. Dep't of Just.,
*Attorney General Merrick B. Garland Statement*
*Regarding the 58th Anniversary of the Voting Rights Act*
(Aug. 4, 2023) ....................................................................................... 35

Press Release, Off. of Pub. Affs., U.S. Dep't of Just.,
*Justice Department to Monitor Compliance with Federal*
*Voting Rights Laws in Alaska Jurisdictions*
(Oct. 3, 2023) ....................................................................................... 35

*Webster's Third New Int'l Dictionary of the English*
*Language* (1961) ................................................................................... 21

## GLOSSARY

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ADA | Americans with Disabilities Act |
| DOJ | Department of Justice |
| FOIA | Freedom of Information Act |
| J.A. | Joint Appendix |
| NAACP | The National Association for the Advancement of Colored People |
| SB 202 | Georgia Senate Bill 202 |

**INTRODUCTION**

In response to concerns raised by voters and county officials over several election cycles, Georgia's General Assembly enacted legislation—Senate Bill 202 ("SB 202")—to increase ballot access for all voters, while also ensuring that Georgians could be more confident in the integrity of the State's elections. But various private interest groups fought SB 202 from the outset. And, after the bill was enacted, those same organizations filed a series of lawsuits claiming that SB 202 was unlawful.

Thereafter, the Department of Justice joined the fray by filing a separate lawsuit. However, unlike the private plaintiffs' broader claims, DOJ claimed only that SB 202 was passed for discriminatory reasons—i.e., that it was intended to target Black voters in Georgia. And DOJ opted to challenge a narrower set of the law's provisions than did the private Plaintiffs. Yet the federal Government invested heavily in rhetoric and hyperbole, with the President even calling SB 202 "Jim Crow 2.0."

To better understand the depths of DOJ's coordination with the private parties suing Georgia—and the genesis of DOJ's unwarranted

decision to smear Georgia's elected officials as driven by discriminatory motives—Georgia submitted a Freedom of Information Act request seeking those coordinating communications between DOJ and the private interest groups. And, as this case progressed, DOJ acknowledged that it had worked closely with those private interest groups to coordinate their attacks on Georgia. In fact, when withholding its communications with those organizations, DOJ claimed it worked so closely with them that the organizations were essentially acting as federal employees, and thus the communications could be withheld under FOIA's Exemption 5.

Applying binding precedent from the Supreme Court and this Court, the district court correctly rejected that argument. Indeed, FOIA's plain text provides that Exemption 5's protections are limited to inter- and intra-agency communications. And, as much as DOJ wishes to characterize the private plaintiffs suing Georgia as "consultants" falling within Exemption 5's protections, DOJ failed to marshal any evidence demonstrating that the private interest groups were acting in support of the same interests DOJ was advancing. Instead, the record demonstrated that those organizations were acting in support of their

*own* litigation interests, and that their coordination with DOJ was merely another way to advance those private interests.

But FOIA provides no protection for such communications, and this Court should affirm the district court's judgment on any or all of its independent grounds.

## COUNTER-STATEMENT OF ISSUES

1.    Whether communications that Department of Justice officials exchanged with third-party interest groups are "inter-agency or intra-agency memorandums."  5 U.S.C. § 552(b)(5).

2.    Whether the same communications, when made outside the framework of a valid common interest agreement, "would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

3.    Whether by exchanging the same communications with third-party interest groups, the Department of Justice waived any work product protection.

## STATUTES AND REGULATIONS

Pertinent authorities appear in an addendum to this brief.

## STATEMENT

A proper appreciation of the parties' various positions in this appeal requires an accurate understanding of (a) the ongoing district court litigation over as SB 202; (b) the FOIA request filed by Georgia in this case; and (c) the district court's decision.

### A.    Georgia SB 202 Litigation

The Georgia legislature passed, and the Governor signed, SB 202 on March 25, 2021.  Through SB 202, Georgia increased access to early voting, established a more objective measure to confirm the identity of individuals voting by absentee ballot, mandated access to drop boxes for returning absentee ballots, ensured that voters waiting in line to vote would not be subject to undue outside influence, required counties to take action if lines were ever more than an hour long at any point on Election Day, and adopted many other measures aimed at increasing voter confidence and securing ballot access.

Once enacted, many private entities that had opposed SB 202 during the legislative process filed lawsuits challenging SB 202, including the Southern Poverty Law Center, the ACLU, the New Georgia Project, the NAACP, VoteAmerica, and the Center for Voter

4

Information.[1]  Months after those private entities filed their complaints, DOJ filed a separate lawsuit challenging portions of SB 202.  *See* Compl., *United States v. Georgia*, No. 1:21-cv-02575-JPB (N.D. Ga. June 25, 2021) ("DOJ Compl."), Decl. of Brian J. Field ("Field Decl.") Ex. 6, ECF No. 16-3.[2]

But DOJ's lawsuit differed in many ways from the lawsuits brought by these private entities.  For instance, DOJ's lawsuit addressed only a narrow set of SB 202's provisions: the rules on mailing of absentee-ballot applications, the identification rules for absentee-ballot applications, the statutory requirement that counties provide drop boxes to allow voters to return absentee ballots, the prohibition on giving things of value to voters

---

[1] *See The New Ga. Project v. Raffensperger*, No. 1:21-cv-01229-JPB (N.D. Ga. filed Mar. 25, 2021); *Georgia State Conf. of the NAACP v. Raffensperger*, No. 1:21-cv-01259-JPB (N.D. Ga. filed Mar. 28, 2021); *Sixth Dist. of the Afr. Methodist Episcopal Church v. Kemp*, No. 1:21-cv-01284-JPB (N.D. Ga. filed Mar. 29, 2021); *Asian Ams. Advancing Just.-Atlanta v. Raffensperger*, No. 1:21-cv-01333-JPB (N.D. Ga. filed Apr. 1, 2021); *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. filed Apr. 7, 2021); *The Concerned Black Clergy of Metro. Atlanta, Inc. v. Raffensperger*, No. 1:21-cv-01728-JPB (N.D. Ga. filed Apr. 27, 2021); *Coalition for Good Governance v. Raffensperger*, No. 1:21-cv-02070-JPB (N.D. Ga. filed May 17, 2021).

[2] Unless noted otherwise, "ECF" citations are to the district court's docket.

waiting in line to vote, and updated rules on out-of-precinct voting. *See* DOJ Compl. ¶ 2. By contrast, the private plaintiffs challenged several other provisions of SB 202, including: the prohibition on mobile voting units, allowing challenges to voter qualifications, allowing the State Election Board to conduct performance reviews of county elections superintendents in certain circumstances, the timeline for early voting during runoff elections, and several other provisions. *See, e.g.*, First Am. Compl. ¶¶ 133–69, *Georgia State Conf. of the NAACP v. Raffensperger*, No. 1:21-cv-01259-JPB (N.D. Ga. May 28, 2021), Field Decl. Ex. 5, ECF No. 16-3 ("NAACP First Am. Compl."); First Am. Compl. ¶¶ 67–110, *The New Ga. Project v. Raffensperger*, No. 1:21-cv-01229-JPB (N.D. Ga. May 17, 2021), Field Decl. Ex. 4, ECF No. 16-3.

In addition to challenging different portions of SB 202, the parties brought different legal claims. DOJ brought only a single claim of intentional discrimination under the Voting Rights Act—resting its entire case on the (false) charge that the Georgia legislators who enacted SB 202 had acted with racial motives. *See* DOJ Compl. ¶¶ 159–65. In contrast, the private plaintiffs brought claims under the First, Fourteenth, and Fifteenth Amendments of the U.S. Constitution, the

Americans with Disabilities Act, the Rehabilitation Act, the Voting Rights Act, and others. *See, e.g.*, Compl. ¶¶ 104–61, *VoteAmerica v. Raffensperger*, No. 1:21-cv-01390-JPB (N.D. Ga. Apr. 7, 2021) ("VoteAmerica Compl."), Field Decl. Ex. 7, ECF No. 16-3 (First and Fourteenth Amendment challenges); Am. Compl. ¶¶ 366–422, *Coalition for Good Governance v. Raffensperger*, No. 1:21-cv-02070-JPB (N.D. Ga. June 11, 2021), Field Decl. Ex. 8, ECF No. 16-3 ("CGG Am. Compl.") (fourteen claims alleging equal protection violations, due process violations, and violations of the Fourteenth Amendment); NAACP First Am. Compl. ¶¶ 170–237 (challenge under Section 2 of the Voting Rights Act alleging discriminatory effects, violations of the Fourteenth and Fifteenth Amendments guarantee of the right to vote, violations of Section 2 of the Voting Rights Act of 1965, and violations of freedom of speech, association, and expressive conduct, and alleging that the State had created an immaterial voting requirement). Rather than intervening in any of the lawsuits brought by the private entities, DOJ filed only a single statement of interest in one case, and, as with DOJ's own complaint, that statement was limited to a claim of intentional discrimination under the Voting Rights Act. *See* J.A. 189.

After the U.S. District Court for the Northern District of Georgia denied Georgia's motions to dismiss the various complaints, the court directed the parties to consider whether the cases should be consolidated for discovery purposes. *See*, *e.g.*, Docket Order, *United States v. Georgia*, No. 1:21-cv-02575-JPB (N.D. Ga. Dec. 9, 2021). Understanding that discovery may present some factual overlap, the parties agreed to consolidate several, but not all, of these cases, and the district court so ruled.[3] The district court did not consolidate the lawsuits brought by VoteAmerica or the Coalition for Good Governance.

## B. FOIA Request and Lawsuit

Early on in the litigation, it became clear that DOJ was involved in coordinating the various lawsuits challenging SB 202. Indeed, DOJ waited to file its lawsuit until after these other lawsuits were filed. And DOJ waited to file its complaint until it saw the motions to dismiss that Georgia filed in several of the other lawsuits. Moreover, DOJ's complaint mimicked many of the hyperbolic allegations from the private plaintiffs'

---

[3] *See, e.g.*, State Defs.' Consol. Stmt. on Consolidation of SB 202 Cases, *Asian Ams. Advancing Just.-Atlanta v. Raffensperger*, No. 1:21-cv-01333-JPB (N.D. Ga. Dec. 14, 2021) (J.A. 141); Order, *In Re Georgia Senate Bill 202*, No. 1:21-MI-55555-JPB (N.D. Ga. Dec. 23, 2021) (J.A. 46–55).

complaints.   For example, DOJ parroted the private plaintiffs' accusations about Georgia's long-past history to suggest that SB 202 was based on racially discriminatory motives.  *See, e.g.,* DOJ Compl. ¶¶ 1, 30–34.

To better understand the nature, depth and breadth of this coordination—and the genesis of DOJ's false claims of discrimination—Georgia submitted a FOIA request to DOJ on August 31, 2021, seeking three categories of records.  *See* Decl. of Kilian Kagle ("Kagle Decl.") (J.A. 102).   As relevant here, Georgia requested: "All communications discussing [SB 202] exchanged between DOJ personnel and the following individuals or representatives of the following non-governmental entities from November 3, 2020, through the date of the search[.]"  Compl. Ex. A at 2 (J.A. 16).  The request listed 62 individuals and entities for which Georgia sought communications.  J.A. 16–18.

The importance of Georgia's FOIA request is highlighted by a recent decision by the district court in Georgia strongly indicating that DOJ's claims of racially discriminatory motivations were unfounded from the start.  With the benefit of full discovery and an extended briefing schedule, DOJ had an opportunity to present to the district court in its

9

motion for preliminary injunction, and in a full-day hearing, all of its purported evidence of racially discriminatory intent by the Georgia legislature. But even after all that, DOJ failed to identify any meaningful evidence of such an intent. And, as a result, the district court's decision denying DOJ's motion found that each of the *Arlington Heights* factors—which provide the analytical framework for assessing claims of racial discrimination in voting rights cases—weighed *against* a finding of discriminatory intent. *See In re Ga. Senate Bill 202*, No. 1:21-MI-55555-JPB, 2023 WL 6628601, at *11–20 (N.D. Ga. Oct. 11, 2023). That finding strongly suggests that DOJ never had a basis for asserting racial discrimination.

That finding also raises a serious question as to whether DOJ pressed this claim because of pressure from the third-party organizations or, alternatively, in the face of warnings from some of those groups that a racial discrimination claim had no factual basis. Either way, the public deserves to know why DOJ maintained such a faulty claim—which is one purpose of Georgia's FOIA request.

After DOJ failed to respond to Georgia's request, Georgia was forced to bring this lawsuit (filed on December 1, 2021), to compel DOJ's

compliance with FOIA. *See* Compl. ¶¶ 25–28 (J.A. 10). Several months later, DOJ finally released some responsive records. For instance, on March 7, 2022, DOJ's Civil Rights Division released 596 pages of records in full. See Kagle Decl. ¶ 25 (J.A. 110). Then, on April 18, 2022, the Civil Rights Division issued what it deemed to be its final response, releasing 394 pages of records. *See id.* ¶ 27 (J.A. 110); Compl. Ex. D (J.A. 120–21). But in that release, the Civil Rights Division withheld several records relying on Exemptions 5, 6, and 7(C). Kagle Decl. ¶ 27 (J.A. 110). On April 21, 2022, DOJ's Office of Information Policy released 21 pages with portions withheld pursuant to Exemption 6. *See* Decl. of V. Brinkmann ¶ 9 (ECF No. 14-6). On June 30, 2022, DOJ's Office of Information Policy issued a supplemental release with two pages released in full. *Id.* ¶ 10.

This appeal addresses only DOJ's Exemption 5 withholdings, which DOJ argues were proper because (it claims) DOJ officials were working closely with the private plaintiff organizations to coordinate their attacks on Georgia. According to DOJ, those coordinated attacks were part of several unwritten (at the time) "common interest agreements." Mem. in Supp. of Def.'s Mot. for Summ. J. at 1 ("DOJ Mot."), ECF No. 14-1.

Accordingly, DOJ contends, they satisfy Exemption 5's "intra-agency" requirement under the consultant corollary. DOJ Mot. at 14–18.

In response, Georgia demonstrated that those communications did not meet Exemption 5's threshold requirement of internality, and, in any event, DOJ had waived the work product privilege by its disclosures to third parties outside the context of a valid common interest agreement. Pls.' Mem. of P. & A. in Supp. of Cross-Mot. for Summ. J. & in Opp'n to DOJ's Mot. at 12–22 ("State's Mot."), ECF No. 15-1.

## C.    The District Court's Ruling

After briefing and oral argument, the district court granted Georgia's Cross-Motion for Summary Judgment. Its decision rested on two independent grounds. First, the court ruled that FOIA's plain text confirms that the withheld communications were not "intra-agency" because they were exchanged with outside, non-governmental parties, *see* J.A. 165–66, and that DOJ could not rely on the so-called "consultant corollary" to Exemption 5 because DOJ did not solicit the advice of the outside parties, those parties were not consulted for their unique expertise, and the outside parties had independent interests in the various lawsuits filed against Georgia. *See* J.A. 169–82. Second, in any

event, DOJ waived the work product privilege by disclosing these communications to third-party organizations, *see* J.A. 182–90. For each of these reasons, the district court ordered DOJ to release all records it had withheld under Exemption 5. *See* J.A. 192. As demonstrated below, the district court was correct on both of these independent bases for its decision.

## SUMMARY OF ARGUMENT

This case is not about the merits of Georgia's SB 202, but whether outside parties may lobby and seek to influence DOJ's litigation strategy under a veil of secrecy. FOIA answers that question with a resounding "no." FOIA's "crystal clear [] congressional objective" was "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny[.]'" *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *Rose v. Dep't of Air Force*, 495 F.2d 261, 263 (2d Cir. 1974)). And the district court's order requiring disclosure here was undoubtedly correct.

1. By its terms, FOIA's Exemption 5 covers only communications that are "inter-agency" or "intra-agency." 5 U.S.C. § 552(b)(5). There is no dispute that DOJ's communications with outside parties were not

"inter-agency."    Rather, they must be considered "intra-agency" communications to be withheld.

But the Supreme Court has instructed that FOIA's exemptions are to be construed narrowly and in accordance with their "ordinary meaning and structure[.]" *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). And the plain meaning of "intra-agency" requires that the communications be sent between DOJ officials and officials from an agency, as FOIA defines that term. 5 U.S.C. § 552(f)(1). But outside parties are not "agencies," and that alone is reason to affirm the district court's ruling. *Food Mktg. Inst.*, 139 S. Ct. at 2364 ("Where, as here, that examination [under the rules of statutory interpretation] yields a clear answer, judges must stop.").

The district court also correctly rejected DOJ's attempt to expand the "consultant corollary" to cover these communications. That doctrine, which some courts have applied to treat outside communications as "intra-agency," does not apply here. Rather, the district court correctly concluded that the consultant corollary, if it is valid at all, was inapplicable because the withheld communications lacked all the

hallmarks required by the Supreme Court and this Court's precedent. J.A. 169–78.

In fact, DOJ conceded as much when it acknowledged that the private plaintiffs had independent interests in the underlying litigation (J.A. 171), thus running afoul of the Supreme Court's requirement that outside consultants function "just as an employee would be expected to do." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 11 (2001).  Likewise, DOJ failed to provide any evidence that it had solicited these outside groups for assistance, despite this Court's precedent *requiring* such evidence.  *See Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 201 (D.C. Cir. 2014) (Kavanaugh, J.) ("[T]his Court has also interpreted the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by *non*-agency entities if those records were solicited by a U.S. agency in the course of its deliberative process.") (citing *McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011)).

On this point, the district court noted that the lack of such evidence is unsurprising, as DOJ could not plausibly claim that the experienced

attorneys from its much-heralded Civil Rights Division required outside expertise to assist in prosecuting its case. J.A. 175–76 (citing *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.*, 512 F.3d 677, 688 (D.C. Cir. 2008) ("*NIMJ*")). Thus, even if the consultant corollary is consistent with FOIA's text, which it isn't, it provides DOJ no basis for withholding the requested records from Georgia and the public.

For similar reasons, the district court correctly refused (J.A. 178–82) to follow the Fourth Circuit's opinion in *Hunton & Williams v. U.S. Department of Justice*, which significantly expanded the consultant corollary beyond the boundaries of *Klamath* and this Court's precedent. *See Hunton & Williams*, 590 F.3d 272, 279–80 (4th Cir. 2010) (expanding the consultant corollary to cover common interest agreements between the government and outside parties). Indeed, *Hunton* failed to heed *Klamath*'s teaching that an agency consultant cannot "represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Klamath*, 532 U.S. at 10–11. Applying binding precedent from the Supreme Court and this Court, this Court should affirm the district court's rejection of *Hunton*'s reasoning—which in any event is readily distinguishable.

16

2.  Rather than directly engage these issues, DOJ spends much of its brief contending (at 22–28) that the district court applied the wrong standard when determining, as an alternative ground for its decision, that DOJ had waived its work product protections by communicating with outside parties.  But the Court need not reach this question for at least two reasons.

First, this argument is irrelevant because DOJ must *first* satisfy Exemption 5's threshold intra-agency requirement before considering whether the withheld records are protected by any litigation privilege.  And, because DOJ cannot do so, it does not matter if the work product protection was waived.

Second, DOJ forfeited this argument by failing to raise it below.  At no point during the district court proceedings did DOJ advance the argument it proposes here—that there are different waiver standards for the attorney-client privilege and the attorney work product doctrine.  Thus, "having failed to raise the argument in the district court in a manner sufficient to put [Plaintiff] on notice of the need to rebut it, the government is barred from doing so for the first time on appeal."  *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1179–80 (D.C. Cir. 2011).

17

But even if this Court were to consider DOJ's new argument, DOJ is mistaken when arguing (at 7, 27) that the work product privilege can be waived *only* by disclosure to an adversary. The notion that DOJ could transmit attorney work product to *anyone*, provided it did not send those communications to Georgia or its counsel, lacks support in the law, much less common sense. Rather, this Court has held that waiver of the work product privilege occurs when disclosures are made to third parties absent a common interest *agreement*. *See In re Lindsey*, 158 F.3d 1263, 1282 (D.C. Cir. 1998) (per curiam). And, as the district court correctly found, DOJ and the outside parties lacked a valid common interest agreement, not only because they could not establish the timely existence of any agreement, but also because they brought *separate* lawsuits, with *separate* claims, challenging *separate* provisions of SB 202. J.A. 187. Thus, in the absence of a valid common interest agreement, DOJ's communications waived any work product protection, and the district court's decision can and (if the Court reaches the issue) should be affirmed for that reason as well.

## ARGUMENT

As demonstrated in greater detail below, the district court correctly concluded that DOJ cannot use Exemption 5 to hide its communications with third parties about the various lawsuits brought against Georgia. The Court should therefore affirm the district court's decision, and order DOJ to release the withheld communications.

## I.    DOJ Cannot Satisfy Exemption 5's Threshold Internality Requirement.

This case begins and ends with FOIA's statutory text.  Indeed, that is where the Court "must" start, *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1298 (D.C. Cir. 2023), and where it must "stop," *Food Mktg. Inst.*, 139 S. Ct. at 2364.  And, under the clear text of Exemption 5, DOJ cannot withhold its communications with non-governmental entities, as those communications are neither "inter-agency" nor "intra-agency."  5 U.S.C. § 552(b)(5).  True, some courts have crafted exceptions to Exemption 5, including the consultant corollary.  But those exceptions, which themselves stand on shaky ground, provide DOJ no relief.  Rather, DOJ failed to carry its burden of demonstrating that it may withhold these records as inter- or intra-agency

communications. And for that reason alone, the Court can and should affirm the district court's decision.

## A. FOIA's Plain Text Confirms That the Withheld Communications Were Neither Inter- nor Intra-Agency.

FOIA's plain text requires DOJ to satisfy two requirements to justify any withholding under Exemption 5: The records must be "[1] inter-agency or intra-agency memorandums or letters that [2] would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Although DOJ focuses much of its opening brief (at 20–32) on the second requirement, the Court need not reach that issue. Rather, the Supreme Court confirms that the "first condition of Exemption 5" has "independent vitality," and, when it is not met, the Court "need not reach step two of the Exemption 5 analysis and enquire whether the communications would normally be discoverable in civil litigation." *Klamath*, 532 U.S. at 12 & n.3 (second quotation citing *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984)).

This text, along with FOIA's "ordinary meaning and structure," confirms that the withheld communications do not satisfy the first step of Exemption 5. *Food Mktg. Inst.*, 139 S. Ct. at 2364. Indeed, FOIA

defines an "agency" to "include[] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government ..., or any independent regulatory agency[.]" 5 U.S.C. § 552(f)(1). There can be no dispute that the private organizations suing Georgia are not "agencies" as FOIA defines that term. And thus, it is undisputed that the withheld communications were not "inter-agency" communications. By definition, "inter" means "among" or "between." *See Inter*, *Webster's Third New Int'l Dictionary of the English Language* ("*Webster's Third*") 1176 (1961) (defining "Inter" as "among" or "between"). Since DOJ was not communicating "among" or "between" agencies, it cannot withhold these communications as "inter-agency" communications.

Nor can DOJ rely on Exemption 5's protection of "intra-agency" communications. "Intra" means "within." *Intra, Webster's Third* 1185. And the Supreme Court similarly explains that "intra-agency" communications are those "addressed both to and from employees of a *single agency*." *Klamath*, 532 U.S. at 9 (emphasis added).

This conclusion is further confirmed by the structure of FOIA itself. In several places, Congress included exemptions in FOIA's text that extend protections to communications with non-governmental parties. For instance, Exemption 4 protects "trade secrets and commercial or financial information *obtained from a person*," as opposed to an agency. 5 U.S.C. § 552(b)(4) (emphasis added). And "person" is defined to include outside entities. *See* 5 U.S.C. § 551(2) (defined as "includ[ing] an individual, partnership, corporation, association, or public or private organization other than an agency"). Likewise, Exemption 8 protects "reports prepared by, on behalf of, or for the use of an agency." 5 U.S.C. § 552(b)(8).

Thus, Congress knew how to extend FOIA exemptions to include communications with outside parties, and it could have done so in Exemption 5. But Congress did not do so, and the Court must apply the "ordinar[y] interpret[ation]" of the statute's terms. *Pub. Emps.*, 740 F.3d at 201 (Kavanaugh, J.).

Because the private organizations communicating with DOJ and suing the State of Georgia are not "agencies" under FOIA, that should end the Court's inquiry, as that reality makes it impossible for DOJ to

satisfy Exemption 5's threshold requirement. *See Klamath*, 532 U.S. at 12.

**B.   DOJ Cannot Rely on the Consultant Corollary to Justify its Withholdings.**

DOJ attempts to escape this conclusion by asking the Court to apply an untenably broad reading of the so-called "consultant corollary." *See* DOJ Br. at 36–37 (proposing a "functional test" that would only ask whether the document was part of the deliberative process of the agency); *but see Klamath*, 532 U.S. at 12 ("The Department seems to be saying that 'intra-agency' is a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential."). Properly applied, however (assuming the doctrine is valid at all), the consultant corollary permits a narrow set of communications exchanged with non-governmental entities to be considered intra-agency where the outside entity "may be enough like the agency's own personnel to justify calling their communications 'intra-agency.'" *Id.* For at least two reasons, DOJ's reliance on this doctrine is misguided.

1.    First, there are significant questions about whether the consultant corollary can be squared with FOIA's text. Exemption 5's text confines the exemption to "inter-agency or intra-agency memorandums

or letters," but the consultant corollary treats parties that are indisputably outside an agency as if they are internal to the agency. 5 U.S.C. § 552(b)(5); *see Klamath*, 532 U.S. at 9 (noting that "neither the terms of the exemption nor the statutory definitions say anything about communications with outsiders"); *Rojas v. Fed. Aviation Admin.*, 989 F.3d 666, 683–85 (9th Cir. 2021) (en banc) (Wardlaw, J., concurring in part) (stating that the consultant corollary contradicts the text of Exemption 5), *cert. denied*, 142 S. Ct. 753 (2022).

The Supreme Court's prior application of the terms "inter-agency" and "intra-agency" only underscores these latent contradictions. The Court has explained that the most natural reading of the phrase intra-agency letter or memoranda "is a memorandum that is addressed both to and from employees of a single agency." *Klamath*, 532 U.S. at 9 (quoting *U.S. Dep't of Just. v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting)). Similarly, the Court has explained that the term "inter-agency" was meant to protect the ability of "*one agency* possessing decisional authority to obtain written recommendations and advice from *a separate agency*." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975) (emphases added). Accordingly, extending

24

Exemption 5 to protect communications with outside consultants cannot be easily reconciled with Congress's choice to limit Exemption 5 to inter- and intra-agency communications.

Rather than following this authority, DOJ relies heavily on a footnote from a dissent by Justice Scalia where he suggested that the text of Exemption 5 can be read to encompass outside consultants. DOJ Br. at 34 (citing *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting)). But that footnote cannot withstand the weight DOJ places on it. Rather, that footnote was written over a decade before *Klamath*, and it did not seriously consider FOIA's definition of an agency or Congress's refusal to protect documents from outside parties in Exemption 5 while doing so in Exemptions 4 and 8.

DOJ's reliance on this footnote also ignores that "disclosure, not secrecy, is the dominant objective of [FOIA]," *Klamath*, 532 U.S. at 8 (quoting *Rose*, 425 U.S. at 361), and that FOIA exemptions are "explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 564 (2011). And, when presented with two possible

readings of a FOIA exemption, "FOIA requires us to choose that interpretation most favoring disclosure." *Rose*, 425 U.S. at 366.[4]

It is thus no surprise that, when presented with this question in *Klamath*, the Supreme Court refused to approve the consultant corollary, resolving the case instead on other grounds. 532 U.S. at 12–15. This Court should thus decline DOJ's request to extend such a suspect doctrine.[5] *See Rojas*, 989 F.3d at 686 (Wardlaw, J., concurring in part) (explaining that "a decades-old D.C. Circuit decision that contained no meaningful analysis of FOIA's text gave birth to an atextual doctrine [the consultant corollary].").

---

[4] The *Julian* footnote's interpretation of Exemption 5 is also inconsistent with DOJ's position because it would only expand Exemption 5 to include "a person acting in a governmentally conferred capacity." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting). Needless to say, private litigants bringing separate lawsuits are not acting in such a capacity, and thus Justice Scalia's dissenting footnote affords DOJ no reprieve.

[5] Indeed, given the Supreme Court's recent decisions in *Food Mktg. Inst.* and *Milner* rejecting atextual readings of FOIA that originated in a more judicially permissive era, the consultant corollary rests on an especially infirm foundation. *See Food Mktg. Inst.*, 139 S. Ct. 2354 (abrogating *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)) ("We cannot approve such a casual disregard of the rules of statutory interpretation."); *Milner*, 562 U.S. at 573 (abrogating *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir. 1981) (en banc)) (faulting this Court's decision for "adopt[ing] a circumvention requirement with no basis or referent in Exemption 2's language").

2.    Second, even if the consultant corollary were not contrary to FOIA's text, it is inapplicable here.  As noted, this doctrine is rooted in the notion that there may be non-governmental consultants who are acting essentially "like the agency's own personnel[.]"  *Klamath*, 532 U.S. at 12.  As this Court has explained, a key feature of such a relationship is that "there [has] been some indicia of a consultant relationship between the outsider and the agency."  *NIMJ*, 512 F.3d at 686.  And, as the district court correctly concluded, there are three circumstances where courts, after *Klamath*, have found such "indicia of a consultant relationship": (1) where the private party is sufficiently disinterested; (2) where the agency solicited the communications; or (3) where an agency seeks a consultant's expertise.  J.A. 169.  None of these is applicable here.[6]

---

[6] To be sure, there are instances where federal circuit courts have concluded that consultants with independent interests may still satisfy the consultant corollary.  *See, e.g.*, *Pub. Citizen, Inc. v. Dep't of Just.*, 111 F.3d 168, 171 (D.C. Cir. 1997); *Ryan v. Dep't of Just.*, 617 F.2d 781, 790–91 (D.C. Cir. 1980).  After *Klamath*, however, those decisions are on shaky ground.  *See Klamath*, 532 U.S. at 12 n.4 (explicitly declining to decide whether this Court's decision in *Ryan* and *Public Citizen* were compatible with its decision); *see also NIMJ*, 512 F.3d at 685 (holding that the Court "need not and d[id] not decide" whether *Ryan* and *Public*

As to the first of these:  DOJ failed to demonstrate that the outside parties were "disinterested."  For this, the Supreme Court has explained that the consultant should be functioning "just as an employee would be expected to do."  *Klamath*, 532 U.S. at 11.  In other words, the consultant's "only obligations" would be "to truth and its sense of what good judgment calls for."  *Id.*  This Court has similarly emphasized the need for such consultants to be neutral parties who are not advancing their own interests.  *Pub. Emps.,* 740 F.3d at 201–02; *McKinley*, 647 F.3d at 338; *NIMJ*, 512 F.3d at 685.  Where the outside party has a personal stake in the outcome, it is not a "disinterested" party under the consultant corollary.  *See Pub. Emps.*, 740 F.3d at 201–02.

Here, the outside parties clearly have a private interest in the litigation they brought against Georgia.  Indeed, DOJ conceded as much, acknowledging below that these groups "no doubt also had an interest in the success of their own lawsuits." J.A. 171.  And DOJ offered no evidence to support its contention that "the interest groups teamed up with DOJ to further the United States' distinct interests rather than their own."

*Citizen*'s embrace of consultants with independent interests was compatible with *Klamath*).

28

J.A. 172 (emphasis omitted).  Rather, DOJ's evidence confirms that these groups have divergent interests from the United States:  DOJ only brought a Voting Rights Act claim while the other groups brought constitutional claims, claims under the Americans with Disabilities Act ("ADA"), and claims under the Civil Rights Act of 1964, challenging different provisions of the law.  J.A. 172, 187.  And, rather than intervening in any of those lawsuits, DOJ brought its own separate lawsuit.

DOJ responds (at 31) that these differences are not due to any divergent interests but reflect the Department's statutory authority to sue for violations of the Voting Rights Act.  Yet DOJ also has the authority to file suits enforcing the ADA, the Civil Rights Act of 1964, and to enforce the guarantee of the right to vote under the Fourteenth and Fifteenth Amendment.  *See* 42 U.S.C. § 12188(b)(1)(B) (granting the DOJ authority to bring ADA enforcement suits); 52 U.S.C. § 10101(c) (granting DOJ authority to enforce the Civil Rights Act's voting provisions); 52 U.S.C. § 10302(a) (recognizing DOJ's authority "to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State."); *United States v. Raines*, 362 U.S. 17, 27 (1960) ("But there is the

29

highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief."). But DOJ refused to bring any such claims, likely because its interests diverged from the private plaintiffs' interests. In fact, when DOJ filed a statement of interest in one such lawsuit brought by private plaintiffs, it limited that interest to the enforcement of Section 2 of the Voting Rights Act and Section 101 of the Civil Rights Act of 1964. J.A. 189–90.

DOJ also attempts (at 50) to short-circuit this requirement that the outside organizations be disinterested, claiming that it need not provide any corroborating declarations from those groups about their interests because, according to DOJ, the common interest agreement is proof enough of the parties' shared interests.[7] But this argument conflates the

---

[7] The outside parties attempt to supplement the record on appeal by offering evidence of their common interest with DOJ in an amicus brief. *See* Br. of Amici Curiae NAACP Legal Defense & Educational Fund, Inc., et al. in Support of [DOJ] at 9–22, Doc. No. 2017028. Of course, evidence offered for the first time in an amicus brief is not part of the record on appeal and should not be considered by this Court. *See* Fed. R. App. P.

existence of a privilege with Exemption 5's threshold inquiry, running afoul of *Klamath*'s admonition that there is "no textual justification for draining the first condition of independent vitality." 532 U.S. at 12. On this record, DOJ has not met that requirement.

As to the second circumstance: DOJ also cannot demonstrate that it solicited the withheld communications from the outside parties, despite the holdings of this Court and others that the consultant corollary *requires* evidence of such solicitation. *See*, *e.g.*, *id.* at 10 (explaining that courts that have applied the consultant corollary "have held that the exemption extends to communications between Government agencies and outside consultants *hired by them*.") (emphasis added); *Pub. Emps.*, 740 F.3d at 201 (Kavanaugh, J.) ("[T]his Court has also interpreted the phrase 'intra-agency' in Exemption 5 to go beyond the text and include U.S. agency records authored by *non*-agency entities *if* those records *were solicited by a U.S. agency* in the course of its deliberative process.") (first emphasis in original; second and third emphases added); *Ryan*, 617 F.2d

---

10(a) (describing the record on appeal); *Carter v. George Washington Univ.*, 387 F.3d 872, 877 (D.C. Cir. 2004) (holding that an appellate court "will not normally consider evidence that a party never presented to the district court").

at 790 ("When an agency record is submitted by outside consultants as part of the deliberative process, *and it was solicited by the agency*, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5.") (emphasis added).

After *Klamath*, this Court has again underscored the necessity of solicitation by the agency for the consultant corollary to apply.  *See NIMJ*, 512 F.3d at 686; *McKinley*, 647 F.3d at 338.  In *NIMJ*, the Court examined its pre-*Klamath* precedent and explained that these cases were supported by the principle that there was "some indicia of a consultant relationship between the outsider and the agency," and that the "relationship is evidenced by the fact that the agency *seeks out* the individual consultants and affirmatively solicits their advice."  512 F.3d at 686 (emphasis added); *accord id.* at 680 (explaining that in *Ryan*, it was "[i]ntegral to the court's analysis" that the documents "'were generated by an initiative from the Department of Justice'") (quoting *Ryan*, 617 F.2d at 790).  Three years later in *McKinley*, this Court confirmed that "we interpret 'intra-agency' 'to include agency records containing comments *solicited from* nongovernmental parties.'"

*McKinley*, 647 F.3d at 336 (emphasis added) (quoting *NIMJ*, 512 F.3d at 680, 682). This Court also held in *McKinley* that the solicitation requirement was met because the Government submitted a "declaration [that] adequately demonstrate[d] that the [Federal Reserve] Board solicited the material[.]" *Id.* at 338.

Here, the record is silent on DOJ's soliciting any assistance from the outside parties. Rather, DOJ points only to a communication (J.A. 37) showing that DOJ and the outside parties decided at some point to begin coordinating their respective lawsuits against Georgia. Of course, that is not evidence of soliciting the private plaintiffs' involvement, and DOJ largely conceded this issue below when it rejected the district court's invitation to explain how DOJ had solicited any assistance from the private plaintiffs. Hr'g Tr. at 6:15–7:24 (J.A. 200–01) (resting on the fact that the parties entered into an agreement without showing that DOJ solicited their advice).

On appeal, DOJ continues (at 51) to rely exclusively on this (tardy) agreement with the private plaintiffs, comparing that arrangement to "forming an ad hoc committee that allied counsel were invited to join." DOJ Br. 51. This comparison begs the question: DOJ has offered no

evidence that *the agency solicited* the outside groups to join it in challenging SB 202.  The record thus falls far short of showing that the communications were "generated by [DOJ's] initiative."  *Ryan*, 617 F.2d at 790.

Finally, DOJ cannot establish the third circumstance—that it was seeking the expertise of these outside parties.  To be sure, as this Court has explained previously, agencies may sometimes have "a special need for the opinions and recommendations of temporary consultants[.]" *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971); *accord NIMJ*, 512 F.3d at 682–83 ("It remains true that federal agencies *occasionally* will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unravelling their knotty complexities.") (quotation marks and citation omitted; emphasis added).  But this is not such a case.  Rather, the district court was right to conclude that it "cannot imagine a group of lawyers *less* in need of assistance to enforce federal voting laws than the specialists in DOJ's Civil Rights Division."[8]  J.A. 176 (emphasis added).

---

[8] In fact, DOJ frequently boasts of its expertise in enforcing federal voting law.  *See, e.g.*, Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice*

DOJ nevertheless argues (at 51) that the district court erred in emphasizing the importance of identifying reasons why an agency decided to consult outside entities.  But DOJ misconstrues the district court's rationale.  The district court recognized that DOJ's failure to show that it had consulted outside experts for their advice was "not dispositive," noting instead that this failure "too suggests that the interest groups here are different in kind from the outsiders the Circuit has previously recognized as falling within the consultant corollary." J.A. 175–76.  Put simply, the outside parties here lack the distinctive and unique expertise common to consultant corollary cases, thus highlighting the consultant corollary's inapplicability.  *See, e.g.*, *NIMJ*, 512 F.3d at 683 ("DOD sought these individuals out and solicited their counsel based

---

*Department to Monitor Compliance with Federal Voting Rights Laws in Alaska Jurisdictions* (Oct. 3, 2023), https://tinyurl.com/5n84xh24 ("The division regularly deploys its staff to monitor for compliance with the federal civil rights laws in elections in communities all across the country."); Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Attorney General Merrick B. Garland Statement Regarding the 58th Anniversary of the Voting Rights Act* (Aug. 4, 2023), https://tinyurl.com/2yd9p24x ("The Justice Department is using every authority we have to protect the franchise for all voters.  We have doubled the size of the Civil Rights Division's enforcement staff for protecting voting rights.  The Department has brought voting rights cases and filed statements of interest and amicus briefs in courts across the country.").

on their undisputed experience and qualifications."); *Formaldehyde Inst. v. Dep't of Health & Hum. Servs.*, 889 F.2d 1118, 1125 (D.C. Cir. 1989) (noting that consultants were "expert scientists" who helped "evaluate the readiness of agency work for publication"); *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 130 (D.C. Cir. 2005) (noting that consultants were "Executive Branch officials who play important roles in the formulation of policy").

For all these reasons, the district court correctly concluded that, even assuming the validity of the consultant corollary, DOJ cannot rely on that doctrine to characterize its communications with outside organizations as "intra-agency."

## C. The Court Should Reject DOJ's Invitation to Apply Erroneous Holdings from the Fourth Circuit.

To escape this binding precedent, DOJ asks this Court to ignore its own precedent in favor of a decision from the Fourth Circuit. DOJ Br. at 38 (citing *Hunton & Williams*, 590 F.3d at 279–80). Of course, this panel is bound by this Court's precedent, and that is reason enough to reject DOJ's invitation. *See e.g.*, *LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) ("One three-judge panel ... does not have the authority to overrule another three-judge panel of the court."). But the

Court should also reject DOJ's argument because it cannot be squared with FOIA's text or the Supreme Court's precedent.

1. In *Hunton*, the Fourth Circuit strayed even further from FOIA's text when it held that the consultant corollary extends to common interest agreements where the two parties simply share a "unitary interest in achieving a litigative outcome and result." 590 F.3d at 279. As discussed above, that cannot be squared with FOIA's text or the Supreme Court's *Klamath* decision. And that is likely why Judge Wardlaw of the Ninth Circuit highlighted the danger posed by *Hunton*'s rationale, explaining that it "extended Exemption 5 ... far beyond the bounds of the consultant corollary[.]" *Rojas*, 989 F.3d at 686, (Wardlaw, J., concurring in part).

If it followed the Fourth Circuit's holding, this Court would remove its carefully constructed checks on an expansive reading of the consultant corollary, and would thus drain Exemption 5's threshold requirement of its "independent vitality[.]" *Klamath*, 532 U.S. at 12; *accord Lucaj v. Fed. Bureau of Investigation*, 852 F.3d 541, 549 (6th Cir. 2017) ("Congress chose to limit the exemption's reach to 'inter-agency or intra-agency memorandums or letters,' 5 U.S.C. § 552(b)(5), not to 'memorandums or

letters among agencies, independent contractors, and entities that share a common interest with agencies.'").

DOJ nonetheless argues (at 38) that *Hunton* is consistent with *Klamath* and this Circuit's precedent, focusing on *Hunton*'s conclusion that the interests of the Government and allied parties merge in the context of a common interest agreement. According to the Fourth Circuit, the existence of a common interest agreement is itself evidence that the allied party "stands to gain personally only if the public's interest is vindicated." *Hunton*, 590 F.3d at 280. But that ignores *Klamath*'s teaching that, for Exemption 5 to apply, a putative agency consultant cannot "represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." 532 U.S. at 10–11.

DOJ's argument also ignores that, post-*Klamath*, this Court has expressly "confined the consultant corollary to situations where an outside consultant did not have its own interests in mind." *Pub. Emps.*, 740 F.3d at 201–02 (Kavanaugh, J.) (citing *McKinley*, 647 F.3d at 336–37); *accord NIMJ*, 512 F.3d at 683 ("no individual interests to promote."). But that is obviously not true here: Private counsel representing outside parties in *separate* lawsuits—as the alleged "consultants" are doing

38

here—have their respective client's interests in mind, and they may have entered into a common interest agreement to advance those distinct interests.

DOJ, following *Hunton*, next argues (at 42–46) that Exemption 5 was meant to safeguard the Government's litigation privileges, specifically the attorney work-product privilege. While true, that is irrelevant. Rather, this argument attempts to collapse the threshold inquiry of whether documents are inter- or intra-agency into the separate question of whether a litigation privilege applies. *Klamath* does not permit DOJ to skip to the second step of Exemption 5's requirements and ignore the first step. 532 U.S. at 12. Rather, DOJ must first satisfy Exemption 5's threshold "intra-agency" requirement before turning to the privilege analysis. *Hunton*, therefore, is not good law, and this Court should not follow it.

To be sure, this conclusion limits DOJ's ability to coordinate and communicate with outside parties behind a cloak of secrecy. But, as the district court correctly observed, "this is a feature [of FOIA], not a bug." J.A. 180. In *Klamath*, the Supreme Court confirmed that preventing such secrecy is an essential part of "FOIA's mandate of broad disclosure,

which was obviously expected and intended to affect Government operations." 532 U.S. at 16. After all, with the enactment of FOIA, "a new conception of Government conduct was enacted into law," and "not every secret under the old law would be secret under the new."[9] *Id.*

2. However, even if the Court were persuaded by *Hunton*, DOJ's arguments still fail. Because the outside parties and the DOJ do not share, as in *Hunton,* a "*unitary* interest in achieving a litigative outcome and result," *Hunton* is inapposite. 590 F.3d at 279 (emphasis added).

*Hunton* concerned a common interest agreement between the Government and a single private party in a lawsuit where the Government had intervened as a co-party. *Id.* at 275. That relationship,

_____

[9] DOJ also argues (at 46–49) that Congress ratified the inclusion of common interest agreements in the scope of Exemption 5 with the enactment of the FOIA Improvement Act of 2016, Pub. L. No. 114-185, 130 Stat. 538. This argument was not made before the district court and was therefore waived. *See Flynn v. Comm'r of Internal Revenue Serv.*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001). To the extent this Court finds that the argument was not waived, DOJ fails to present the "'overwhelming evidence of acquiescence' necessary to support its argument." *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 682 (2023) (quoting *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169 n.5 (2001)).

according to the Fourth Circuit, showed a "singular and unitary litigation interest" compatible with *Klamath*. *Id.* at 278.

Yet in this case, DOJ and the various interest groups are not co-parties in the same case, and DOJ only filed a statement of interest in one of their cases. J.A. 189. And even that statement of interest is limited to a narrow subset of claims, excluding any concern for the constitutional claims presented there. J.A. 189–90. As the district court explained, "this suggests that the United States does not share an interest—or perhaps has a divergent interest—in the parties' constitutional and other statutory claims." *Id.*

Based on this record, DOJ and the outside parties lack the requisite singular unity of interests for Exemption 5 to apply, even under *Hunton*.[10] Thus, even if *Hunton* were good law, it is inapplicable.

_____

[10] Given these vast divergences, the only shelter *Hunton* might provide would be for communications exchanged after the district court in Georgia consolidated DOJ's case with others for discovery purposes. J.A. 51. At that point, there may arguably have existed a unity of interest akin to the parties being co-parties in a single lawsuit. *See Hunton & Williams*, 590 F.3d at 279. But that is not the argument DOJ makes, and DOJ's broad view of *Hunton* is inconsistent with this Court's precedent and the text of Exemption 5.

## II.    Alternatively, DOJ Waived the Attorney Work Product Privilege by Sending Materials to Third Parties.

While DOJ gives short shrift to Exemption 5's threshold requirement, DOJ focuses extensively on the district court's alternative holding that DOJ waived any work product protection by exchanging communications with outside organizations.  According to DOJ, the district court erred by applying the incorrect legal standard.  But DOJ failed to raise this argument below and, even if DOJ had raised it, the argument misstates the applicable standard for waiver of the work product privilege.  In any event, this argument requires DOJ to demonstrate that it had a valid common interest agreement in place with the outside parties when the requested records were created.  But, as the district court correctly concluded, DOJ did not come close to satisfying that requirement.

### A.    DOJ Forfeited this Argument by Raising it for the First Time on Appeal.

The first reason to reject DOJ's work product argument is its failure to argue before the district court that DOJ may share attorney work product with any third party who is not an adversary.  DOJ's central argument here (at 22–28) that it may disclose work product to any non-adversary, and that such disclosed material retains protection under the

42

attorney work product doctrine, is being advanced for the first time on appeal. But this Court is not the place for new arguments.

Indeed, this is "a court of *review*, not of first view[.]" *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) (emphasis added). Because of that role, "an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent 'exceptional circumstances.'" *Flynn v. Comm'r of Internal Revenue Serv.*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001) (quoting *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 663 (D.C. Cir. 1994)). This rule is not a matter of simple convenience but "is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." *Hormel v. Helvering*, 312 U.S. 552, 556 (1941); *cf., Johnston v. Reily*, 160 F.2d 249, 250 (D.C. Cir. 1947) ("This is not a mere technicality but is of substance in the administration of the business of the courts."). And it applies to new legal theories, preventing parties from "attempt[ing] to overturn the judgment of the District Court by advancing a new legal theory on

appeal." *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984).

True, this Court may use its discretion to disregard this rule in "exceptional circumstances." *Flynn*, 269 F.3d at 1069; *accord Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) ("That discretion generally has been exercised to allow consideration of issues not raised earlier only in exceptional circumstances."). But this Court has explained that such circumstances extend only to: "uncertainty in the state of the law, a novel, important, and recurring question of federal law, an intervening change in the law, and extraordinary situations in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process." *Roosevelt*, 958 F.2d at 419 n.5 (internal citations omitted); *accord Flynn*, 269 F.3d at 1069. But none of those circumstances is present here.

In fact, because DOJ does not even acknowledge in its opening brief that it failed to raise this argument below, DOJ necessarily fails to argue that there are "exceptional circumstances" that require this Court to exercise its discretion to consider a new argument. And it cannot do so for the first time in its reply brief. *See Pennsylvania Elec. Co. v. Fed.*

*Energy Regul. Comm'n*, 11 F.3d 207, 209 (D.C. Cir. 1993) ("We have said before, and we say again, that ordinarily we will not consider arguments raised for the first time in a reply brief[.]").

Rather, this Court should follow its consistent practice of refusing to entertain arguments that were not made before the trial court. *See, e.g., Roth*, 642 F.3d at 1179–80 ("having failed to raise the argument in the district court in a manner sufficient to put Roth on notice of the need to rebut it, the government is barred from doing so for the first time on appeal."); *Maydak v. U.S. Dep't of Just.*, 218 F.3d 760, 764–65 (D.C. Cir. 2000) (declining to permit remand for DOJ to raise new FOIA exemptions not raised before the district court); *Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1197 (D.C. Cir. 2018) ("However, Feld failed to raise this argument with the District Court and, thus, forfeited it."); *Flynn*, 269 F.3d at 1069 ("There are no exceptional circumstances in this case."); *Marymount Hosp.*, 19 F.3d at 663 ("Marymount failed both in the district court and before the Board to raise this argument. Arguments not made below are deemed waived[.]").

Moreover, the Court should conclude that DOJ forfeited this argument by making the *opposite* argument below. In its opening brief,

DOJ argues (at 22–27) that—even absent a common interest agreement with the outside parties—its disclosures did not waive the work product privilege because the disclosures were not made to an adversary. But when Georgia raised waiver before the district court—arguing that waiver occurred when DOJ exchanged communications absent a valid common interest agreement—DOJ accepted the premise that a valid common interest agreement is necessary before work product may be exchanged. *Compare* State's Mot. at 17 ("Because DOJ has failed to carry its burden of establishing that it exchanged communications before the December 23, 2021 consolidation order in pursuit of a common legal interest, DOJ waived any privilege over those communications when it exchanged them with third parties."), *with* Reply Mem. in Supp. of Def.'s Mot. for Summ. J. & Mem. in Opp'n to Pls.' Cross-Mot. for Summ. J. at 7, ECF No. 18 ("That such coordination among attorneys is often beneficial is, of course, the rationale for the common-interest exception to waiver principles.").

Likewise, at oral argument, DOJ agreed that a common interest agreement was needed to avoid waiver of the privilege:

> I absolutely agree with Your Honor that those are two separate questions, first the question of whether or not the

> alignment satisfies the consultant corollary cases for the threshold, and second, the question of whether there's a common interest to avoid waiver of attorney work product doctrine.

Hr'g Tr. at 13:6–11 (J.A. 207).  But that position makes no sense if, as DOJ now argues, disclosure to non-adverse third parties was permissible *regardless* of any "common interest."    Either a common interest agreement is necessary for DOJ to exchange work product with third parties, or such exchanges are permissible because those third parties are not adversaries.  But it cannot be both, and this Court should not countenance DOJ's about-face in this Court.[11]

In short, DOJ "failed to raise this argument with the District Court and, thus, forfeited it." *Feld*, 909 F.3d at 1197.

---

[11] This abrupt reversal demonstrates that DOJ is not seeking to "refine and clarify its analysis" on appeal but is instead "attempt[ing] to overturn the judgment of the District Court by advancing a new legal theory on appeal." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 100 (D.C. Cir. 2015) (first quote) (quoting *Teva Pharms., USA, Inc. v. Leavitt,* 548 F.3d 103, 105 (D.C. Cir. 2008)); *Air Fla.*, 750 F.2d at 1080 (second quote); *see also Huron v. Cobert*, 809 F.3d 1274, 1280 (D.C. Cir. 2016) (holding that an appellant offering a new theory of standing on appeal was "inaccurate and unfair to the district court").

**B.    DOJ's New Argument Also Misstates the Applicable Standard.**

Even if DOJ had not forfeited this argument, DOJ misunderstands the rules governing waiver of the work product privilege.  In DOJ's estimation, work product protections are waived *only* when materials are disclosed to an adversary.  DOJ Br. 2.  That is not the law.  Federal Rule of Civil Procedure 26(b)(3)(A) codifies the attorney work-product privilege, protecting from discovery "documents and tangible things that are prepared in anticipation of litigation[.]"  As this Court has explained, the work-product privilege exists "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) ("*AT&T*").  Although mere disclosure to a third party does not automatically waive the work product privilege, this Court refuses to "endorse a ... standard so broad as to allow confidential disclosure to any person without waiver of the work product privilege." *Id.*

In assessing whether a disclosure is consistent with the maintenance of the privilege, "[t]he existence of common interests between transferor and transferee is relevant to deciding whether the

48

disclosure is consistent with the nature of the work product privilege." *Id.* The district court properly applied this precedent (at J.A. 186–90), finding that DOJ lacked a sufficiently common interest to enjoy any protection for its communications with the outside parties.[12]

This Court's *AT&T* decision is not an outlier. Rather, four years after *AT&T*, this Court applied this same framework and held that the work product privilege was waived by the company's submissions to the SEC because "there is not here any 'existence of common interests between transferor and transferee[.]'" *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C. Cir. 1984) (quoting *AT&T*, 642 F.2d at 1299)). And this Court reiterated the same approach in *In re Lindsey*, holding:

> As a usual rule, disclosure of attorney-client or work product confidences to third parties waives the protection of the relevant privileges; however, when the third party is a lawyer whose client shares an overlapping "common interest" with the primary client, the privileges may remain intact.

158 F.3d at 1282.

---

[12] Also, the district court pointed out that some communications pre-dated the existence of the purported common interest agreement. J.A. 183–86. These emails clearly fall outside the protection of Exemption 5 and should be released.

To be sure, DOJ attempts to avoid this Court's holding from *In re Lindsey*, claiming that "[w]ork-product protection is waived by voluntary disclosure *only* when made to an adversary[.]"  DOJ Br. 2 (emphasis added).  For support, DOJ cites (at 26) *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010), where this Court stated that "the voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection for that material."  But DOJ's expansive reading of recent Circuit precedent is inconsistent with *AT&T*'s refusal to "endorse a ... standard so broad as to allow confidential disclosure to any person without waiver of the work product privilege."  642 F.2d at 1299.  DOJ's broad reading of *Deloitte* also ignores *AT&T*'s instruction to assess whether common interests exist between transferor and transferee.[13]  *Id.*

In short, it is the existence *vel non* of a *valid* common interest agreement that determines whether disclosures to separate parties in separate litigation are "inconsistent with the maintenance of secrecy

---

[13] This point also highlights another reason DOJ should have raised this argument below—i.e., to ensure that a factual record could be developed on the existence of common interests, apart from any agreement.

from the disclosing party's adversary.'" *Deloitte*, 610 F.3d at 140 (quoting *AT&T*, 642 F.2d at 1299). As shown below, DOJ cannot demonstrate that it had a valid common interest agreement with the private plaintiffs when the relevant communications were made, and thus those communications waived any work product protections.

## C.    DOJ Failed to Demonstrate the Required Identity of Interests.

Because DOJ's communications with outside parties were not made pursuant to a valid common interest agreement, these disclosures waived the work product privilege. *See In re Lindsey*, 158 F.3d at 1282.

1.    As DOJ's authority—*Hunton*—emphasized, "common interest assertions by government agencies must be carefully scrutinized." 590 F.3d at 274. That is especially appropriate where, as here, DOJ seeks to use the common-interest privilege to shield what amounts to lobbying communications by outside parties.[14] DOJ's assertions here cannot

---

[14] Although DOJ claims (at 40) that concerns about self-interested parties seeking to persuade the Government to pursue a particular cause of action are unwarranted because DOJ had already decided to sue the State, that does not diminish the lobbying interests of the outside parties. Those organizations continued to have an interest in the way DOJ prosecuted its case and in the way DOJ deployed its resources and expertise.

withstand scrutiny under the prevailing standard, which requires that "[E]xemption 5 claims … be supported with specificity and in detail," *Senate of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 585 (D.C. Cir. 1987) (cleaned up), rather than with "conclusory assertions of privilege," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980).

In fact, recent developments underscore the need to "carefully scrutinize[]" the alleged "common interest assertions." *Hunton & Williams*, 590 F.3d at 274. As noted earlier, a recent decision by the district court in Georgia preliminarily rejecting DOJ's intentional discrimination claim strongly indicates that DOJ's claims of racially discriminatory motivations for SB 202 were unfounded from the start. And, as noted, that reality raises a question as to whether DOJ pressed this claim *because* of pressure from the third-party organizations or, perhaps, in the face of warnings from some of those very groups that a racial discrimination claim had no factual basis. Either way, the records Georgia seeks in this FOIA litigation likely reinforce the conclusion that there was, in fact, no identity of interests between DOJ and these other groups.

52

Rather than trying to establish an identity of interests with the other litigants, DOJ largely ignores this Court's precedent and relies (at 28) on isolated treatises to argue that courts do not require an identity of interest to support the common-interest privilege.  Of course, as this Court has held, the privilege presupposes "litigation against a common adversary *on the same issue or issues*," *AT&T*, 642 F.2d at 1299 (emphasis added); *accord Frontier Refin., Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 705 (10th Cir. 1998) (interest must "be identical, not similar"); *Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 252 n.7 (D.D.C. 2004) (requiring "an 'identical, and not merely similar, legal interest'") (quoting *Roberts v. Carrier Corp.*, 107 F.R.D. 678, 687–88 (N.D. Ind. 1985)); *United States v. AT&T*, 86 F.R.D. 603, 615 (D.D.C. 1979) (requiring a "substantial identity of legal interest").  DOJ has plainly failed to satisfy this requirement.

To the contrary, DOJ does not dispute that the outside parties and their lawyers participating in the withheld communications brought separate lawsuits against Georgia asserting separate claims under separate legal theories.  As noted above, DOJ has asserted claims only under the Voting Rights Act, and only based on allegations of

53

discriminatory purpose. By contrast, none of the private complaints is limited to the Voting Rights Act. And even DOJ admits (at 31–32) that those complaints including Voting Rights Act claims differ substantially from DOJ's claim. For instance, the outside parties are arguing for liability based on discriminatory *effects*, while DOJ is arguing for liability based solely on discriminatory intent. DOJ's argument (at 31) that the same legal standard applies to both claims does not change the fact that the parties made distinct strategic decisions about how to pursue their distinct claims, challenging distinct provisions of SB 202, in distinct lawsuits.

Moreover, as DOJ concedes (at 31), two of the other complaints do not allege violations of the Voting Rights Act at all. There is no genuine overlap with one case—*VoteAmerica*—where the closest claims are DOJ's challenge to the fines imposed on groups that distribute duplicate absentee ballot applications (DOJ Compl. ¶ 35(b)) and VoteAmerica's challenge to the broader duplicate absentee ballot application provision and the safe harbor that allows groups to avoid those fines (VoteAmerica Compl. ¶¶ 86–103). The only overlap with the other case—*Coalition for Good Governance*—is the challenge to the provision requiring that

absentee ballots be requested eleven days before an election. *Compare* DOJ Compl. ¶ 35(d), *with* CGG Am. Compl. ¶¶ 114–20. Beyond these minor overlaps, the complaints are wholly distinct.[15]

Thus, the district court correctly concluded that DOJ had not sufficiently demonstrated that it shared an adequate common interest with the parties to which it sent work product.

2. Attempting to escape this conclusion, DOJ again resorts (at 29) to a high-level of abstraction, asserting that it is enough that DOJ and the interest groups all have an interest "in vindicating federal civil rights laws to protect the rights of Georgia voters."[16] But such a broad interest is not an identical or substantially identical interest because, as explained above, the lawsuits are not substantially identical—even if

---

[15] DOJ argues (at 31) that the vast majority of communications did not include these parties, and that the district court erred on this point. But that is of no moment, unless DOJ is conceding that it at least waived work product protections for those communications.

[16] The outside parties again attempt to supplement the record on appeal through their assertions of common interests in their amicus brief. *See* Br. of Amici Curiae NAACP Legal Defense & Educational Fund, Inc., et al. in Support of [DOJ] at 9–16, Doc. No. 2017028. As noted above, evidence offered for the first time in an amicus brief is not part of the record on appeal and should not be considered by this Court. *See* Fed. R. App. P. 10(a); *Carter,* 387 F.3d at 877.

some overlap to varying degrees.  Indeed, DOJ and each of the outside parties could theoretically prevail in entirely separate ways, and without affecting the interests of the other.  Nor does such abstraction help DOJ carry its burden of establishing the applicability of a FOIA exemption that requires specificity and precision.  *See Senate of P.R.*, 823 F.2d at 585.  That is because—even at the high levels of abstraction proffered by DOJ—the precise common legal interest between DOJ and each of the outside parties remains elusive.

For example, DOJ attempts (at 29) to invoke a shared, generic interest in "establishing liability under Section 2 of the VRA," "proving a racial motivation in enacting SB 202," and "prevailing in enjoining the challenged statutory provisions."  But in fact, while all the outside parties assert constitutional arguments, DOJ made the considered choice *not* to file any statement of interest taking a position on these arguments in the other cases.  J.A. 189–90.  This refusal was likely because constitutional rulings may limit the ability of DOJ's own client, the federal government, to regulate in the field of election integrity.  By contrast, a narrower ruling under the Voting Rights Act would not constrain Congress from

enacting future legislation departing from that ruling, while a constitutional holding would permanently pre-empt such legislation.

Also, as noted, DOJ's Voting Rights Act claim only alleges discriminatory purpose, and does not rely upon discriminatory effects. If DOJ shared the asserted interests invoked by the private plaintiffs who brought discriminatory effect claims, DOJ certainly would have sued to vindicate those interests, rather than filing the narrower lawsuit it ultimately pursued.

Ultimately, it remains unclear exactly what common interest DOJ asserts. It cannot be a general antipathy to Georgia's election laws, as no party challenges the entirety of SB 202. Nor is a generalized shared interest in advancing certain interpretations of the Voting Rights Act and the U.S. Constitution sufficient, as the various organizations rely on different laws and claims in their lawsuits. Because DOJ has not established a common interest, DOJ cannot escape its waiver of any work product protections its records might otherwise have enjoyed.

In a final attempt to avoid the district court's conclusion, DOJ suggests (at 30) that Georgia already stipulated that DOJ and the private Plaintiffs have shared interests. But the parties' discovery stipulation on

which DOJ relies—that Georgia would not seek, *in discovery,* materials exchanged among the outside parties and DOJ—does not extend as far as DOJ wishes. The stipulation was not a recognition of the applicability of the work product privilege but was instead entered for the convenience of the parties. *See* J.A. 77. For its part, Georgia wanted to avoid logging litigation-related communications, which would overwhelm privilege logs. That agreement of convenience cannot be converted into an agreement that the attorney work product privilege applied.

## CONCLUSION

As a federal agency, DOJ operates under FOIA, which is designed to ensure that the public can learn sufficient information about DOJ to hold it, and other agencies, accountable. But DOJ seeks to thwart that purpose by hiding its communications behind untenable expansions of legal principles that find no support in FOIA's text. Rather than adopt such expansive rules, the Court should apply FOIA's text and affirm the district court's conclusion that DOJ failed to carry its burden of demonstrating that the withheld communications fall within Exemption 5's protections. Alternatively, the Court could affirm the

district court's holding that DOJ waived any work product protection applicable to those communications.

October 20, 2023

CHRISTOPHER M. CARR
  *Attorney General of Georgia*
STEPHEN J. PETRANY
  *Solicitor General*
OFFICE OF THE GEORGIA
ATTORNEY GENERAL
40 Capitol Square, S.W.
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

Respectfully Submitted,

*s/ Gene C. Schaerr*
GENE C. SCHAERR
  *Counsel of Record*
ERIK S. JAFFE
BRIAN J. FIELD
ANDREW STRAIN
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

BRYAN P. TYSON*
BRYAN F. JACOUTOT
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
(678) 336-7197
btyson@taylorenglish.com

*Admission pending

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of Appellees complies with the type-face requirements of Fed. R. App. P. 32(a)(5) & (6) and the 13,000-word type-volume limitation of Fed. R. App. P. 32(a)(7)(b) and 32(a)(7)(B) in that it uses Century Schoolbook 14-point type and contains 11,818 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).  The number of words was determined through the word-count function of Microsoft Word.

*s/Gene C. Schaerr*
Gene C. Schaerr


## ANTI-VIRUS CERTIFICATION

I hereby certify that the foregoing Brief of Appellees submitted in PDF format via the ECF system was scanned using the current version of McAfee and no viruses or other security risks were found.

*s/Gene C. Schaerr*
Gene C. Schaerr

# ADDENDUM

## TABLE OF CONTENTS

**Page**    **Description**

Add. 1:    52 U.S.C. § 552: Public information; agency rules, opinions, orders, records, and proceedings

5 U.S.C.A. § 552

§ 552. Public information; agency rules, opinions, orders, records, and proceedings

Effective: June 30, 2016

**(a)** Each agency shall make available to the public information as follows:

**(1)** Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

**(A)** descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

**(B)** statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

**(C)** rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

**(D)** substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

**(E)** each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by

Addendum 1

reference therein with the approval of the Director of the Federal Register.

**(2)** Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

**(A)** final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

**(B)** those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

**(C)** administrative staff manuals and instructions to staff that affect a member of the public;

**(D)** copies of all records, regardless of form or format--

**(i)** that have been released to any person under paragraph (3); and

**(ii)(I)** that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

**(II)** that have been requested 3 or more times; and

**(E)** a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be

Addendum 2

explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if--

**(i)** it has been indexed and either made available or published as provided by this paragraph; or

**(ii)** the party has actual and timely notice of the terms thereof.

**(3)(A)** Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

**(B)** In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that

Addendum 3

form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

**(C)** In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

**(D)** For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

**(E)** An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to--

**(i)** any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

**(ii)** a representative of a government entity described in clause (i).

**(4)(A)(i)** In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

**(ii)** Such agency regulations shall provide that--

**(I)** fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

Addendum 4

**(II)** fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

**(III)** for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

**(iii)** Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

Addendum 5

**(iv)** Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section--

**(I)** if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

**(II)** for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

**(v)** No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

**(vi)** Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

**(vii)** In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided*, That the court's review of the matter shall be limited to the record before the agency.

**(viii)(I)** Except as provided in subclause (II), an agency shall not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) under this subparagraph if the agency has failed to comply with any time limit under paragraph (6).

**(II)(aa)** If an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a

Addendum 6

timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days. If the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees).

**(bb)** If an agency has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, an agency may charge search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) if the agency has provided a timely written notice to the requester in accordance with paragraph (6)(B) and the agency has discussed with the requester via written mail, electronic mail, or telephone (or made not less than 3 good-faith attempts to do so) how the requester could effectively limit the scope of the request in accordance with paragraph (6)(B)(ii).

**(cc)** If a court has determined that exceptional circumstances exist (as that term is defined in paragraph (6)(C)), a failure described in subclause (I) shall be excused for the length of time provided by the court order.

**(B)** On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

**(C)** Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[**(D)** Repealed. Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357]

**(E)(i)** The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

**(ii)** For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

**(I)** a judicial order, or an enforceable written agreement or consent decree; or

**(II)** a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

**(F)(i)** Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

Addendum 8

**(ii)** The Attorney General shall--

  **(I)** notify the Special Counsel of each civil action described under the first sentence of clause (i); and

  **(II)** annually submit a report to Congress on the number of such civil actions in the preceding year.

**(iii)** The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

**(G)** In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

**(5)** Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

**(6)(A)** Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

  **(i)** determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of--

    **(I)** such determination and the reasons therefor;

    **(II)** the right of such person to seek assistance from the FOIA Public Liaison of the agency; and

    **(III)** in the case of an adverse determination--

      **(aa)** the right of such person to appeal to the head of the agency, within a period determined by the head of the agency that is not less than 90 days after the date of such adverse determination; and

      **(bb)** the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services; and

Addendum 9

**(ii)** make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

**(I)** that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

**(II)** if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

**(B)(i)** In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

**(ii)** With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request

cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

**(iii)** As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

**(I)** the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

**(II)** the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

**(III)** the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

**(iv)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve

Addendum 11

clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

**(C)(i)** Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

**(ii)** For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

**(iii)** Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

**(D)(i)** Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

**(ii)** Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an

Addendum 12

opportunity to limit the scope of the request in order to qualify for faster processing.

**(iii)** This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

**(E)(i)** Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records--

**(I)** in cases in which the person requesting the records demonstrates a compelling need; and

**(II)** in other cases determined by the agency.

**(ii)** Notwithstanding clause (i), regulations under this subparagraph must ensure--

**(I)** that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

**(II)** expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

**(iii)** An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

**(iv)** A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

**(v)** For purposes of this subparagraph, the term "compelling need" means--

**(I)** that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

**(II)** with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

**(vi)** A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

**(F)** In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

**(7)** Each agency shall--

**(A)** establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

**(B)** establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

**(i)** the date on which the agency originally received the request; and

**(ii)** an estimated date on which the agency will complete action on the request.

**(8)(A)** An agency shall--

Addendum 14

**(i)** withhold information under this section only if--

**(I)** the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

**(II)** disclosure is prohibited by law; and

**(ii)(I)** consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

**(II)** take reasonable steps necessary to segregate and release nonexempt information; and

**(B)** Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).

**(b)** This section does not apply to matters that are--

**(1)(A)** specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

**(2)** related solely to the internal personnel rules and practices of an agency;

**(3)** specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

**(A)(i)** requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

**(ii)** establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

**(B)** if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

**(4)** trade secrets and commercial or financial information obtained from a person and privileged or confidential;

**(5)** inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

**(6)** personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

**(7)** records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

**(8)** contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

**(9)** geological and geophysical information and data, including maps, concerning wells.

Addendum 16

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

**(c)(1)** Whenever a request is made which involves access to records described in subsection (b)(7)(A) and--

**(A)** the investigation or proceeding involves a possible violation of criminal law; and

**(B)** there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

**(2)** Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.

**(3)** Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains

Addendum 17

classified information, treat the records as not subject to the requirements of this section.

**(d)** This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.

**(e)(1)** On or before February 1 of each year, each agency shall submit to the Attorney General of the United States and to the Director of the Office of Government Information Services a report which shall cover the preceding fiscal year and which shall include--

**(A)** the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

**(B)(i)** the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

**(ii)** a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

**(C)** the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

**(D)** the number of requests for records received by the agency and the number of requests which the agency processed;

**(E)** the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

Addendum 18

**(F)** the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

**(G)** based on the number of business days that have elapsed since each request was originally received by the agency--

  **(i)** the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

  **(ii)** the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

  **(iii)** the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

  **(iv)** the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

**(H)** the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

**(I)** the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

Addendum 19

**(J)** data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

**(K)** data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

**(L)** the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

**(M)** the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

**(N)** the total amount of fees collected by the agency for processing requests;

**(O)** the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests;

**(P)** the number of times the agency denied a request for records under subsection (c); and

**(Q)** the number of records that were made available for public inspection in an electronic format under subsection (a)(2).

**(2)** Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

**(3)** Each agency shall make each such report available for public inspection in an electronic format. In addition, each agency shall make the raw statistical data used in each report available in a timely manner

for public inspection in an electronic format, which shall be made available--

  **(A)** without charge, license, or registration requirement;

  **(B)** in an aggregated, searchable format; and

  **(C)** in a format that may be downloaded in bulk.

**(4)** The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Oversight and Government Reform of the House of Representatives and the Chairman and ranking minority member of the Committees on Homeland Security and Governmental Affairs and the Judiciary of the Senate, no later than March 1 of the year in which each such report is issued, that such reports are available by electronic means.

**(5)** The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

**(6)(A)** The Attorney General of the United States shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President a report on or before March 1 of each calendar year, which shall include for the prior calendar year--

  **(i)** a listing of the number of cases arising under this section;

  **(ii)** a listing of--

    **(I)** each subsection, and any exemption, if applicable, involved in each case arising under this section;

    **(II)** the disposition of each case arising under this section; and

**(III)** the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4); and

**(iii)** a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

**(B)** The Attorney General of the United States shall make--

**(i)** each report submitted under subparagraph (A) available for public inspection in an electronic format; and

**(ii)** the raw statistical data used in each report submitted under subparagraph (A) available for public inspection in an electronic format, which shall be made available--

**(I)** without charge, license, or registration requirement;

**(II)** in an aggregated, searchable format; and

**(III)** in a format that may be downloaded in bulk.

**(f)** For purposes of this section, the term--

**(1)** "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

**(2)** "record" and any other term used in this section in reference to information includes--

**(A)** any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

**(B)** any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

**(g)** The head of each agency shall prepare and make available for public inspection in an electronic format, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including-

**(1)** an index of all major information systems of the agency;

**(2)** a description of major information and record locator systems maintained by the agency; and

**(3)** a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

**(h)(1)** There is established the Office of Government Information Services within the National Archives and Records Administration. The head of the Office shall be the Director of the Office of Government Information Services.

**(2)** The Office of Government Information Services shall--

**(A)** review policies and procedures of administrative agencies under this section;

**(B)** review compliance with this section by administrative agencies; and

**(C)** identify procedures and methods for improving compliance under this section.

**(3)** The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a nonexclusive alternative to litigation and may issue advisory opinions at the discretion of the Office or upon request of any party to a dispute.

**(4)(A)** Not less frequently than annually, the Director of the Office of Government Information Services shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President--

Addendum 23

**(i)** a report on the findings of the information reviewed and identified under paragraph (2);

**(ii)** a summary of the activities of the Office of Government Information Services under paragraph (3), including--

**(I)** any advisory opinions issued; and

**(II)** the number of times each agency engaged in dispute resolution with the assistance of the Office of Government Information Services or the FOIA Public Liaison; and

**(iii)** legislative and regulatory recommendations, if any, to improve the administration of this section.

**(B)** The Director of the Office of Government Information Services shall make each report submitted under subparagraph (A) available for public inspection in an electronic format.

**(C)** The Director of the Office of Government Information Services shall not be required to obtain the prior approval, comment, or review of any officer or agency of the United States, including the Department of Justice, the Archivist of the United States, or the Office of Management and Budget before submitting to Congress, or any committee or subcommittee thereof, any reports, recommendations, testimony, or comments, if such submissions include a statement indicating that the views expressed therein are those of the Director and do not necessarily represent the views of the President.

**(5)** The Director of the Office of Government Information Services may directly submit additional information to Congress and the President as the Director determines to be appropriate.

**(6)** Not less frequently than annually, the Office of Government Information Services shall conduct a meeting that is open to the public on the review and reports by the Office and shall allow interested persons to appear and present oral or written statements at the meeting.

Addendum 24

**(i)** The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

**(j)(1)** Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

**(2)** The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

**(A)** have agency-wide responsibility for efficient and appropriate compliance with this section;

**(B)** monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

**(C)** recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

**(D)** review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

**(E)** facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply;

**(F)** offer training to agency staff regarding their responsibilities under this section;

**(G)** serve as the primary agency liaison with the Office of Government Information Services and the Office of Information Policy; and

Addendum 25

**(H)** designate 1 or more FOIA Public Liaisons.

**(3)** The Chief FOIA Officer of each agency shall review, not less frequently than annually, all aspects of the administration of this section by the agency to ensure compliance with the requirements of this section, including--

**(A)** agency regulations;

**(B)** disclosure of records required under paragraphs (2) and (8) of subsection (a);

**(C)** assessment of fees and determination of eligibility for fee waivers;

**(D)** the timely processing of requests for information under this section;

**(E)** the use of exemptions under subsection (b); and

**(F)** dispute resolution services with the assistance of the Office of Government Information Services or the FOIA Public Liaison.

**(k)(1)** There is established in the executive branch the Chief FOIA Officers Council (referred to in this subsection as the "Council").

**(2)** The Council shall be comprised of the following members:

**(A)** The Deputy Director for Management of the Office of Management and Budget.

**(B)** The Director of the Office of Information Policy at the Department of Justice.

**(C)** The Director of the Office of Government Information Services.

**(D)** The Chief FOIA Officer of each agency.

**(E)** Any other officer or employee of the United States as designated by the Co-Chairs.

**(3)** The Director of the Office of Information Policy at the Department of Justice and the Director of the Office of Government Information Services shall be the Co-Chairs of the Council.

Addendum 26

**(4)** The Administrator of General Services shall provide administrative and other support for the Council.

**(5)(A)** The duties of the Council shall include the following:

**(i)** Develop recommendations for increasing compliance and efficiency under this section.

**(ii)** Disseminate information about agency experiences, ideas, best practices, and innovative approaches related to this section.

**(iii)** Identify, develop, and coordinate initiatives to increase transparency and compliance with this section.

**(iv)** Promote the development and use of common performance measures for agency compliance with this section.

**(B)** In performing the duties described in subparagraph (A), the Council shall consult on a regular basis with members of the public who make requests under this section.

**(6)(A)** The Council shall meet regularly and such meetings shall be open to the public unless the Council determines to close the meeting for reasons of national security or to discuss information exempt under subsection (b).

**(B)** Not less frequently than annually, the Council shall hold a meeting that shall be open to the public and permit interested persons to appear and present oral and written statements to the Council.

**(C)** Not later than 10 business days before a meeting of the Council, notice of such meeting shall be published in the Federal Register.

**(D)** Except as provided in subsection (b), the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents that were made available to or prepared for or by the Council shall be made publicly available.

**(E)** Detailed minutes of each meeting of the Council shall be kept and shall contain a record of the persons present, a complete and accurate

Addendum 27

description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Council. The minutes shall be redacted as necessary and made publicly available.

**(l)** FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

**(m)(1)** The Director of the Office of Management and Budget, in consultation with the Attorney General, shall ensure the operation of a consolidated online request portal that allows a member of the public to submit a request for records under subsection (a) to any agency from a single website. The portal may include any additional tools the Director of the Office of Management and Budget finds will improve the implementation of this section.

**(2)** This subsection shall not be construed to alter the power of any other agency to create or maintain an independent online portal for the submission of a request for records under this section. The Director of the Office of Management and Budget shall establish standards for interoperability between the portal required under paragraph (1) and other request processing software used by agencies subject to this section.

Addendum 28