[ORAL ARGUMENT NOT YET SCHEDULED]

No. 23-5083

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

STATE OF GEORGIA and BRAD RAFFENSPERGER, Georgia Secretary of State, in his official capacity,

Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Defendant-Appellant.

On Appeal from the United States District Court
for the District of Columbia

## SUPPLEMENTAL BRIEF FOR APPELLANT

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*

# INTRODUCTION AND SUMMARY

Appellant United States Department of Justice respectfully responds to the Court's May 31, 2024 order directing supplemental briefing following this Court's decision in *American Oversight v. U.S. Department of Health and Human Services*, 101 F.4th 909 (D.C. Cir. 2024).

*American Oversight* addressed the meaning of Exemption 5's phrase "intra-agency memorandums or letters" in applying the principles of the consultant-corollary doctrine to deliberative communications between Executive Branch officials and Congress. The Court concluded that those communications did not fall within the parameters of that doctrine, which "is limited to situations" where the consultant "[does] not have a stake in the outcome of the agency's process." 101 F.4th at 916. In so doing, the Court "follow[ed] the path marked by" the Supreme Court in *Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001) (*Klamath*), insofar as *Klamath* suggested that the "typical case" is one in which "the consultant 'functions just as an employee would be expected to.'" 101 F.4th at 915-16 (quoting *Klamath*, 532 U.S. at 11). The panel majority thus rejected the understanding of *Klamath*'s holding that had been advanced by the government and credited by the district court.

This case likewise concerns Exemption 5's "intra-agency" requirement but is otherwise distinct in all relevant respects. In contrast to *Klamath* and *American Oversight,* this case involves an assertion of generally available, common-law litigation privileges that are incontrovertibly as available to the government as they are to other litigants. This Court's consultant-corollary doctrine, typically involving application of the deliberative-process privilege to communications with advisers outside the Executive Branch, has no direct application here. Even if it did, however, the records at issue would qualify for Exemption 5's protection under *American Oversight* because the very premise of the common-interest communications was that the Department and its allied parties had common, not "divergent," interests. 101 F.3d at 916, 921.

## ARGUMENT

### THE RECORDS AT ISSUE ARE "INTRA-AGENCY MEMORANDUMS OR LETTERS" FOR WHICH FOIA DOES NOT COMPEL DISCLOSURE

**A.** *American Oversight* involved what has come to be known as FOIA's "consultant corollary."[1] Under that doctrine, "an agency record [that] is submitted by outside consultants as part of the [agency's] deliberative process, and ... solicited by the agency" is deemed "to be an 'intra-agency'

---

[1] Technically, the doctrine is not a "corollary" to Exemption 5; it is an application of its text. *Cf. Klamath*, 532 U.S. at 9-10 (describing Justice Scalia's "textual[]" analysis). To avoid confusion, we follow this Court's recent practice and use the phrase "consultant corollary" where relevant.

2

memorandum for purposes of determining the applicability of Exemption 5." *McKinley v. Board of Governors of Federal Reserve System*, 647 F.3d 331, 336 (D.C. Cir. 2011).

The question in *American Oversight* was whether records of communications exchanged between the Executive Branch and Congress, involving "negotiations over potential healthcare reform legislation," were properly understood to fall within the consultant-corollary doctrine. 101 F.4th at 912. The government had withheld those records under the deliberative-process privilege—an executive privilege available only to the government and which is the privilege most commonly at issue in consultant-corollary cases.

The panel majority in *American Oversight* began its analysis by reiterating an important central premise of Exemption 5. Under this Court's precedent, the term "intra-agency" is not textually limited to documents "authored by and exchanged between a single agency's employees," but instead is properly read to "include some scenarios" in which non-employees "assist[] an agency in carrying out the agency's functions." 101 F.4th at 913-14. One such scenario is presented when agencies seek advice from consultants: "agencies often rely on outside experts for advice in their deliberative processes," and Exemption 5 has long protected records when "'created for the purpose of aiding the agency's deliberative process' and in fact used in that process." *Id.* at 914.

3

In *Klamath*, the Supreme Court assumed the validity of the consultant corollary while placing limits upon it. The extent of those limits proved a matter of disagreement. Some courts understood *Klamath* as holding narrowly that the doctrine does not apply when the putative consultant is an advocate lobbying against the interests of competitors. *Cf. Klamath*, 532 U.S. at 12 n.4 (declining to "decide" other question because "[a]s explained above, the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants"). Other courts took *Klamath* to suggest more broadly that the doctrine should not apply whenever the consulting entity holds any stake in the agency's decision-making process. *Cf. id.* at 11 (describing the "typical case[]" in which "the consultant does not represent an interest of its own").

"[T]he outcome-determinative question" in *American Oversight* was "whether the consultant corollary extends beyond what *Klamath* described as the typical case." 101 F.4th at 916. The panel majority acknowledged that the congressional staff communicating with HHS and OMB were not "'self-advocates' ... operating 'at the expense of others'" as in *Klamath*. *Id.* at 918. But it reasoned that "nothing in *Klamath* instructs" that this consideration should mark the doctrine's boundary. *Id.* Rather, the panel viewed *Klamath*'s logic as hinging on whether the putative consultants "'necessarily

4

communicated with the [agency] with their own interests in mind.'" *Id.* (brackets and ellipsis omitted). Under this view, "[t]he additional fact that the [consultants in *Klamath*] were advocating for finite benefits at the expense of others served only to make the distinction from agency personnel 'even sharper.'" *Id.* (quoting *Klamath*, 532 U.S. at 12).

Applying this understanding of *Klamath*, the panel majority concluded that the records in *American Oversight* were not "intra-agency." It observed that the Legislative and Executive Branches are "'opposite and rival' political branches" and reasoned that "[w]hen members of Congress and their staffs engage with executive agencies" about potential legislation, "they are almost inevitably acting on behalf of interests other than those of the agencies." *American Oversight*, 101 F.4th at 920. The panel stopped short of deciding "whether members of Congress or their staffs could ever satisfy the post-*Klamath* consultant corollary requirements," however, because the factual record "ma[de] clear that in the communications between the agencies and Congress, each side had an independent stake" in the particular matters they discussed. *Id.* Citing the government's declarations, the panel reasoned that "[a]n agency would not develop a 'strategy' to 'negotiate' with and 'advocate' to outsiders to garner their 'support' if those outsiders were analogous to an employee or a disinterested consultant." *Id.* at 921. In other words, Congress

5

was "negotiating with a co-equal branch" rather than "functioning in a consultative capacity." *Id.* at 913.

**B. 1.** Like *American Oversight*, this case involves communications with persons who are not agency employees. In all other relevant respects, however, the two cases are dissimilar. The question here is not whether Exemption 5 protects deliberative advice provided to an agency in aid of the agency's internal decision-making process. Rather, this case involves Exemption 5's application to attorney communications, governed by common-law privileges enjoyed by governmental and private litigants alike, made solely in service of the agency's conduct of active litigation in federal court.

By design, Exemption 5 encompasses not only governmental privileges but common-law privileges as well. As explained at length (Opening Br. 20-24, 42-46), "Congress had the attorney's work product privilege specifically in mind when it adopted Exemption 5," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975), and from its outset, courts have consistently understood that privilege to encompass litigation preparation among allied parties. Congress enacted FOIA in 1966 against that backdrop. *Cf. Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) (recognizing that "courts may take it as given that Congress has legislated with an expectation that the [common-law] principle will apply"). On that basis, the Department of Justice has long

6

utilized common-interest arrangements in both affirmative and defensive litigation. The government's litigation allies have likewise long relied on the confidentiality of common-interest communications, particularly where such coordination is court-ordered and thus unavoidable. *See generally* Br. of Amici Curiae NAACP Legal Defense & Educ. Fund, *et al.* And as explained in our prior briefing, Congress has further ratified these judicial, agency, and private understandings by reenacting Exemption 5's relevant text without change, even as it narrowed that Exemption in other ways. *See* Opening Br. 46-49.

Nothing in *American Oversight* suggests a different understanding of "intra-agency memorandums or letters." As discussed in our briefs, that phrase is not defined by statute, and thus must be given a "'fair reading'" with a view to its role in the statute's operation. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019); *see id.* (rejecting assertion that FOIA's exemptions "should be narrowly construed"). "Intra-agency" means "within" an "agency"; an agency is an institutional entity that necessarily acts through persons it invites to participate in its functions. Not all of those people will be agency employees or appointees.

As relevant here, a litigant who "cooperate[s] with the agency in pursuit of the agency's own litigation aims ... becomes a part of the enterprise that the agency is carrying out." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d

272, 280 (4th Cir. 2010). That cooperation takes place only once the agency, exercising statutory authority, has "determine[d] that the public interest and the litigation partner's interest have converged," thus warranting coordinated litigation. *Id.* And this reading "give[s] 'independent vitality' to the statutory term 'intra-agency.'" *American Oversight*, 101 F.4th at 917 (quoting *Klamath*, 532 U.S. at 12); *see* Reply Br. 19. Exemption 5 is satisfied not simply because work-product protection applies to the records (the "privilege" requirement), but also because the records were made pursuant to an express agency determination that coordination with allied parties was necessary to fulfill the agency's litigating functions (the "intra-agency" requirement).

The consultant corollary has provided a useful framework for, *inter alia*, analyzing records submitted to an agency's "deliberative process" and withheld under executive privilege. *See generally American Oversight*, 101 F.4th at 912-17 (majority op.). But that framework was not designed to address materially different contexts, including the invocation of commonly available litigation privileges that Congress plainly intended Exemption 5 to accommodate. For example, Exemption 5 would protect privileged attorney-client communications between the Department of Justice and certain other non-agency personnel when it represents them in litigation, such as federal judges or Members of Congress, without regard to all the concerns analyzed in

the consultant-corollary context. *Cf., e.g.*, *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015) (official-capacity suit against Supreme Court marshal); *Martinez v. United States*, 838 F. App'x 662 (3d Cir. 2020) (*Bivens* suit against federal judges). As this Court has reaffirmed in a post-*Klamath* decision, Exemption 5 also protects communications with the President, who of course is not an "agency" or agency employee, without requiring him to qualify as a "consultant." *See Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129-31 (D.C. Cir. 2005).

As Judge Wilkins observed, although *American Oversight* was litigated and decided under its framework, "[d]eploying the consultant corollary doctrine" in some circumstances is "rather like forcing a square peg into a round hole." 101 F.4th at 929 (Wilkins, J., concurring in part and dissenting in part). And as the Fourth Circuit stressed in *Hunton & Williams*, nothing in the text, context, history, or purpose of FOIA suggests any intention to "force the United States into a uniquely disadvantaged litigation posture." 590 F.3d at 277-78; *see generally United States v. AT&T Co.*, 642 F.2d 1285, 1300 (D.C. Cir. 1980) ("The Government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives.").

**2.** In any event, even if the concerns central to the Court in *American Oversight* were fully applicable here, the decision strongly supports reversal.

9

The basis for the panel's conclusion that "[t]he communications at issue do not qualify as 'intra-agency memorandums or letters'" was that they occurred among parties who "brought 'divergent interests to bear'" on their discussion. *Id.* at 916, 923. Here, by contrast, the Department's communications with allied counsel occurred only because the Department first determined that those counsel possessed the same interest as the federal government: their shared interest in proving that certain provisions of Georgia law were enacted with discriminatory intent. And because the Department had already filed suit and already determined that shared interests existed before it communicated with allied co-counsel, those co-counsel "lack[ed] a[ny] stake in the outcome of the [Department's] decision" in any sense relevant to Exemption 5. *Id.* at 918.

Moreover, whereas the non-employees in *American Oversight* had a "stake in the outcome of *the agency's* process," *id.* at 917 (emphasis added), here the relevant process is one external to the agency (litigation in federal court), and Department leadership determined that the communications were in the agency's interest in fulfilling its statutory litigation functions. Any concerns about "self-interested parties attempting to persuade the government to adopt a particular policy ... are no longer in play once the government is actually persuaded that the policy is in the public interest," *American Mgmt. Servs., Inc. v.*

*Department of the Army*, 703 F.3d 724, 735 (4th Cir. 2013) (quotation marks omitted), and is seeking to vindicate that shared interest in federal court.

The agency declarations here confirm these common, not "diverg[ing]" interests. The United States filed its Georgia complaint in June 2021, weeks after other plaintiffs had already brought suit. The next month, Department attorneys and "plaintiffs' counsel in various of the cases challenging Georgia's SB 202" conferred and "agreed that they 'share a common interest in the successful prosecution of this litigation'" sufficient to justify "'shar[ing] … privileged communications and other litigation material between and among them without waiving'" relevant privileges. J.A. 22 (Russ Decl. ¶ 8). The Department entered into that agreement only after concluding not merely that "[t]he United States shares a common interest with the plaintiffs in the five other consolidated cases" but also, more specifically, that "[p]rivileged communications among the Common Interest Group are necessary to efficiently and effectively litigate the SB 202 litigation," including prosecuting the United States' own claims. J.A. 28, 30 (*id.* ¶¶ 25, 30). The need for coordination became particularly acute once the district court consolidated the SB 202 race-discrimination cases and expressly ordered the Department and other plaintiffs to "work together on discovery." J.A. 30 (*id.* ¶ 30). That instruction ultimately culminated in a motion for preliminary injunction jointly

11

filed by the Department and private parties, as well as a lengthy joint opposition brief to the State's summary-judgment motion.[2]

Finally, *American Oversight* of course has no bearing on the district court's anomalous ruling that the Department and allied parties waived work-product protection by communicating with one another. *See* Opening Br. 20-32; Reply Br. 4-15. This Court has long recognized that work-product protection is waived by disclosure only "if 'such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the *disclosing party's adversary*.'" *United States v. Deloitte LLP*, 610 F.3d 129, 140 (D.C. Cir. 2010) (emphasis added); *see AT&T Co.*, 642 F.2d at 1299 (same). No such disclosure to adversaries has occurred here, and FOIA cannot be used to compel it.

---

[2] Though plaintiffs have disclaimed any request for allied-party communications exchanged after the date of consolidation, the logic of their statutory interpretation would nonetheless require disclosure of such documents if requested. *See* Opening Br. 12 n.3.

# CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*

MARK B. STERN
/s/ *Jeffrey E. Sandberg*
JEFFREY E. SANDBERG
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7214*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 532-4453*
  *jeffrey.e.sandberg@usdoj.gov*

JUNE 2024

  *Counsel for Defendant-Appellant*
    *United States Department of Justice*

# CERTIFICATE OF COMPLIANCE

This supplemental brief complies with the limits established by this Court's order of May 31, 2024, because it contains 2,561 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Calisto MT 14-point font, a proportionally spaced typeface.

                                                  */s/ Jeffrey E. Sandberg*
                                                  Jeffrey E. Sandberg

# CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2024, I electronically filed the foregoing supplemental brief with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

                                                  */s/ Jeffrey E. Sandberg*
                                                  Jeffrey E. Sandberg