# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 4, 2024            Decided August 12, 2025

No. 23-5083

STATE OF GEORGIA AND BRAD RAFFENSPERGER, GEORGIA
SECRETARY OF STATE, IN HIS OFFICIAL CAPACITY,
APPELLEES

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-03138)

———

*Jeffrey E. Sandberg*, Attorney, U.S. Department of Justice,
argued the cause for appellant. With him on the supplemental
briefs were *Brian M. Boynton*, Principal Deputy Assistant
Attorney General, *Sarah E. Harrington*, Deputy Assistant
Attorney General, and *Mark B. Stern*, Attorney.

*Anuja D. Thatte* argued the cause for *amici curiae* NAACP
Legal Defense & Educational Fund, Inc. in support of
appellant. With her on the brief were *Jon M. Greenbaum*, *Ezra
D. Rosenberg*, *Pooja Chaudhuri*, *Janai S. Nelson*, *Samuel*

2

*Spital*, *Leah C. Aden*, *Katrina Feldkamp*, and *Bradley E. Heard.*

*Gene C. Schaerr* argued the cause for appellees. With him on the supplemental brief were *Christopher M. Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Stephen J. Petrany*, Solicitor General, *Erik S. Jaffe*, *Brian J. Field*, *Andrew Strain*, and *Bryan P. Tyson.*

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: The Freedom of Information Act generally requires the government to disclose requested agency records unless a statutory exemption applies. This case involves FOIA's Exemption 5, which allows withholding "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5).

As its terms make evident, Exemption 5 assures that the government need not disclose records under FOIA that would be privileged from discovery in litigation—including, of particular salience, materials protected by the attorney work-product privilege. If not for that exemption, a party opposed to the government in litigation would be barred from obtaining the government's privileged attorney work product through discovery but could still gain access simply by filing a FOIA request. Exemption 5 prevents FOIA from forcing the government to bear that kind of asymmetric disadvantage in litigation: where opposing counsel would have access to the government's litigation strategy notwithstanding the work-

3

product privilege but the government would have no parallel ability to overcome the privilege in the reverse direction.

The issue in this case is whether that type of imbalance nonetheless arises whenever the government coordinates with other parties aligned on the same side of a case. For purposes of the work-product privilege, the government—like any party—can communicate and share protected materials with aligned parties without waiving the privilege. That is especially so when the parties enter into a so-called "common-interest" agreement designed to enable coordination and exchanging of documents within the fold of the privilege. But what about for purposes of FOIA? Does the government's sharing of attorney work product with aligned parties mean that Exemption 5 no longer protects those privileged communications from disclosure to the opposing side under FOIA?

Georgia argues in this case that the answer is yes. Georgia is a defendant in a number of consolidated lawsuits challenging a state election law. The plaintiffs in the cases include the federal government and several aligned parties. Those parties entered into a common-interest agreement to protect their ability to communicate about the cases under the umbrella of the attorney work-product privilege. Georgia filed a FOIA request seeking disclosure of all communications between the federal government and aligned parties in the cases, regardless of whether the materials would be protected from discovery in the ongoing litigation under the work-product privilege.

According to Georgia's argument, it does not matter if the materials it seeks are "memorandums or letters that would not be available by law to [it] in litigation with the agency" within the meaning of Exemption 5. Georgia emphasizes that the exemption speaks in terms of "*intra-agency* memorandums and

4

letters"; and to Georgia, because the communications it seeks
were shared between the government and aligned non-
government parties, the materials are not "intra-agency"
records.  The result, in Georgia's view, is that it can obtain the
opposing side's privileged work product in the cases even if the
opposing side cannot obtain Georgia's.

We disagree that FOIA requires that anomalous result.
Several of our precedents establish—and the Supreme Court
has assumed—that agency records can qualify as "intra-
agency" materials under Exemption 5 in certain conditions
even if exchanged with outsiders.   In that situation, the
outsiders are treated as coming within the hem of the agency
for the purpose of insulating their shared communications from
disclosure pursuant to Exemption 5.

That understanding makes particular sense in the context
of work-product materials shared among aligned parties under
a common-interest agreement grounded in a mutual
expectation of confidentiality.   An animating purpose of
Exemption 5 is to prevent parties opposed to the government
in litigation from using FOIA as a workaround to obtain
privileged materials they could not access in the lawsuit.  Those
concerns are pronounced when the sought-after records would
disclose the government's strategy and impressions about an
ongoing case, resulting in precisely the kind of unbalanced
playing field for the government that Exemption 5 aims to
forestall.

We hold that when the government exchanges attorney
work product with aligned parties under a common-interest
agreement rooted in shared interests and a need for
confidentiality, the shared work product qualifies as "intra-
agency" material under Exemption 5.  Our conclusion accords
with the only other court of appeals' decision to consider the

5

issue.  *See Hunton & Williams v. U.S. Dep't of Just.*, 590 F.3d 272 (4th Cir. 2010).  Because the district court here reached the opposite conclusion, we reverse its decision in principal part.

I.

A.

Shortly after the 2020 elections, Georgia enacted the Election Integrity Act, known in the state as SB 202.  *See* 2021 Ga. Laws Act 9.  While Georgia touted SB 202 as a much-needed update to election procedures, various organizations thought otherwise.  From their perspective, the legislation targeted "every aspect of the voting process . . . to make absentee, early, and election-day voting more difficult." Compl. ¶ 4, *The New Ga. Project v. Raffensperger*, No. 21-cv-1229 (N.D. Ga. Mar. 25, 2021), Dkt. No. 1.

Seven organizations separately filed suit in the Northern District of Georgia to challenge various provisions of SB 202. *See Georgia v. U.S. Dep't of Just.*, 657 F. Supp. 3d 1, 6 n.1 (D.D.C. 2023).  While each of the seven lawsuits seeks to invalidate SB 202 as violating voters' rights under federal law, they raise varying claims.  Five organizations raise claims of race discrimination under Section 2 of the Voting Rights Act (VRA) along with separate claims under the Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. The remaining two suits raise non-race-based statutory and constitutional claims.

Shortly after the private organizations filed their seven suits, the United States Department of Justice (DOJ) initiated its own challenge to SB 202 in the same court.  *See* Compl., *United States v. Georgia*, No. 21-cv-2575 (N.D. Ga. June 25, 2021), Dkt. No. 1.  DOJ brought a race-discrimination claim under Section 2 of the VRA "to enforce the voting rights

6

guaranteed by the Fourteenth and Fifteenth Amendments to the
United States Constitution." *Id.* ¶ 3. DOJ's suit, along with the
other seven challenges, were assigned to the same judge.

DOJ soon began communicating with the other plaintiffs
challenging SB 202 in the same court. The parties' mutual
engagement is standard practice in complex civil litigation
when parties with aligned interests coordinate for efficiency
and simplicity—often with the court's encouragement or at its
direction. *See* Manual for Complex Litigation (Fourth)
§§ 10.22–10.221 (2004).

On July 28, 2021, DOJ and six of the seven plaintiff
organizations—including all five organizations raising claims
of race discrimination—formalized their entry into a common-
interest agreement for sharing communications about the
litigation. The agreement stated that DOJ and the other
plaintiffs "share[d] a common interest in the successful
prosecution of this litigation" and provided that they "may
share (but are not required to share) privileged communications
and other litigation material between and among them without
waiving the attorney-client privilege, the work product
protection or any other privilege or protection." J.A. 157.
Though seven parties (including DOJ) joined the agreement,
only the six parties litigating race-discrimination claims shared
information after the agreement's memorialization. The shared
materials were prepared by attorneys and included "documents
discussing legal strategy, potential witnesses, types of
discovery needed, [and] division of labor in a case that would
likely be consolidated." Decl. of John A. Russ, IV (Russ Decl.)
¶ 28 (J.A. 29).

The decision to form a common-interest agreement proved
prescient. The district court administratively consolidated the
six cases raising race-discrimination claims. *See* Order, *In re*

7

*Ga. Senate Bill 202*, No. 21-mi-55555 (N.D. Ga. Dec. 23, 2021), Dkt. No. 1. The court explained that the cases involved "virtually identical defendants and mostly the same facts and legal issues," including "race discrimination, undue burden on the right to vote and abridgment of free speech, expression[,] and association." *Id.* at 5, 7. In accordance with the court's discovery orders, the consolidated plaintiffs (including DOJ) submitted a joint discovery plan and coordinated on complying with the court's overall caps on the discovery—e.g., the number of total depositions—they could collectively conduct.

B.

In August 2021, roughly one month after DOJ and other organizations formalized their common-interest agreement for sharing privileged communications, Georgia submitted a FOIA request to DOJ. *See* State of Georgia FOIA Request (Aug. 31, 2021) (J.A. 14–19). The FOIA request ostensibly stemmed from Georgia's suspicion that DOJ was involved in coordinating suits against SB 202 resting on allegedly false claims of discrimination. Georgia's FOIA request sought all "DOJ communications with various non-governmental entities that are involved in the legal challenges to [SB 202]" within a date range beginning on November 3, 2020—before the commencement of the litigation—and ending with the date of the search. *Id.* at 2 (J.A. 15).

In December 2021, Georgia brought this suit in the district court to enforce its FOIA request. *See* Compl., *Georgia v. U.S. Dep't of Just.*, No. 21-cv-3138 (D.D.C. Dec. 1, 2021), Dkt. No. 1; *see also* 5 U.S.C. § 552(a)(4)(B) (granting jurisdiction in the District of Columbia for FOIA suits). In response, DOJ produced nearly one thousand pages of materials. DOJ also withheld six documents and redacted portions of 52 others. The withheld documents included communications from July

8

to September 2021—all after DOJ joined the litigation—exchanged between DOJ and other plaintiffs who were parties to the common-interest agreement.

In support of its withholdings and redactions, DOJ relied on FOIA's Exemption 5, which shields from disclosure inter- or intra-agency materials "that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). DOJ explained that the "material withheld in this case comprises attorney work-product privileged materials exchanged within the Common Interest Group." Russ Decl. ¶ 28 (J.A. 29). Georgia countered that (a) the withheld materials are not "intra-agency" records under Exemption 5 because they had been exchanged with non-government parties, and (b) DOJ had waived any claim to the work-product privilege by sharing information with third parties without adequately demonstrating a common interest.

The district court granted summary judgment in Georgia's favor on both grounds. The court first rejected DOJ's argument that the common-interest doctrine rendered materials exchanged with non-government litigants "intra-agency" records for purposes of Exemption 5. The court further determined that the work-product privilege in any event had been waived by the sharing of communications with other parties.

II.

DOJ appeals both aspects of the district court's ruling, contending that (a) its communications with aligned non-government parties under a common-interest agreement qualify as "intra-agency" exchanges for purposes of Exemption 5, and (b) it did not waive the attorney work-product privilege by sharing materials within the rubric of a common-interest arrangement. We agree with DOJ on both scores. Reviewing

9

the matter de novo, *see Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 369 (D.C. Cir. 2005), we hold that privileged attorney work product exchanged with aligned parties under a common-interest arrangement can be withheld from FOIA disclosure pursuant to Exemption 5.

A.

Congress enacted FOIA "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks and citation omitted). At the same time, Congress recognized that "public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982), and "it is necessary to protect certain equally important rights of privacy with respect to certain information in Government files," S. Rep. No. 89-813, at 3 (1965).

Congress balanced those competing considerations by excluding certain materials from FOIA's disclosure mandate pursuant to nine enumerated exemptions. *See* 5 U.S.C. § 552(b)(1)–(9). The FOIA exemption at the center of this case is Exemption 5. Under that exemption, agencies need not disclose "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." *Id.* § 552(b)(5). The exemption "incorporates the privileges available to Government agencies in civil litigation," *U.S. Fish & Wildlife Serv. v. Sierra Club*, 592 U.S. 261, 267 (2021), and "exempt[s] those documents [that are] normally privileged in the civil discovery context," *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).

While Exemption 5 encompasses the range of privileges the government can assert in civil litigation, it is "clear that Congress had the attorney's work-product privilege specifically in mind when it adopted Exemption 5." *Id.* at 154.

10

The work-product privilege "exist[s] to . . . promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." *United States v. A.T.&T. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980) (emphasis omitted); *see generally Hickman v. Taylor*, 329 U.S. 495 (1947). Exemption 5 secures FOIA's adherence to that essential guarantee of fairness in the adversary system in suits involving the government: the exemption enables the government to litigate without fear that its opponent can gain access to its attorney work product—and thereby nullify the privilege—through the mechanism of a FOIA request. As a general matter, "attorney work product . . . should not be any more easily discoverable from the Government than from any other party." *A.T.&T.*, 642 F.2d at 1301. Exemption 5 vindicates that principle in FOIA.

"FOIA expressly recognizes that important interests are served by its exemptions and those exemptions are as much a part of FOIA's purposes and policies as the statute's disclosure requirement." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (cleaned up). With Exemption 5 in particular, the Supreme Court has underscored the exemption's integral role in preserving a balanced playing field in government litigation.

The Court has explained that FOIA "is fundamentally designed to inform the public about agency action and *not to benefit private litigants*." *Sears, Roebuck & Co.*, 421 U.S. at 143 n.10 (emphasis added). The Court thus has "consistently rejected . . . a construction of the FOIA" under which a party "can obtain through the FOIA material that is normally privileged." *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 801 (1984). That kind of construction "would create an anomaly in that the FOIA could be used to supplement civil discovery." *Id.* The Court does "not think that Congress could

11

have intended that the weighty policies underlying discovery privileges could be so easily circumvented" via the mere submission of a FOIA request. *Id.* at 801–02. That understanding substantially informs our resolution of this appeal.

## B.

Exemption 5 allows the government to withhold records from disclosure if they satisfy two conditions. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). First, they must qualify as "inter-agency or intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5). Second, they must "not be available by law to a party . . . in litigation with the agency," *id.*—i.e., they "fall within the ambit of a privilege against discovery," *Klamath*, 532 U.S. at 8. The two conditions have "independent vitality" in that they both must be satisfied. *Id.* at 12. And while they can be taken up in any order, we will consider them in the order they appear in the exemption's terms.

So, we initially examine whether the withheld materials in this case qualify as "intra-agency memorandums or letters." Answering yes, we then assess whether they fall within the attorney work-product privilege or whether, as Georgia claims, DOJ waived the privilege by sharing the materials with other parties. Finding no waiver, we conclude that Exemption 5 shields the withholdings from FOIA's disclosure mandate.

## 1.

We first consider whether the withheld communications qualify as "inter-agency or intra-agency memorandums or letters" within the meaning of Exemption 5. 5 U.S.C. § 552(b)(5). There is no dispute that the materials amount to "memorandums or letters," and DOJ does not contend that they

are "inter-agency" records.  The sole issue then is whether the withheld information qualifies as "intra-agency."

a.

To answer that question, we must first understand the precise nature of the withheld materials.  Georgia's FOIA request "seek[s] DOJ communications with various non-governmental entities that are involved in the legal challenges to" the state's election law, SB 202.  State of Georgia Request at 1 (J.A. 15).  The withheld documents thus all involve communications between DOJ and non-government parties.  Specifically, the withholdings were all exchanged among parties to the common-interest agreement.  In accordance with that scope, DOJ confines its position on what counts as "intra-agency" materials to information shared under a common-interest agreement.

Common-interest agreements derive from the common-interest doctrine.  Under that doctrine, "[i]f two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter," the information remains "privileged as against third persons."  Restatement (Third) of the Law Governing Lawyers § 76(1) (A.L.I. 2000).  The rationale is to enable parties with aligned interests to prepare their case and "coordinate their positions without destroying the privileged status of their communications."  *Id.* § 76 cmt. b.  A common-interest agreement protects the privileged status of shared communications as to both the attorney-client privilege and (relevant here) the attorney work-product privilege.  *See Minebea Co. v. Papst*, 228 F.R.D. 13, 16 (D.D.C. 2005).

The "common interest doctrine," in short, "permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or

13

defend their claims." *Hunton & Williams*, 590 F.3d at 277. So when the government enters into a common-interest agreement with aligned parties in litigation, the government concludes that their interests have merged to an extent rendering it in the public interest to coordinate their mutual efforts and do so under a cone of confidentiality. The question here is whether communications among the government and allied parties within that rubric qualify as "intra-agency" exchanges under Exemption 5.

b.

The sole court of appeals to have considered that question answered it affirmatively. *Hunton & Williams*, 590 F.3d at 277–81. The Fourth Circuit there explained: "Because the common interest doctrine requires the agency to determine that the public interest and the litigation partner's interest have converged, communications between the agency and its partner can be understood as 'intra-agency' for purposes of Exemption 5." *Id.* at 280. Notably, in reaching that conclusion, the court integrally relied on decisions from our court applying Exemption 5 in related contexts. *See id.* at 279–80.

A long line of our court's decisions establishes that "intra-agency" for Exemption 5 purposes can encompass materials to or from persons outside an agency's employ. *See Klamath*, 532 U.S. at 9, 12–13 n.4 (discussing decisions); *U.S. Dep't of Just. v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting) (same). As we recently observed, "our court and others have long treated Exemption 5's coverage of 'intra-agency' records as extending beyond just [the] category" of materials "authored by and exchanged between [an] agency's employees." *Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 101 F.4th 909, 914 (D.C. Cir. 2024).

14

Our line of decisions began over 50 years ago with *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), where we recognized what has come to be known as the consultant corollary. *Soucie* established that a document created by an agency's outside private consultant can qualify as an "intra-agency" record under Exemption 5. "That exemption," we explained, "was intended to encourage the free exchange of ideas during [an agency's] process of deliberation and policymaking." *Id.* at 1077. We reasoned that "[t]he "government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity." *Id.* at 1078 n.44. An outside report thus can "be treated as an intra-agency memorandum of the [soliciting] agency," in furtherance of Exemption 5's purposes. *Id.*

Since *Soucie*, we have continued applying the consultant corollary to protect materials exchanged with non-agency outsiders under Exemption 5. *See, e.g.*, *McKinley v. Bd. of Governors of Fed. Resrv. Sys.*, 647 F.3d 331, 339 (D.C. Cir 2011); *Nat'l Inst. of Mil. Just.* (*NIMJ*) *v. U.S. Dep't of Def.*, 512 F.3d 677, 685 (D.C. Cir. 2008); *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 130–31 (D.C. Cir. 2005); *Ryan v. Dep't of Just.*, 617 F.2d 781, 789–91 (D.C. Cir. 1980). Those decisions rest on "a common sense interpretation of 'intra-agency' that encompasses the advice submitted by such temporary consultants." *NIMJ*, 512 F.3d at 685 (quoting *Ryan*, 617 F.2d at 790 (quotation marks removed)). "When interpreted in light of its purpose," we have determined, "the language of Exemption 5 clearly embraces [the] situation" of an agency's "rely[ing] on the opinions and recommendations of temporary consultants, as well as its own employees." *Id.* at 680 (quoting *Ryan*, 617 F.2d at 789).

15

The Supreme Court has assumed the correctness of those decisions' interpretation of "intra-agency," albeit without definitively deciding the matter.  *See Klamath*, 532 U.S. at 9–14 (citing *Soucie*, among other decisions).  In doing so, the Court described and quoted Justice Scalia's support of the decisions in his separate opinion (joined by two other Justices) in *Department of Justice v. Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting).  *See Klamath*, 532 U.S. at 9–10.  (The majority in *Julian* did not reach the issue.  *See Klamath*, 532 U.S. at 10 n.2; *Julian*, 486 U.S. at 11 n.9.)

Justice Scalia allowed that "the most natural meaning of the phrase 'intra-agency memorandum' is a memorandum that is addressed both to and from employes of a single agency." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting).  But "[t]he problem with this interpretation is that it excludes many situations where Exemption 5's purpose of protecting the Government's deliberative process is plainly applicable." *Id.* "Consequently, the Courts of Appeals have uniformly rejected it," he explained.  *Id.*  And "[i]t seem[ed] to [him] that these decisions are supported by a permissible and desirable reading of the statute"—one that is "textually possible and much more in accord with the purpose of the provision."  *Id.*

Under Justice Scalia's and our court's understanding of Exemption 5, "Congress . . . did not intend 'inter-agency' and 'intra-agency' to be rigidly exclusive terms."  *Ryan*, 617 F.2d at 790; *see Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting) (discussing *Ryan* and supporting its reading of the statute); *Klamath*, 532 U.S. at 12–13 n.4 (declining to decide whether result in *Ryan* is correct).  The same is true of the immediately ensuing words in Section 5:  "memorandums or letters."  5 U.S.C. § 552(b)(5).  While there is no dispute in this case that the withheld materials qualify as "memorandums or letters," it bears noting that those terms have likewise been given a

16

nonrigid construction in accommodation of Exemption 5's purposes.

The items held to fall within Exemption 5's protection of "memorandums or letters" thus include: agency draft opinions, *U.S. Fish & Wildlife Serv.*, 592 U.S. at 273; draft historical manuscripts and reports, *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014); interview notes, *Williams & Connolly v. SEC*, 662 F.3d 1240, 1245 (D.C. Cir. 2011); agency notebooks, *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Com.*, 907 F.2d 203, 207–08 (D.C. Cir. 1990); cost estimates, *Quarles v. Dep't of the Navy,* 893 F.2d 390, 391–92 (D.C. Cir 1990); and calendar entries, *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 394 F. Supp. 3d 39, 48–49 (D.D.C. 2019). Those decisions recognize that effective government deliberation can take place through a range of documentary formats beyond traditional "memorandums or letters." 5 U.S.C. § 552(b)(5). Allowing FOIA to reach materials such as draft pleadings, computer data, or handwritten notes would drain Exemption 5 of its protective purpose. *See Hunton & Williams*, 590 F.3d at 280–81.

c.

In accordance with our previous decisions, we refrain from giving "intra-agency" in Exemption 5 an unduly rigid reading and instead construe it in a common-sense way that accords with the exemption's purposes. *See NIMJ*, 512 F.2d at 680, 685; *Soucie*, 448 F.2d at 1078 n.44; *see also Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting). Applying that approach, we conclude that the government's attorney work product shared with aligned parties in litigation under a common-interest agreement qualifies as "intra-agency" material. That understanding is "textually possible," and it is "much more in

17

accord with the purpose of the provision." *Julian*, 486 U.S. at 18 n.1 (Scalia, J., dissenting).

As for the text, our consultant corollary decisions hold that non-agency outsiders can be sufficiently aligned and involved with an agency in certain conditions that their exchanges with the agency are treated as "intra-agency" under Exemption 5. *See* Part II.B.1.b, *supra*. Considered against that backdrop, "intra-agency" likewise embraces the circumstances of this case: communications among an agency and its allied litigating partners under a common-interest agreement aimed to preserve the privileged status of their exchanges. After all, the "Government has the same entitlement as any other party to assistance from those sharing common interests." *A.T.&T.*, 642 F.2d at 1300. And by entering into a common-interest arrangement with aligned parties in litigation, the government decides it is in the public interest to carry out their mutual engagement in the undertaking under a common umbrella of confidentiality recognized by the law. In that situation, the other parties to the agreement can be treated as coming into the agency's fold for purposes of coordinating strategy and litigating the case and sharing confidential information to that end. *See Hunton & Williams*, 590 F.3d at 280 ("By cooperating with the agency in pursuit of the agency's own litigation aims, the litigation partner in a limited sense becomes a part of the enterprise that the agency is carrying out.").

That understanding of "intra-agency" holds particular sway when considered in light of Exemption 5's purposes, as our decisions have consistently done. The central salient purpose of Exemption 5 in this case is the one elaborated earlier: preventing parties in litigation from using FOIA as a collateral means of accessing materials the law excludes from discovery in the lawsuit. *See* Part II.A, *supra*. As the Supreme Court has long made clear, FOIA is not intended to afford a

18

substitute way to obtain "normally privileged" agency records, uniquely disadvantaging the government's side in litigation. *Weber Aircraft*, 465 U.S. at 801. To that end, "Exemption 5 expresses Congress's view that the public interest is not served by stripping government agencies of the privileges otherwise available to them in litigation." *Hunton & Williams*, 590 F.3d at 277.

Reading "intra-agency" to exclude the withheld materials in this case, though, would do exactly that. When a government agency is a party in litigation, Exemption 5 generally prevents the opposing side from using FOIA to obtain the agency's privileged attorney work product. That is a core object of the provision. But if "intra-agency" is rigidly understood to exclude sharing of materials outside the strict confines of an agency's employees, FOIA would instantly become a gateway to accessing the government's attorney work product whenever it is exchanged with aligned parties on the same side of multiparty litigation.

It would not matter if the attorney work-product privilege protects the shared materials from discovery in the litigation—which, as we later explain, would normally be the case. *See* Part II.B.2, *infra*. It also would not matter if the shared records involve an especially sensitive type of attorney work product—e.g., a document laying out the government's legal strategy and detailing its vulnerabilities. Nor would it matter if the materials are exchanged under a common-interest agreement, the entire purpose of which is to preserve the documents' privileged status. It would not even matter if the parties on the government's side are ordered by the court to coordinate their work and consolidate their submissions. Regardless of any of that, FOIA would afford a ready means for the opposing side to obtain any and all attorney work product shared on the government's side.

19

We do not believe Congress intended the term "intra-agency" in Exemption 5 to produce that striking result. And the implications would be far-reaching. In an array of situations, the government coordinates with non-agency parties to advance the public interest. For instance, an agency often litigates multi-party disputes alongside a range of parties on the same side. *See generally, e.g.*, *West Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022). The federal government also frequently submits amicus briefs and participates in oral argument in support of other parties. *See generally, e.g.*, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *DeVillier v. Texas*, 601 U.S. 285 (2024). In other instances, DOJ may represent nonagency personnel, such as members of Congress or judges or other judicial officers. *See generally, e.g.*, *Martinez v. United States*, 838 F. App'x 662 (3d Cir. 2020); *Hodge v. Talkin*, 799 F.3d 1145 (D.C. Cir. 2015). And in qui tam lawsuits, there is extensive coordination between the government and private relators. *See, e.g.*, *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 425–26 (2023).

In all those situations and others, the government naturally communicates with allied parties in litigation on matters essential to effective advocacy and central to the work-product privilege—e.g., developing legal arguments, coordinating strategy, apportioning workstreams, drafting submissions, and preparing for court appearances. Throughout, there is an essential need to "maintain[] the confidentiality of attorney-client communications in order to promote the rendering of legal services." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997). Beyond that, the protection of attorney work product is indispensable to the integrity and fairness of the adversarial process as a whole. *See Hickman*, 329 U.S. at 511; *United States v. Deloitte LLP*, 610 F.3d 129, 139–40 (D.C. Cir. 2010); *A.T.&T.*, 642 F.2d at 1299.

20

In a host of circumstances, moreover, a court will leave the government with no choice but to coordinate with aligned parties. In the consolidated cases at issue here, for instance, the court hearing the cases imposed collective discovery caps on DOJ and the other consolidated plaintiffs—i.e., overall limits on the number of depositions and interrogatories—necessarily requiring the parties to work closely together. And in comparable cases, "the United States routinely is required by district court judges to file coordinated briefs, written discovery, and other legal documents with other aligned parties," including "joint filings (such as briefs, findings of fact and conclusions of law, etc.) reflecting the views of multiple plaintiffs including the United States." Russ Decl. ¶¶ 34–35 (J.A. 31–32).

To be sure, the government could try to engineer its coordination with aligned parties so as to refrain from exchanges that would subject its attorney work product to disclosure under FOIA. Georgia suggested in oral argument, for instance, that DOJ could confine its communications with its common-interest partners to oral conversations by phone or videoconference, without any sharing of written materials that might constitute FOIA records. *See* Oral Argument at 39:37–42:32. The parties then would presumably coordinate their joint efforts in the consolidated challenges without ever sharing a document via email or any medium.

It is hard to imagine effective—let alone efficient—coordination under those kinds of manufactured constraints. And at any rate, a central purpose of Exemption 5 is to avoid subjecting the government to asymmetric disadvantages in the conduct of litigation, which those sorts of doctored restrictions would surely do. Ultimately, Georgia's suggestion amounts to saying that DOJ could avoid the need to disclose privileged communications under FOIA if it would just forgo

21

communications implicating FOIA. Yet the entire object of Exemption 5 is to protect the government's privileged communications, not discourage them.

For all those reasons, we conclude that communications among the government and aligned parties in litigation under a common-interest agreement qualify as "intra-agency" exchanges for purposes of Exemption 5.

d.

In resisting that conclusion, Georgia contends that it conflicts with our court's consultant-corollary decisions. Those decisions, as explained, establish that "intra-agency" under Exemption 5 can range beyond the strict confines of an agency's employ. In that important respect, the consultant-corollary decisions substantially inform our conclusion that the communications in this case likewise qualify as "intra-agency," as we have set out. But those decisions' understanding of the exact conditions in which an outside consultant's communications count as "intra-agency" records does not reflexively control in the distinct context of this case.

This is not a consultant-corollary case: it does not involve an outside consultant giving advice to an agency as part of the deliberative process leading to an agency decision. The consultant corollary arose in and is tied to that setting. "We first endorsed the corollary in *Soucie* . . . to account for the reality that agencies often rely on outside experts for advice in their deliberative processes." *Am. Oversight*, 101 F.4th at 914. And we recently held that "[t]he consultant corollary is limited to situations where the outside entity . . . does not 'represent an interest of its own, or the interest of any other client, when it advises the agency.'" *Id.* at 916 (quoting *Klamath*, 532 U.S. at 11). We considered the consultant's absence of a stake in the outcome of the agency's deliberative process to be "the

22

hallmark of a consultative relationship," *id.* at 920, and to put the consultant in a comparable position to an agency employee in that context for purposes of Exemption 5's "intra-agency" requirement, *id.* at 918.

This case, however, does not involve a "consultative relationship," and DOJ does not attempt to fit within the consultant corollary. So the question here is not whether an outside expert's advice to an agency as part of the agency's own deliberative process is protected by Exemption 5. *See id.* at 916 ("The key is that the consultant must not have a stake in the outcome of *the agency's process* . . . " (emphasis added)). This case instead involves an agency exchanging privileged attorney work product with aligned outside parties in litigation under a common-interest agreement.

To elaborate, the consultant corollary centrally concerns an agency's internal deliberative process and privileges that are exclusive to the government in connection with its decisional process. *See id.* at 914 (deliberative-process privilege); *Soucie*, 477 F.2d at 1071–72 (executive privilege); *cf. Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (noting that "deliberative process privilege" is "unique to the government"). Here, by contrast DOJ had completed its internal process of deciding whether to bring a challenge to SB 202 and had filed its suit; and the agency seeks to preserve the confidentiality of its attorney work product in the latter external process (litigation) under a privilege generally available to all sides and parties in that process (the attorney work-product privilege). In accordance with those distinctions, what is centrally at stake in the consultant-corollary cases is the government's ability to obtain advice to inform its own decisional process. *E.g.*, *Soucie*, 448 F.2d at 1077, 1078 n.44. What is centrally at stake here is different: the fairness and integrity of the adversary system writ large, and whether the

23

government must disclose its own side's privileged work product about litigation strategy when the opposing side need not.

We acknowledge in this regard that the Supreme Court's decision in *Klamath*, while primarily addressed to the deliberative-process privilege, noted that the government there also asserted the attorney work-product privilege. *See Klamath*, 532 U.S. at 6–8. But apart from those brief mentions, the decision's analysis focused entirely on the deliberative-process privilege. That is unsurprising given that the decision concerned the suitability of the government's reliance there (unlike here) on the consultant corollary, in connection with the agency's own decisional process. *See id.* at 8–16. *Klamath* thus had no occasion to treat with the prospect of the government's having to turn over its attorney work product to the opposing side in litigation—much less with the implications of a common-interest agreement in that setting or whether the sharing of information under such an agreement qualifies as an "intra-agency" communication protected by Exemption 5. *See Hunton & Williams*, 590 F.3d at 279 (distinguishing *Klamath*).

We confront that issue here. In this context, unlike with the consultant corollary, an agency's aligned partners inherently come to the joint enterprise with their own interests as parties in litigation. Still, when the government joins hands with them in a common-interest arrangement securing the confidential sharing of privileged information in furtherance of the mutual undertaking, they are appropriately treated as coming within the fold of the agency for that limited purpose under Exemption 5. FOIA otherwise would severely undercut the government's attorney work-product privilege, even though Congress enacted Exemption 5 with that privilege specifically in mind. "We do not think that Congress could

24

have intended that the weighty policies underlying discovery privileges could be so easily circumvented" via a FOIA request. *Weber Aircraft*, 465 U.S. at 801–02.

That conclusion fully squares with the requirement to give Exemption 5's "intra-party" condition "independent vitality." *Klamath*, 532 U.S. at 12. We cannot treat that statutory language as "a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential." *Id.* Our approach does not do so. We do not consider the "intra-party" requirement satisfied merely because the materials fall within a privilege of value to the government. Rather, we conclude that, in the situation of a common-interest agreement, the circumstances satisfy the "intra-agency" condition because the outside parties to the agreement are sufficiently aligned and involved in the agency's enterprise. To be sure, the common-interest agreement can also bear on the remaining condition under Exemption 5: whether the attorney work-product privilege applies in the specific circumstances, a subject we turn to below. But so long as we give the "intra-agency" requirement independent content, which we do, nothing in *Klamath* bars—or purports to bar—the same information from potentially bearing on both conditions.

e.

Having determined that an agency's sharing of information with aligned parties pursuant to a common-interest agreement qualifies as an "intra-agency" exchange, we now assess whether the withheld communications in this case fit in that category. Georgia argues that the withheld materials do not qualify as "intra-agency" records even if communications under a common-interest agreement generally do. According to Georgia, the parties do not share sufficiently common

25

interests to implicate the common-interest doctrine. We disagree. The government bears the burden to show that the common-interest doctrine applies, *see Hunton & Williams*, 590 F.3d at 284, and the government has carried its burden.

Aside from two initial emails, the withheld communications all post-date the parties' memorialization of their common-interest agreement. We disregard DOJ's challenge as to the two initial emails: DOJ confines that challenge to a three-sentence footnote in its brief, DOJ Opening Br. 29 n.7, and we "need not consider cursory arguments made only in a footnote." *Hutchins v. D.C.*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999). What remains, then, is a set of communications that all plainly took place after the parties had entered into their common-interest agreement. A "common interest agreement can be inferred where two parties are clearly collaborating in advance of litigation," regardless of whether there is any written instrument. *Hunton & Williams*, 590 F.3d at 284. But here, there is no ambiguity about the existence of a common-interest arrangement because all the communications in issue came after the parties had formalized their agreement.

That set of communications was shared solely among the six parties (including DOJ) whose cases had been consolidated. And all of those parties challenged SB 202 on grounds of race discrimination. To be sure, some of those race-discrimination claims were brought under the Voting Rights Act and others under the Constitution, and some may focus on discriminatory intent while others allege discriminatory effect. But those sorts of modest variations do not stand in the way of recognizing that the parties' commonality of interests is more than enough for purposes of the common-interest doctrine.

26

Common interests "may be either legal, factual, or strategic in character," and "[t]he interests of the separately represented clients need not be entirely congruent." Restatement (Third) of the Law Governing Lawyers § 76 cmt. e. Here, accordingly, the district court consolidated the six cases involving race-discrimination claims because of the overlapping nature of the challenges, and the court imposed collective discovery limits on the premise that the plaintiffs could coordinate their work and jointly conduct discovery across their consolidated matters. In *United States v. A.T.&T.*, we found an adequate commonality of interests between the government and a private plaintiff who had brought similar antitrust claims against A.T.&T. in two separate forums. *See* 642 F.2d at 1299–300. We explained that the parties were "proceeding on overlapping . . . issues against a common adversary," and that they "shared common interests in developing legal theories and analyses of documents on which to proceed on those issues where they both made the same . . . claims." *Id.* at 1300. The same is true in the consolidated cases here.

2.

We have concluded that the withheld communications in this case qualify as "intra-agency" materials within the meaning of Exemption 5. We now address whether they also satisfy the exemption's second condition: that they "would not be available bylaw to a party . . . in litigation with the agency," 5 U.S.C. § 552(b)(5)—here, due to the attorney work-product privilege.

DOJ explains that the withheld materials in this case are classic attorney work product. *See Hickman*, 329 U.S. at 511. The "records include documents discussing legal strategy, potential witnesses, types of discovery needed, division of

labor in a case that would likely be [and later was] consolidated, and the efficient presentation of the case." Russ Decl. ¶ 28 (J.A. 29). And the "emails and other documents at issue were prepared by attorneys for the United States or attorneys for the Common Interest Group and include those attorneys' mental impressions, conclusions, opinions, and legal theories concerning positions that might be taken in the litigation." *Id.* (J.A. 29–30).

Georgia does not dispute that those kinds of materials fall squarely within the attorney work-product privilege. Georgia's argument instead is that DOJ waived the privilege by sharing the documents with aligned litigation partners. That is incorrect.

"[W]hile the mere showing of a voluntary disclosure to a third person will generally suffice to show waiver of the attorney-client privilege, it should not suffice in itself for waiver of the work product privilege." *A.T.&T.*, 642 F.2d at 1299 (emphasis omitted); *see Deloitte LLP*, 610 F.3d at 139. Even as to the attorney-client privilege, in fact, there is no waiver if the disclosure occurs under the rubric of a common-interest arrangement. *See* Restatement (Third) of the Law Governing Lawyers § 76. Here, accordingly, even if the case involved the attorney-client privilege rather than the attorney work-product privilege, disclosure of privileged matter to other parties pursuant to the common-interest agreement would not constitute a waiver.

The absence of any waiver is all the more clear with the attorney work-product privilege. With that privilege, "disclosing work product to a third party can waive protection if such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *Deloitte*, 610 F.3d at 140 (internal quotation marks

28

omitted).  In other words, "voluntary disclosure of attorney work product to an adversary or a conduit to an adversary waives work-product protection."  *Id.*; *see A.T.&T.*, 642 F.2d at 1299.

The disclosure of attorney work product in this case was not "to an adversary or a conduit to an adversary" and was not "inconsistent with the maintenance of secrecy from the disclosing party's adversary."  *Deloitte*, 610 F.3d at 140 (internal quotation marks omitted).  To the contrary, the work product was shared with aligned parties pursuant to a common-interest agreement.  And where there are "common interests on a particular issue against a common adversary, the transferee is not at all likely to disclose the work product material to the adversary."  *A.T.&T.*, 642 F.2d at 1299.  That is particularly so when the parties enter into a common-interest agreement, the entire purpose of which is to assure that they can exchange privileged matter without waiving the privilege.  There was no waiver here.

\*    \*    \*    \*    \*

For the foregoing reasons, we affirm the district court's grant of summary judgment to Georgia with respect to the two emails predating memorialization of the common-interest agreement, but we otherwise reverse the district court's grant of summary judgment.

*So ordered.*